MEMORANDUM OF LAW: CLAIM #6

### SUMMARY OF ARGUMENT # 6

Petitioner argues that the conviction was obtained as the result of evidence that is insufficient to persuade a properly instructed, reasonable jury of his guilt beyond a reasonable doubt. Petitioner's conviction was based on less than proof beyond a reasonable doubt of each and every element of the charged crime.

**ARGUMENT:**
**Assignment of Error #6**

Insufficient evidence.

### STANDARD OF REVIEW

The responsibility of jurors, in a trial by jury, is to determine the sufficiency or insufficiency of evidence presented during preceding in order to proclaim guilt or innocence of a defendant. A guilty verdict shall be rendered only if the evidence presented during trial is sufficient enough to persuade a properly instructed, reasonable jury of the defender's guilt beyond a reasonable doubt. <u>Jackson v. Virginia, 443 U.S. 307 (1979)</u>. In any instance that a defendant's conviction is based on less than proof beyond a reasonable doubt of each and every element of the charged crime, the court shall set aside the conviction and sentence, granting an evidentiary hearing to re-examine the evidence. <u>In re Winship 397 U.S. 358 (1970)</u>.

### Argument #6

Petitioner argues that evidence presented during trial, on behalf of the State, was not sufficient enough to persuade a properly instructed, reasonable jury of Petitioner's guilt. Subsequently, Petitioner's conviction was based on less than proof beyond a reasonable doubt of each and every element of the charged crime, which pertinently states:

Forcible Rape: Done by force, (of a man)

force (another person) to have sexual

intercourse with him against their will

(CT 1 R.S. 14:42.1)

Petitioner reenters this claim of ("insufficient evidence "), which was

originally presented in "direct appeal" by Appellate Attorney Katherine M..

Franks, based solely on the "interest of justice".

In support of said claim, Petitioner submits the initial report of C. Ben

[alleged victim], taken by Detective Greg Powell of the New Orleans Police

Department (NOPD). Within Detective Powell's Report, he writes, " on 01-16-

2012, approximately 12:15 p.m., Chanel Ben [alleged victim] called her sister

and informed her that she was kidnaped and she escaped from the men that

kidnaped her". Detective Powell responded to the location that C. Ben

advised that she was at. Once Detective Powell arrived at the location, C. Ben

advised him that she went outside as usual, and found an unknown bag on the

front porch behind the flower pot. C. Ben claimed, at that time, three (3)

masked men ran up to the porch, opened the door, and forced her into an

unknown red car, put something over her head, and drove her to an unknown

location. C. Ben stated that after a while, she was able to escape from her

captors and ran to a hotel" pg #6A para. #2 ln. #1 - #10).

After it was discovered that C. Ben was being untruthful, and that she had,

in fact, called a taxi service at approximately 7:45 a.m. the same morning,

Detective Powell approached C. Ben, and advised her that he had spoken with the

cab driver, whom was later identified as Mr. Elliot Flood. Mr. Flood informed

Page #43

Detective Powell that he picked up a young lady from 3801 Lennox Blvd. Mr. Flood said that the young lady went on to say that she was going to 1326 Hickory Street, Slidell, La., and informed him that she was a student at Dillard University and she worked at the Oakwood Mall. Mr. Flood said that he asked C. Ben who was she intending to pay the fare, which was eighty-five (85) dollars? Mr. Flood stated that the young lady said she was going to pay with a credit card, which was later discovered to be stolen from her mother's purse, and he asked to see some identification. Mr Flood said the young lady was already talking to someone on the phone, and he heard the young lady ask the person on the phone if they were going to pay for the cab fare. Mr. Flood said that a few minutes later, a man approached the cab, payed him the eighty-five (85) dollars cash, and the young lady got out of the cab (**pg. #6A para. #3 ln. #3 - #13**).

Detective Powell stated that C. Ben began to cry, then admitted that she had caught the cab to a man's house at 1326 Hickory Street, in Slidell, but said, "**they did not do anything**" (**pg. #6A para. #4 ln. #3**). Detective Powell's report was never introduced into trial, written nor oral. In fact, Petitioner submits an entry within the Supplemental Narrative Report, written and submitted into evidence by lead detective, Alvin Hotard of the Saint Tammany Parish Sheriff's Department, which states, "**...that a criminal patrol unit had not been dispatched to take an initial report**" (**pg. #6B para. #2 ln. #7 - #8**).

Next, Petitioner submits a separate entry within the same Supplemental Narrative Report which details one of three versions of the initial interrogation of Petitioner also written by Detective Hotard. It reads, Eaglin [**Petitioner**] advised that sometime in the morning on Monday, January 16, 2012, C. Ben [alleged

victim] arrived at his residence in a cab, which he was forced to pay because C.

Ben [alleged victim], had no money.  Upon seeing C. Ben [alleged victim] Eaglin

[Petitioner] asked her to see some identification, because he [Petitioner] thought

she looked younger than nineteen (19) years old (**pg. #6C para. #4 ln #6 - #9**).

Detective Hotard also stated that, Eaglin [Petitioner] advised that at no time did

he and C. Ben [alleged victim] ever engaged in any type of inappropriate or

sexual activities (**pg # 6C para. #4 ln. #14 - #15**).  This statement, which

Detective Hotard documented within his investigative report, collaborates with the

statements given to Detective Powell, by C. Ben [alleged victim].

To further support his claim of **"insufficient evidence"**, Petitioner presents

the trial testimony of C. Ben [alleged victim].  A section within the criminal

terminology pertaining to crime of **"forcible rape"** states, **"...the act of resisting**

**would not prevent the rape" (pg. #6D Oxford University Press)**.  During trial,

C. Ben [alleged victim] testified that Petitioner never threatened her in any

manner, nor did Petitioner display any item that may have been misconstrued or

identified as a weapon. C. Ben [alleged victim] also testified that (**after**) the

alleged incident had occurred, Petitioner exited his residence to greet an elderly

woman and three (3) minor children.  Both, C. Ben and the elderly woman

testified that Petitioner remained outside for approximately 25 to 30 minutes.

During this time, C. Ben [alleged victim] possessed ample time and opportunity to

exit the residence should she have felt that she was in any form of danger.

Furthermore, C Ben [alleged victim] did not make attempts to dial anyone to

extract her from Petitioner's residence, nor dial 911, despite testifying that she was

in possession of her cellular phone during the entire period of which Petitioner was

outside of the residence... over twenty-five (25) minutes.  In fact, C Ben [alleged

victim] stated that she exited Petitioner's residence and began walking down the street.  But, Petitioner caught up to her in his vehicle, asked her to get in so that he could bring her home, and she entered his vehicle upon her own will (**pg. 6E para. #2 ln. #4 - #8**).

In reviewing the actions of C. Ben, **in conjunction** with all of the various inconsistent statements given to two (2) separate law enforcement agencies, it is clear that less than proof beyond a reasonable doubt of each and every element of the charged crime had been proven by the "State.

C. Ben intentionality provided a false information regarding her social background and age to a social dating website.  Although this website permitted users thirteen years of age or older to join, C. Ben testified that she deliberately entered an incorrect date of birth (**pg. #6F para. #1 ln. # 2 - #3**).  In fact, should C. Ben have  entered her correct age in the website database, the website would have activated a default that would have prevented her from viewing Petitioner's profile.  Likewise, Petitioner would not have been able to view a profile that may have been created by the alleged victim.  After representing herself untruthfully on the website, C. Ben made plans to travel to Petitioner's residence, stole a credit card and cash money from her mother purse, and solicited a taxi service to transport her over forty(40) miles to meet Petitioner at his residence.  C. Ben and petitioner exchanged several text messages during the morning of the alleged incident (**pg. #6G**).  But, once C. Ben arrived at Petitioner's residence, it was obvious that C. Ben was not the age that she claimed to be, Petitioner asked her to see come identification, when she [**alleged victim**] could not , Petitioner told her that she had to leave his residence.  C. Ben gave testimony that she exited Petitioner's residence

**Page #46**

without any impediment, and began **walking** down the street, but claimed that

Petitioner caught up to her in his vehicle, and asked her to get in so that he could

take her home. C. Ben testified that she willing entered the vehicle with Petitioner,

but once Petitioner stopped at a **high volume convenience store,** she exited vehicle

and ran to an isolated hotel. "Then, c. Ben called her sister and told her that she

had been kidnaped by three (3) masked men. C. Ben was initially questioned by

Defective Greg Powell, of the New Orleans Police Department, and reiterated what

she had told her sister. Eventually, C. Ben's mother discovered that C. Ben had

used a taxi service, and informed Defective Powell of the information that she had

learned. Even when Detective Powell re-interviewed C. Ben, informing her that he

had spoken to the cab driver, and that the cab driver had offered the address of

which he had dropped C. Ben off to, C. Ben admitted to using the taxi service to go

to a man's house, but they did not do anything.

      C. Ben offered testimony, during trial, to the fact that Petitioner never made

any threats towards her, nor did he possess any items that may have been

interpreted as a weapon. C. Ben also testified, during trial, to the fact that

Petitioner exited the residence during the time that she was within the residence,

Petitioner remained outside for approximately twenty-five minutes (25). But C.

Ben did not make any attempts to exit the residence, call her family to extract her

from the residence, or dial 911... who would have traced her location. Also, C. Ben

testified that she eventually exited Petitioner's residence unrestricted, and began

walking down the street. But, Petitioner caught up to her in his vehicle and asked

her to get in so that he could take her home, she willingly entered the vehicle,

accompanying the same individual that she would later claim to have raped her.

Once C. Ben did get questioned by a member of law enforcement she began with a

lie of being kidnaped by three (3) masked men.  Then, after it was discovered that C. Ben had in fact, solicited a taxi service to travel to a man's house, she earnestly denied that anything had happened (**pg. #6A para. #4 ln. #3**).  Even once she did admit to having sexual intercourse with a man, C. Ben never made any claims of being **raped**, nor did she say that the man of which she had gone to see, was the Petitioner.

Also, the Saint Tammany Parish Crime Lab did not find any physical evidence, forensic evidence, or deoxyribonucleic acid to sustain a claim of **rape**. C. Ben testified that Petitioner did not make any threats towards her at any time. Also C. Ben testified that she exited Petitioner's house once she was ready.

The state did not provide any evidence to prove each and every element of the charged crime.  Petitioner's conviction is based on less than proof beyond a reasonable doubt of the charged crime.  Petitioner filed a motion to Enroll As Co-Council, in an attempt to provide the aforementioned evidence before the Court, but Petitioner's motion was denied (**pg. #6G**)

**MEMORANDUM OF LAW: CLAIM #7**

## SUMMERY OF ARGUMENT #7

Petitioner challenges the moral integrity of the pursuance of the charges against him.

**ARGUMENT:**
**Assignment of Error #7**

The integrity and morality of the charged crime is challenged due to the creditability of the Saint Tammany Parish District Attorney.

### STANDARD OF REVIEW

In reviewing the sufficiency of evidence presented by Petitioner, the Court must decide whether viewing the evidence in the light most favorable to Petitioner, any rational trier of fact could have found that Petitioner proved the essential elements of innocents beyond a reasonable doubt. **Jackson v. Virginia, 443 U.S. 307, 319, 99 S, Ct. 2781, 61 L. Ed. 2d 560, 573 (1979): State v. Mitchell, 99-3342 (La 10/17/00), 772 So 2d 78.** A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and it's determination will not be disturbed unless it is contrary to the evidence. **State v. Vessell, 450 So 2d 938 (La 1984).** However, where the evidence is so internally inconsistent or in conflict with the physical evidence, an irrational verdict should be set aside. **State v. Mussall, 523 So. 2d 1305 (La.1988).**

### Argument #7

Petitioner argues that the integrity of the charges for which he was convicted and sentenced to serve an eighty (80) year term of imprisonment without the benefit of parole, is subject to challenge due to the creditability of District Attorney Walter P. Reed. Petitioner was arrested on January 16, 2012, and charged with Forcible Rape. Petitioner's bond was set at one-hundred thousand (100,000)

dollars. On the 27th day of January 2012, Petitioner submitted a Motion for

Reduction of Bond, which was not heard by the Court until November 15, 2012.

Petitioner remained in jail writing to ascertain his status, until the District

Attorney's Office decided to file a Bill of Information on May 3, 2012. Petitioner

was placed on Court Docket for the 26th day of June 2012, but Petitioner was not

transported from jail. Therefore Court ordered for the matter to be continued to

July 24, 2012. Again, Petitioner was not transported from jail, and the matter being

on assignment for Felony Arraignment and hearing of Motion for 701 Release was

continued to August 6, 2012. On August 6, 2012, Petitioner was finally

transported to court, where he was advised that a Bill of Information had been

filed, and that the court ordered the Motion for 701 Release be moot. At that

point, Petitioner's Public Offender, John W. Hoque, III presented Petitioner with a

copy of the Bill of Information. Petitioner makes notice that the Bill of

Information is stamped and signed by Head District Attorney, Walter P. Reed.

But, Petitioner argues that Walter P. Reed, who is currently is the former Head

District Attorney's Office, is a convicted felon, which should cause his creditability

to be questioned. Petitioner submits documentation which shows that although

Walter P. Reed had not been convicted of felony charges at the time of his

conviction, Walter P. Reed was under investigation for the same felony charges of

which he was convicted (**pg. #7A - #7C**).

Petitioner argues that the idea of allowing an individual whom was under

investigation by law enforcement agencies for a substantial period of time, which

subsequently led to multiple felony convictions, to sit in for the Parish of Saint

Tammany as the undersigned head of the District Attorney's Office of the Twenty

Second Judicial District of Louisiana is severely unethical. Therefore, Petitioner

respectfully request that the conviction and sentence be sed aside.

MEMORANDUM OF LAW: CLAIM #8

## SUMMERY OF ARGUMENT #8

Petitioner was denied his constitutional rights, as it pertains to the Fourteen

Amendment, Section 1 of the United States Constitution, when State Appointed

Attorneys neglected to introduce evidence into trial that was favorable to

Petitioner's Defense, which may have created reasonable doubt of guilt to the jury.

**ARGUMENT:**
**Assignment of Error #8**

<u>Evidence favorable to defense not being introduced into trial</u> - Actual

innocence.

## STANDARD OF REVIEW

In reviewing the sufficiency of evidence presented by Petitioner, the Court

must decide whether viewing the evidence in the light most favorable to Petitioner,

any rational trier of fact could have found that Petitioner proved the essential

elements of innocents beyond a reasonable doubt. **Jackson v. Virginia, 443 U.S.**

**307, 319, 99 S Ct. 2781, 61 L. Ed. 2d 560, 573 (1979):  State v. Mitchell, 99-**

**3342 (La 10/17/00), 772 So 2d 78.**  A trier of fact's determination as to the

credibility of a witness is a question of fact entitled to great weight, and it's

determination will not be disturbed unless it is contrary to the evidence.  **State v.**

**Vessell, 450 So 2d 938 (La 1984).**  However, where the evidence is so internally

inconsistent or in conflict with the physical evidence, an irrational verdict should

be set aside.  **State v. Mussall, 523 So 2d 1305 (La.1988).**  Petitioner is actually

innocent of committing the charged crime; hence his procedural default cannot be

used to deny him right to have his habeas claim heard on the merits.  **Schlup v.**

**Delo, 513 U.S. 298 (1995).**

## Argument #8

On January 17, 2012, Petitioner was arrested and charged with Forcible Rape against C. Ben. Petitioner and C. Ben met on a social networking website referred to as "Tagged". C. Ben, Although thirteen (13) years of age, represented herself as a nineteen (19) year old female. Petitioner and C. Ben communicated through e-mails and text messages for several days, until January 15, 2012, in which C Ben made plans to travel to Petitioner's residence the following day.

The New Orleans Police Department (NOPD) reported that, on Monday, January 16, 2012 at about 9:09 a.m. Officer Derrick Banks (NOPD) was dispatched to investigate a signal 21J, relative to a missing/runaway juvenile at 3801 Lennox Blvd. (alleged victim's residence) **(pg. #8A para. #1 ln. #1 - #2).**

Upon arrival, the officer met with reporting person, Edna Ben, who was the mother of the missing runaway juvenile. Edna Ben advised that at approximately 8:00a.m.., C. Ben informed her that she wanted to start jogging. Edna Ben stated that after a few minutes later, she heard a vehicle horn blow and the front boor of her residence opened. Edna Ben stated that she looked out her window and notice that the vehicle was gone, and C. Ben was no where in sight. Edna Ben said that she drove around looking for C,. Ben, but did not locate her. Edna Ben notified police, advising them that she continued to try and reach C. Ben on her mobile phone, but there was no reply **(pg. #8A para. #2 ln. #1 - #8).**

Within the report of the First Responder, Detective Greg Powell of the New Orleans Police Department (NOPD), it states that on January 16, 2012, at approximately 12:15 p.m., C. Ben called her sister and informed her that she had been kidnaped by three (3) masked men, but somehow she managed to escape. C.

Ben also told her sister that she was at a hotel located at 7001 Bullard Avenue in New Orleans. C. Ben's sister in turn notified police, whom traveled to the location C. Ben specified (**pg. #8B para. #2 ln. #1 - #10**).

Detective Powell arrived on scene, and began questioning C. Ben. C. Ben reiterated the same version of events that she told her sister. But as Detective Powell questioned C. Ben, her mother examined her mobile phone and advised that she discovered a phone number belonging to a taxi service. Defective Powell contacted the taxi service and spoke to Elliot Flood (**cab #146**), who advised that he picked up C. Ben and drove her to 1326 Hickory Street in Slidell, Louisiana. Detective Hotard approached C. Ben with this information. C. Ben admitted that she had taken a taxi to a man's house but nothing happened. Detective Powell continued questioning C,. Ben in the presence of her mother. Eventually, C. Ben began to cry, and informed her mother that she had sex with a man who she "**would not or did not want to identify**". Edna Ben then transfer C. Ben to Children's Hospital for evaluation (**pg. #8B para. #4 ln. #1 - #6**).

At this point, the Saint Tammany Parish Sheriff's Department was notified. Detective Alvin Hotard and Detective Rachael Smith, both of the Saint Tammany Parish Sheriff's Department arrived at the children's Hospital and began conducting interviews. During the interview with C. Ben, Detective Hotard and Smith documented that C, Ben advised them that she had traveled to petitioner's residence on January 16, 2012. At some point, Petitioner forced himself onto her. During the act a vehicle pulled into Petitioner's driveway. Petitioner went outside to greet an elderly woman and three (3) minor children. C. Ben claimed that she attempted to dress, but before she would finish, Petitioner returned inside of the

residence and forced himself on her again.  Eventually, she exited the residence

and began walking down the street.  C. Ben claimed that Petitioner got into his

vehicle, caught up to her, and asked her to get inside so that he could bring her

home.  C. Ben entered the vehicle, but once Petitioner stopped at a convenience

store in New Orleans, she exited the vehicle and ran to a nearby hotel, where she

called her mother (**pg. #8C para. #5 ln. #4 - #14**) (**pg. #8D para. #1 - #2 ln. #1 -
#4 & #1 - #10**).

   Petitioner argues that the entire narrative written by the Saint Tammany

Parish Sheriff's Department is false, and the charges against him are invalid.  In

support of a claim to **"actual innocence"** Petitioner offers the following evidence

before the Court.  First, in reviewing the report written by Detective Greg Powell

of the New Orleans Police Department (NOPD), who was the first member of law

enforcement to come into contact with C. Ben, it shows that C,. Ben made several

provision to ensure that she accomplished exactly what she intended to do on

January 16, 2012.  C. Ben entered her mother's bedroom early that morning, not to

ask for permission to go jogging, but to make sure that her mother was still in bed.

Within the Modus Operandi printed by NOPD, it reads that, **"shortly after C. Ben
exited her mother's bedroom, Edna Ben heard a vehicle horn blow, and the
front door of her residence open"**.  When Edna Ben looked out of her window,

C. Ben was no where to be found.  This statement suggest that C, Ben had

previously called the taxi service and packed a bag prior to entering her mother's

bedroom (**pg. #8A para. #2 ln. #1 - #8**).  NOPD reported that C. Ben called her

sister at approximately 12:15 p.m., same date, and informed her that she had been

kidnaped by three (3) masked men but managed to escape.  Once law enforcement

arrived, C. Ben offered the same story.  Although it was discovered that her

statements were false, C. Ben refused to offer Petitioner's name as the man she traveled to meet.  Despite having Petitioner's name, address, phone umber, and picture inside of her mobile phone, C. Ben did not mention Petitioner's name or the word "Rape".  The report, written by Detective Powell, was not introduced at trial (**pg. #8B para. #4 ln. # 1 - #6**).

Within the interview of C. Ben taken by Detective Hotard of the Saint Tammany Parish Sheriff's Department, Detective Hotard documents several statements, assumed to be that of C. Ben's that are questionable, and favors Petitioner's argument.  C. Ben testified during trial, that during the time of the alleged incident, Petitioner exited his residence, and remained outside speaking with an elderly woman and three (3) minor children for approximately twenty (20) minutes.  During trial, C. Ben and the older woman testified to that fact (**pg. #8C para. #5 ln. # 11 - #14**).  C. Ben did not make any attempts to exit the residence.  Although C. Ben testified to having her mobile phone in her possession throughout the entire time Petitioner remained outside, she did not attempt to call 911 or her family to extract her from Petitioner's residence.

Detective Hotard also documented C. Ben stating, **"subsequently, she exited Petitioner's residence and began walking down the street.  Petitioner caught up with her in his vehicle and asked her to get in so that he could bring her home, and she got into the vehicle"**.  But, law enforcement neglected to question C. Ben as to why would she get into a vehicle freely with an individual that she claimed just committed "Rape" against her (**pg. 8D para. #2 ln. #4 - #6**).

In continued support of this claim, petitioner presents three separate entries within the Narrative Report written by Detective Alvin Hotard of the Saint

Tammany Parish Sheriff's Department, which describes three (3) completely

different versions of the initial interrogation of Petitioner, done by Detective

Hotard. In the first version, its reads, "<u>After being advised of his Rights per</u>

<u>Miranda, Keefer [Petitioner] provided Detective Hotard with a short account</u>

<u>of what occurred at 1326 Hickory St. (Petitioner's Residence) on January 16,</u>

<u>2012. Detective Hotard found Keefer's statement to be supportive of what the</u>

<u>victim reported, acknowledging that she was present at his residence with him</u>

<u>on said date</u>. Keefer refused to answer any questions relative to having sexual

intercourse with the victim stating "**that he had been down this road before and**

**wanted an attorney**". Keefer was subsequently charge accordingly per the issued

arrest warrant for the offense of forcible rape. Keefer was then transported to the

Saint Tammany Parish Jail by uniform personnel and booked according (<u>pg. 8E</u>

<u>para. #7 ln. #1 - #7</u>).

   But in the second version it reads, "<u>After being advised of his Rights per</u>

<u>Miranda, Keefer Eaglin [Petitioner] provided Detective Hotard with a short</u>

<u>account of what occurred at 1326 Hickory St. On 01/16/2012. Detective</u>

<u>Hotard found Keefer's statements to be supportive of what the victim</u>

<u>reported. Keefer was subsequently charged accordingly per the issued arrest</u>

<u>warrant for the offense of forcible rape. Keefer was then transported to the</u>

<u>St. Tammany Parish Jail by uniform personnel and booked accordingly</u>" (<u>pg.</u>

<u>#8F para. #5 ln. #1 - #6</u>). In comparison, these two version are identical... except

for the omission of Petitioner's request for an **attorney**. The fact these entries are

so similar on two entirely different documents suggest that the missing lines were

omitted intentionally.

Within the same report, Detective Hotard documents an entirely different

third version of his initial interrogation of Petitioner.  It reads, **"Eaglin [Petitioner]**

**advised that he met C. Ben through a website called, "Tagged" and according**

**to her profile, she was nineteen (19) years old.  Upon meeting each other they**

**chatted on line for three or four days, until Sunday January 15, 2012 when**

**they spoke over the phone,.  Eaglin advised that during the conversation, they**

**planned to meet at Eaglin's residence the following day, Monday, January 16,**

**2012 and C. Ben advised she would drive there.  Eaglin advised that sometime**

**in the morning on Monday, January 16, 2012, C. Ben arrived in a cab, which**

**he was forced to pay for because C. Ben had no money.  Upon seeing C. Ben,**

**Eaglin asked her to see some identification, because he thought she looked**

**younger than nineteen (19) years old.  When C. Ben could not provide any**

**identification, Eaglin told her to get into his car because he was going to take**

**her back home to the West back of New Orleans.  Upon driving there on**

**Interstate 10, Eaglin advised he stopped at a gas station, and during that time,**

**C. Ben ran off, but he did not know where C. Ben ran off to.  Eaglin than**

**drove back home.  Eaglin advised that at no time did he and Ben ever engage**

**in any type of inappropriate or sexual activities".**  This particular entry displays

a date of 02/15/2012, approximately an entire month after the day in question, but

offers a significantly different version of the interrogation conducted by Detective

Hotard (**pg. #8G para. #4 ln. #1 - #15**.

Detective Hotard's inconsistencies continues throughout his entire report.

At one point, Detective Hotard quotes C. Ben as stating, **"Once Keefer**

**[Petitioner] stopped raping the victim, she subsequently got dress and told him**

**her real age (pg. 8H para. #3 ln. #4 - #5)**.  But within the same report, Detective

Page #58

Hotard writes, **"C. Ben advised that at no time did she tell Keefer [Petitioner] how old she was, or did they ever discuss age" (pg. #8D para. #3 ln. #1 - #2)**. Detective Hotard also provides several conflicting versions of C. Ben's actions. Within the first entry provided by Petitioner, Defective Hotard writes, **"Once in the vehicle, Keefer [Petitioner] drove to a gas station in New Orleans East, at which time the victim exited the vehicle and ran to a local hotel, where she called her mother and sister, who called the police" (pg. #8H para. #3 ln. #8)**. In the following entry, Defective Hotard interviews Lisa Lupin, RN at Children's Hospital, quoting her as stating, **C. Ben had called 911 and her mother from a hotel in New Orleans East and advised that she had been Kidnaped and raped in Slidell, Louisiana (pg. 8I para. #6 ln. #1 - #5)**.

In further support of Petitioner's claim of actual innocence, Petitioner offers documentation pertaining to Edna Ben, the mother of C. Ben.  First, Petitioner offer the written report of Detective Greg Powell of the NOPD.  In it's first paragraph, it reads, on 01/16/2012 **at approximately 9:45 a.m.**, the reporting person, Edna Ben, reported her daughter, C. Ben missing or as a runaway (**pg. #8B para. #1 ln. #1 - #2**).  But, in the written report of Detective Alvin Hotard of the Saint Tammany Parish Sheriff's Department, it reads, **"E. Ben stated that on the morning of Monday, January 16, 2012, at approximately 7:50 a.m., she heard the front door of her house open and close, and realized that her daughter, C. Ben had left the residence" (pg. #8D para. #5 ln. #1 - #3)**.  These two statements would imply that Edna Ben waited almost two (2) full hour to contact police in regards to her thirteen (13) year old missing or runaway daughter in the city of New Orleans.

Furthermore, Petitioner claims that although he did know of Edna Ben, she

Page #59

was well aware of him.  In support of this statement, petitioner offer an entry within Detective Hotard's report that narrates his interview with Edna Ben.  Detective Hotard writes, **"At the conclusion of the interview with C. Ben, the detective relocated to the second floor waiting room where Edna Ben was located.  Upon their arrival to the waiting room, the detectives introduced themselves to Edna Ben and explained their presence to her (pg. #8D para. #4 ln. #1 - #5)**, this implies two distinctive facts.  First, the Saint Tammany Parish Sheriff's Department questioned a thirteen (13) year old female with consent or acknowledgment of her parental guardian.  Second, that prior to their questioning, C. Ben had not made any claims of being raped... giving cause to the detectives need to explain their presence.  During their interview with Edna Ben, the detective asked her **"if she had ever heard of an individual named "Keefer".  Edna Ben then advised that she thought "Keefer" was a nineteen (19) year old black male and that she had seen his picture on a computer website called "Tagged".** Edna Ben Further stated that **"C. Ben had "Keefer" contact information in her phone along with a picture of him" (pg. #8J para. #3 ln. #1 - #5)**.  This statement made by Edna Ben verifies that she was aware of her thirteen (13) year old daughter soliciting men that she knew to be older than herself and aided in her actions by not notifying law enforcement.  In fact a **family member** of C. Ben called Petitioner's mobile phone at approximately 8:00 p.m. on the day in question stating that **"all of this can go away, but its up to you,"** and hung up the phone.  This call being placed to Petitioner's phone is evident within Petitioner's mobile phone log (**pg. #8K ln.#11**).  Petitioner made an attempt to call the unfamiliar phone number back, but the call went unanswered (**pg. #8L ln. #5**).

Finally, Petitioner argues that the actions, of which the State claims that

Petitioner performed during the alleged commission of the crime was physically impossible for Petitioner to conduct.  In support of this statement, Petitioner provided medical records and documentation, belonging to Petitioner, which dates from July 14, 2010 to March 3, 2012.  This documentation offers written commentary and ultrasound imaging proves that Petitioner was legally bind before, during, and after the day in question.  Petitioner suffers with retinal detachment and glaucoma as a result of Type I **(Insulin Dependent)** diabetes, which he was diagnosed with since April 5, 1998 **(pg. #8M - #8Z)**.  Therefore, it is incomprehensible to believe C. Ben's statement of Petitioner operating a motor vehicle to drive her in excess of forty (40) miles over a congested interstate to a hotel.

In Fact, Petitioner was schedule of eye surgery on Thursday, January 19, 2012, two (2) days after his arrest.  In addition, Petitioner offers medical documentation from Vera Williams, APRN at Bogalusa Medical Center, which explains through commentary and diagrams, that Petitioner did not have any feeling in either of his feet **(pg. #8U)**.  This document displays the date of December 13, 2011, approximately one (1) month prior to Petitioner's arrest.  This documentation discredits the claim of Petitioner driving over forty (40) miles on a congested interstate that was claimed by the State and C. Ben.  During trial, Petitioner wore coverings over each of his eyes and C, Ben testified that petitioner had made her aware of his vision impairment prior of her traveling to Petitioner's residence.  In reviewing the medical documentation provided by Petitioner, it is obvious that Petitioner was physically unable to preform the actions claimed by the State.

In reviewing the entirety of the evidence provided by Petitioner, it is clear to see and understand that validity is given to Petitioner's claim of "**<u>actual innocence</u>**", and should not be ignored.  C. Ben represented herself as a nineteen (19) year old female on a social networking website with the intentions of luring older men.  Had C. Ben entered her correct age, the website would not have allowed either C. Ben, nor Petitioner to view each other profile page.  As stipulated on page **<u># 1 paragraph #1</u>** of the "Terms of Service" booklet of the "Tagged" website (**<u>pg. #8AA para. #2 ln. #2 - #3</u>**).  Once C. Ben's plans to "leave home" failed to go accordingly, she began constructing lie after lie in an effort to avoid punishment from a mother whom she labeled as "strict".  During trial procedure, C. Ben's mother, Edna Ben admitted to having knowledge of Petitioner (**<u>pg. #8J para. #3 ln. #1 - #5</u>**), but never notified police, suggesting that Edna Ben was aiding in her daughter's behavior.  Once C. Ben was interviewed by officers from the Saint Tammany Parish Sheriff's Department without acknowledgment, awareness, or consent of her parental guardian, and did not have any other convincing stories to tell, the claim of **"Rape"** developed.  The report taken by first responder, Detective Greg Powell of the New Orleans Police Department, was deliberately omitted from the investigation intentionally, allowing Saint Tammany Parish Officers to orchestrate a frivolous investigation to ensure Petitioner conviction.  But, Detectives from Saint Tammany Parish was not aware of Petitioner's physical conditions until the starting day of trial.  The fact is, Petitioner was physically unable to perform the actions claimed by the State.

This fact, in compilation of all the evidence provided gives validity to Petitioner's claim of **"actual innocent"**.  The evidence provided reflects that the allegations made by C. Ben are false, and her statement were intentionally and precisely

orchestrated to obtain a false conviction of Petitioner.

Detective Hotard also quotes Edna Ben as stating that **"later in the afternoon around 2:00 p.m., Edna Ben received a phone call from C. Ben. During the conversation, C. Ben advised that she was at a hotel in New Orleans East, and had been kidnaped" (pg. #8D para. #6 ln. #1 - #3)**.  But, according to Detective Powell's report, and New Orleans Police Department Dispatch, C. Ben called her sister at approximately **12:15 p.m.**, same day (**pg. 8B para. #2 ln. #1**).  In addition, Detective Hotard quotes Lisa Lupin, RN, at the Children's Hospital as stating, **"C. Ben had been brought to the hospital at approximately 2:00 p.m. by her mother, Edna Ben (pg. #8I para. #6 ln. #1 - #3)**.

Also, supporting the claim of **"actual innocense"**, Petitioner submits the evidence receipts of items taken from Petitioner's and his person.  In reviewing Detective Hotard's report, Detective Hotard documented C. Ben stating that **"Once her clothes were off, Keefer began "raping" her, forcefully putting his penis into her vagina against her will"**.  C. Ben claimed that this incident occurred on Petitioner's bed.  As indicated on the evidence receipts provided by Petitioner, Saint Tammany Parish Law Enforcement confiscated the following items as they conducted a search warrant of Petitioner's residence;

(CL - 1) One (1) comforter - color :  grey
(CL - 2) Two (2) pillow cases
(CL - 3) One (1) comforter - color : brown
(CL - 4) Two (2) pillow cases
(CL - 5) One (1) Fitted sheet - color : red
(CL - 6) One (1) pair of sweat pants - color : grey
(CL - 7) One (1) tank top - color : brown
(CL - 8) One (1) baseball cap - color : brown
(pg. #8BB)

Page #63

All of these items went through analyzation for C. Ben's DNA, but each item returned negative for C. Ben's DNA. These items also returned negative results to any fibers from C. Ben's clothing, suggesting that C. Ben was never on Petitioner's bed. Detectives also did not locate any of C. Ben's DNA on Petitioner's person. In fact, the only evidence of DNA presented during trial, was a **"minor"** trace of Petitioner's DNA located on a sample of C, Ben pubic hair. But, C. Ben admitted in trial, that she had used Petitioner's bathroom. The DNA analysis called by the State, stipulated to be an expert in her field of study, gave testimony acknowledging that C. Ben may have acquired this **"minor"** trace of Petitioner's DNA by simply sitting on the toilet bowl of Petitioner's residence. Petitioner submitted a Motion into the Twenty-Second (22nd) Judicial District Court, requesting to Enroll as Co-Counsel, so that he could present the aforementioned facts before the court, but said motion wad denied by the Court (**pg. #8CC**).

SUPPLEMENTAL BRIEF

## INDEX

1.) Memorandum of Law for Claim #2.................................................Pg.  1-3

2.) Memorandum of Law for Claim #3.................................................Pg.  4-5

3.) Memorandum of Law for Claim #4.................................................Pg.  6-8

4.) Memorandum of Law for Claim #5.................................................Pg.  9-10

5.) Memorandum of Law for Claim #6.................................................Pg.  11-13

6.) Memorandum of Law for Claim #8.................................................Pg.  14-17

Prayer.........................................................................................Pg.  18

SUPPLEMENTAL BRIEF:  CLAIM  #2

<u>SUPPLEMENTAL BRIEF FOR CLAIM #2</u>

Petitioner argues that his constitutional rights, as it pertains to Section 2 of the La. Consta. and the Fifth Amendment of the United States Constitution, was violated when Petitioner was convicted upon the use of physical and mental coercion.  Merit is created to Petitioner's claim upon viewing the documented facts obtained throughout the course of the investigation.

First, C Ben [alleged victim report that she had been kidnapped by three (3) masked men, had a bag put over her head, thrown into a red car, and driven to an unknown location. (Ref. Pg.#2G Para.#2 Ln.#7-10)  during the same moment of questioning, C Ben changed her initial statement, and told police that she had in fact,"used a cab service to transport her to a man's house at 1326 Hickory Street, in Slidell, Louisiana, but they did not do anything." (Ref. Pg. #2G Para.#4 Ln.#3)  Only minutes later, during the same moment of questioning, C Ben changed her statement once more, stating "that she did have sex with the man, whom she did not or would not identify. (Ref. Pg.#2G Para. #4 Ln.#4-4 PCR)  In comparison to the several conflicting statements given by C Ben, Detective Alvin Hotard,of the Saint Tammany Parish Sheriff's Department, quotes Petitioner as stating, "at no time did he and Ben ever engage in any type of inappropriate sexual activity." Ref Pg.#2F Para.#4 Ln.#14-15 PCR)  As noticed,this statement is consistent with the initial statement made by C Ben, that was documented by Detective Greg Powell Of the New Orleans Police Department (NOPD), whom was the member of law enforcement to come into contact with C Ben.  Petitioner also makes notice that C Ben had still not made any allegations being threatened, harmed, or raped during the entire interview with Detective Powell.

In Saint Tammany Parish Departments second documented version of Petitioner's initial interview, Detective Hotard clearly documents that Petitioner maintained his position of innocence by stating, "Keefer [Petitioner[ refused to answer any questions relative to having sexual intercourse with the victim...(Ref. Pg. #8E Para.#7 Ln. @3-4 PCR)  In fact, the allegation of rape was

①

not introduced until Detective Alvin Hotard and Detective Rachel
Smith, also of the Saint Tammany Parish Sheriff's Department inter-
viewed C Ben in the hospital room, without the presence of a par-
ent, guardian, or parental figure present.  This fact is evident
within the investigative  report written an d submitted into
evidence by Detective Hotard, which states, "At the conclusion
of the interview with C Ben, the detectives relocated to the
second floor waiting room [from ground level] to where Edna Ben
[alleged victim's mother] was located. (Ref. Pg.#8D Para.#4 Ln.
#1-5 PCR)  it continues to state that, "upon there arrival to the
waiting room, the detectives introduced themselves to Edna Ben
and explained their presence to her. (Ref. Pg.#8D Para.#4 Ln.#2-4
PCR)  This statement would suggest that Edna Ben was aware of any
allegations of rape at this point.  It is also suggested that the
two detectives not only used this moment of opportunity to formu-
late the narrative of rape with C Ben, but that C Ben cooperated
with this narrative as an effort to avoid punishment from her
mother, whom she [C Ben] described as being a "mean Person" during
her trial testimony.

Furthermore.merit is offered to Petitioner's claim of
coercion in reviewing each piece of medical documentation pro-
vide by Petitioner.  These documents are furnished by several
different medical institutions, Including: Ochsner Optometry
Clinic, Louisiana State University Medical Clinic, and The Internal
Medical Association of New Orleans.  Each document provided ex-
plains that: 1.)Petitioner suffered from glaucoma and detachment
of the retina in both eyes (Ref. Pg.#2I-2Z1) ; and 2.) that Pet-
itioner had been diagnosed with lack of sensation in the bottom
of both feet as of 12/13/11, which was approximately one (1)
exact month prior to the day in question. (Ref. Pg.#4Z PCR)
Petitioner brings the Court's attention to the dates indicated
on each of these documents, which dates as far back as 07/14/12
and continued long after Petitioner's arrest.  Therefore, it
would have been impossible for Petitioner to perform the actions
of operating a motor vehicle and driving over forty (40) miles
across a dense interstate, as C Ben had claimed.  In fact, C Ben

②

testified that she was aware of Petitioner's vision impairment dur-
ing her trial testimony.

Finally, Petitioner submits a copy of an evidence receipt,
which was introduced into trial proceeding by the State.  This
receipt offers a list of items that were supposedly seized from
Petitioner's residence on the 16 day of January 2012.  But in
reviewing all the evidence provided,it is clear to conclude that
this too would be considered impossible to have taken place, due
to the fact that law enforcement did not come into contact with
Petitioner until the 17th day of january 2012, at approximately
2:00 am.  Petitioner suggest that this error was made as Detective
Hotard attempted to "cover-up" the many undocumented visits that
he and other members of the Saint Tammany Parish Sheriff's Depart-
ment to Petitioner's residence, conducting threats of violence
and removal of Petitioner's son from the household.

In viewing each of these facts that Petitioner has provided
to the Curt, more than enough merit is proclaimed to support Pet-
itioner's claim of coerced testimony.  Therefore Petitioner
humbly request that the grants relief to Petitioner's applica-
tion.

SUPPLEMENTAL BRIEF:  CLAIM  #3

## SUPPLEMENTAL BRIEF FOR CLAIM #3

In Claim #3, Petitioner argues that his constitutional rights, as it pertains to Section 18 of the La. Consta. and the Eighth Amendment of the United States Constitution, was violated when excessive bail was placed upon Petitioner by a judge within the Twenty- Second (22) Judicial District, whom was not the trial judge assigned to Petitioner's case.  As stated in the original memorandum to Claim #3, Petitioner's bond amount was originally set at one-hundred thousand (100,000) dollars.  On Monday. August 5, 2013, approximately (19) month after the date Petitioner was charged, and (13) days prior to the completion of Petitioner's imposed probation revocation sentence, Petitioner's bond amount was significantly increased from the Original amount to five-hundred thousand (500,000) dollars, by Judge William J. Burris. No just cause was ever provided to Petitioner or Defense Cousel to explain the reasoning for the increase.  The La. Const. Section 18 and the Eighth Amendment to the United States Constitution pro-hibits the sanction of excessive bail.  A similar issue was address-ed State v Nance, 315 So. 2d. 695,698 (La. 1975), of which a North Dakota resident was charged with a crime of violence that carried a potential term of ninety- nine (99) years of incarceration. Nance's bail had been reduced significantly, but counsel urged that it was still too high.  Citing C.CR. P. Art 317, the review-ing found no abuse of discretion on the part of the trial judge in denying the further reduction of Nance's Bail amount.  Petit-ioner submitted an Application For The Reduction Of BOnd on the 27th day of January 2012which was filed by the 22nd Judicial Court on the 27th day of January 2012. (ref. Pg.#3B PCR) A Notice of Assignment was mailed to Petitioner indicating the 3rd day of February as the date for this hearing to be held (Ref. Pg.#3C PCR)  Not only was Petitioner not transported to court on that day, but the hearing never took place.  In fact the hearing was delayed for approximately nineteen (19) months. Eventually, . the application was addressed by the Court on the 18th day of November 2013, approximately three (3) days before the beginning date of trial.  At this time, Petitioner had not been informed

to add page

that the bond amount had been increased.  But, on this date, Defense Counsel withdrew the motion.  In the State's response to Petitioner's Post-Conviction Application, The State admits that the record is not clear as to why the increase was requested, or whom had initiated the request (Ref. Pg.#5 Para.#6 Ln.#1-12, Pg.#6 Para.#1 Ln.#1 of State's Response), but claims that regardless of the bond amount, Petitioner could not have bonded out until Petitioner's revocation sentence was completed.  Records show that Petitioner's revocation sentence was completed on August 24,2013,

which made Petitioner eligible for bond.  The Court failed to Petitioner and Defense Counsel of the bond increase, or it's reason.  Section 13 of the La. Consta. and the Sixth Amendment of the United States Constitution grants Petitioner the right to counsel of his choice.  This right was violated by the Court's sudden and unexplained actions of increasing Petitioner's bond amount.  Obviously, the Court was aware that Petitioner would not be able to secure such increased bond amount so close to the start of trial because Petitioner had submitted an Application For  Bond Reduction over nineteen (19) months ago.  The sudden increase in the bond amount did not afford Petitioner sufficient time to acquire counsel of his choice.  It is clear that Honorable Judge William J. Burris intently abused his discretion in increasing Petitioner's bond amount so drastically and so suddenly.

For the reason listed above, Petitioner humbly request that his petition for relief be granted.

SUPPLEMENTAL BRIEF: CLAIM #4

## SUPPLEMENTAL BRIEF FOR CLAIM #4

In Claim #4, Petitioner argues that Defence Counsel demonstrated an ineffectiveness of adequate representation throughout the trial process.  Petitioner intends to present merit to this claim by outlining the ineffective actions of Trial Counsel.

First, Petitioner was not introduced to his State Appointed Counsel until the 24th day of JUly 2012. (Ref Pg.#4A PCR)  Petitioner was never arraigned on the charges.

Second, Defense Counsel demonstrated a lack of awareness in regards to prior court proceedings that taken place before trial defense was assigned to represent Petitioner.  State Appointed Trial Attorney. Olivier Carrire failed to consult with any of the previously assigned attorneys within the Public Defender's Office (PDO).  This fact is evident when reviewing the Court MInutes dated November 18,2013, Which quotes Defense COunsel as stating, "they did not know of the proceedings until Wednesday, November 13, 2013," less than two (2) weeks before the beginning date of trial. On that same day, instead of requesting a continuance so that he may be informed of any court proceeding that he was not aware of, Mr. Carriere Withdrew Petitioner's Application For Reduction Of Bond, and proceeded with a Preliminary Examination that he had not summoned any witness on behalf of Petitioner.  Petitioner argues that Defense Counsel's lack of awareness regarding these issues severely hindered Petitioner's defense.

Third, Defense Counsel failed to investigate any of the conflicting issues surrounding the case. (Wiggins v Smith, 539 U.S. 510 (2003)  New Orleans Police Department (NOPD) dispatch documented that C Ben [alleged victim] was located a hotel in New Orleans East.  Defense Counsel did not make any attempts to speak with any of the employees who were working at the hotel on the day in question.  Considering the circumstances: C Ben packing a bag of clothing; stealing a credit card and cash from her mother's purse: initially claiming that she had been kidnapped; and then eventually claiming that she had been raped, it would have been appropriate for Defense Counsel to at least attempt to question employees of the hotel to see if perhaps C Ben was with anyone

else at the hotel, or if C Ben may have had a room at the hotel. ALthough C Ben stated that she was present within Petitioner's residence at some point on the day in question, C Ben also told Saint Tammany Parish Detectives that, "Keefer [Petitioner[ subsequently let her leave the residence anyway.  At that time, C Ben followed him[Petitioner[ to his car, but walked pass him down the street.  (Ref. Pg.#6E Para.#2 Ln.#5 PCR)

 Defense Counsel also failed to summon several potential key witness that may have been extremely beneficial to Petitioner's defense.  Defense Counsel did not attempt to summon Detective Greg Powell, of the NOPD, whom was the first member of law enforcement to come into contact with C Ben and conduct an interview with C Ben.  Detective Powell was the first individual to document a statement from C Ben.  Petitioner reminds the Court that C Ben initially reported that she had been <u>kidnapped.</u>  Then C Ben stated that she had traveled to a man's house, but <u>they did not do anything</u>.  Then C Ben stated that she did have sex with the man, but <u>did not or would not identify him</u>.  The relevance of summoning Detective Powell speaks to the credibility of the alleged victim.  Without Detective Powell's testimony, no one can attest to the method of questioning used by Detective Powell, which caused C Ben to develop so many different versions of what actually took place on the morning in question.  This also allowed the Prosecution to enter a "hear-say" testimonial of Detective Powell's report in a more favorable manner for the State.

     Defense Counsel also failed to Summon Mr. Elliot Flood, whom was driver of the cab that transported C Ben to Petitioner's residence on the day in question.  Mr. Flood had told Police that C Ben advised him that she was a nineteen (19) year old college at Jackson University.  Mr. Flood also told Police that C Ben attempted to pay the cab fare with a credit card that he would not accept .  Again, the relevance of summoning this witness speaks to the credibility of the alleged victim.  It also demonstrates the lengths taken by the alleged victim to protect the identity of Petitioner.

Defense Counsel also failed to to summon Trevon Eaglin, Petitioner's thirteen (13) year son, whom was the only other individual inside of the residence during the time of the alleged incident.  On the morning of Petitioner's arrest, Detective Hotard interviewed Trevon. (Ref. Pg.#4J Para.#1 Ln.#1-6 PCR)  Petitioner submits a notarized affidavit, written By Trevon Eaglin, which details his version of events on the day in question. (Supplemental Evid.#1)

Finally, Petitioner argues that Defense Counsel significantly demonstrated an ineffectiveness of inadequate representation during trial, by not presenting factual evidence into Court that may have exonerated Petitioner.  Within Claims #2, #4, and #8. Petitioner presented medical documentation, which illustrated that at the time of the alleged incident, Petitioner had been diagnosed with glaucoma and retina detachment in both of his eyes. (Ref. Pg.#4L-4Y PCR)  These documents also describe that Petitioner also suffered from lack of sensation in the bottom of both of his feet. (Ref. Pg.#4Z 12/13/11)  The dates on these documents are approximately One (1) month prior to the date of the alleged incident.  Therefore, IN alliance with CLaims #2 and #8, it would have been impossible for Petitioner to perform the actions claimed by the alleged victim.  At the time of trial, Defense Counsel was in possession of these documents in it's entirety. The production of these documents, by Trial Counsel, may well have suggested reasonable doubt as to Petitioner's guilt.

In reviewing all the facts presented by Petitioner, it is clear that Defense Counsel so utterly failed to defend against the charges, that the trial was the functional equivalent of a guilty plea, rendering Counsel's representation presumptively inadequate. (U.S. v Chronic, 466 U.S. 648 [1984])  For the aforementioned reasons, Petitioner humbly request that relief be granted to this Claim.

June 20, 2017

I, Trevon Eaglin, was present within the residence located at 1326 Hickory Street, in Slidell, Louisiana 70460, on the date and during the time of the alleged incident, which was said to have happened on the 16th day of January 2012.

I was asleep in my room, which is located approximately four (4) to five (5) yards from my father's room. During the time of the alleged incident, I did not hear any noises being made that would have indicated that anyone was in any type of danger or harm.

Trevon Eaglin

Signed this 30th day of June, 2017.

SUPPLEMENTAL BRIEF:  CLAIM  #5

## SUPPLEMENTAL BRIEF FOR CLAIM #5

In Claim #5, Petitioner argues that the State used the per-
jured testimony of Detective Alvin Hotard and Sergeant Brian
O'Cull in order to secure a guilty verdict in Petitioner's trial.
During Trial, both Officers were asked, "did Petitioner ever re-
quest the presence of an attorney prior to questioning?"  Both
Officer's answered,"NO," while under oath.  The State argues that
this Claim has no merit.  But the merit pertaining to this Claim
is dependent on proving that the Officers committed perjury under
oath, and the relevance of the perjury.  The relevance of the
Officer's answers are first presented within Claims #1 and #8 of
Petitioner's Post-Conviction Memorandums.  In Claim #1, Petition-
er argued that the Saint Tammany Parish Sheriff's Department (STPSD)
obtained a recorded statement from Petitioner through the means
of physical and mental coercion, and in violation of Petitioner's
right to have Defense Counsel Present during questioning.  In the
State's response to Petitioner's Post-Conviction Application, the
State admits that, "Petitioner invoked his right to Counsel dur-
ing the initial investigation, and all discussion ceased at that
time. (Ref. Pg.#12 Para.#4 Ln.#5-5 of State's Response)  But, the
State insist that, Petitioner did not ask for an attorney, but
declared that he would not talk to Officers without Counsel be-
ing present.  But, in reviewing the documented report written by
Detective Hotard,it clearly and precisely quotes Petitioner as
stating, "Keefer [Petitioner] refused to answer any questions
relative to having sexual intercourse with the victim, stating
that he [Petitioner] wanted an attorney" (Ref. Pg.#5A Para.#7
Ln.#3-5) PCR)  Therefor, in conjunction with with Claim #1,
falsely testifying that Petitioner never made a request to have
an attorney present during questioning, benefitted the Prosecu-
tion by allowing the preservation of the "assumed" integrity and
credibility commonly associated with members of law enforcement.
During Preliminary Examination Proceedings, Defense Counsel filed
a Motion to Suppress the recorded Statement.  As seen in the State's
response, obviously the Hearing Judge was not presented with the
facts of the investigation.  Should Detective Hotard and Sergeant
O'Cull have answered this question truthfully during their trial

testimony, the recorded statement obtained by Sergeant O'Cull, may have been subject to suppression from trial. Therefore, the act of perjury committed by Detective Hotard and Sergeant O'Cull was relevant in securing the guilty verdict. This document was presented as evidence within Trial Proceedings. It was also present within both, Defense Counsel's and the Prosecution's, discovery. "The failure of the Prosecutor to correct the testimony of the witness, which he knows to be false, denied Petitioner due process of law, in violation of the Fourteenth Amendment."(Napue v Illinois, 360 U.S. 265-272 [1959]) " It is established that a conviction obtained throught the use of false evidence, known to be such to a representative of the State, must fall under the Fourteenth Amendment. (Mooney v Holohan, 294 U.S. 103; Pyle v Kansas, 317 U.S. 213; Curran v Deleware, 259 F. 2d 707; Compare Jones v Kentucky, 97 F. 2d. 335,338 with In re Sawyer's Petition, 229 F. 2d805,809 cf. Messiah v United States, 352 U.S. 1.) The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected. (Thompson v Dye, 221 F. 2d 763; United States ex rel. Almeida v Baldy, 195 F. 2d 815; United States ex rel. Montgomery v Ragen, 86 F. Supp.382)

   Likewise, Defense Counsel was in possession of Detective Hotard's report. Therefore, Allowed Detective Hotard and Sergeant O'Cull"s perjured testimony to go uncorrected. Subsequently, hindering Petitioner's Defense against the charge. In reviewing the Trial Transcripts, Defense Counsel Olivier Carriere, repeatedly asked both Officers, "did Petitioner ever request the presence of an attorney prior to questioning?" It has already been established that both Officers answered, "no," to this question. Therefore, Petitioner's Claim of Perjury is proven, and by the Prosecution allowance of this perjury, Petitioner's constitutional rights were violated.

   for the reasons mentioned above, Petitioner humbly request that this Honorable Court grant relief to his Petition.

SUPPLEMENTAL BRIEF:  CLAIM #6

<u>SUPPLEMENTAL BRIEF FOR CLAIM #6</u>

In Claim #6, Petitioner argues that the conviction was obtained from evidence that was less than proof beyond a reasonable doubt of each and every element of the charged crime.

Petitioner provides merit to this claim by presenting the actions of the alleged victim, C. Ben, on the day in question. First, C. Ben admitted that she deliberately entered false information, regarding her correct age, into an adult social networking website. Petitioner offers a copy of the "Terms Of Service" associated with the website, "Tagged", which Petitioner and C. Ben initially came into contact with one another. (Ref. Pg.#6F PCR) It is apparent that C.Ben was fully comprehensive of the fact that she may have joined the website by entering her correct age, because the "Terms Of Service" clearly states, "Only members who are thirteen (13) years of age or older may register. (Ref Pg.#6F Para.#1 Ln.#2) At the time of the alleged incident, C. Ben was 13 years of age. Therefore, the cite would have allowed her to register with her correct age entered.

On the morning of the alleged incident, C Ben packed a bag of clothing, stole cash and a credit card from her mother's purse, called a cab to pick her up and transfer her over forty (40) miles, from New Orleans, La. to Slidell, La. C Ben testified that she was in possession of her cell phone during the entire day of the alleged incident. C Ben also testified that at some point during that morning, Petitioner exited the residence, leaving her presumingly alone in the residence for approximately 25-30 minutes, while he [Petitioner] spoke to a woman whom had pulled into Petitioner's driveway. (Ref Pg.#8C Para.#5 Ln.#12-13 PCR) Although Petitioner had left C Ben alone in the residence, C Ben admitted that she did not make any attempts to exit the residence, use her phone to call for anyone to extract her from Petitioner's residence, Or to make any noise to signal for help. These actions would commonly indicate that C Ben did not feel as if she was in any type of danger, fear, of trouble.

Furthermore, C Ben told Detective Hotard that "Petitioner subsequently let her [c Ben] leave the residence anyway. At that

time, C Ben followed him[Petitioner] to his car, but walked past him down the street.  Subsequently, Keefer [Petitioner] caught up with her in his vehicle, and she got in." (Ref. Pg.#6E Para. #2 Ln.#5-7)  Petitioner notes that C. Ben did not state that she ran from Petitioner, but instead, "got in.'  This statement alone proves that C Ben did not consider herself in any danger.

Second, Detective Greg Powell, of the New Orleans Police Department (NOPD, whom was the first member of law enforcement to come into contact with C Ben, documented that, "On 01-16-12, at approximately 12:15 pm, C Ben called her sister and informed her that she had been kidnapped by three (3) masked men, thrown into a red car, had a bag put over her head, and driven to an unknown location. (Ref. Pg.#6A Para.#2 Ln.#10 PCR)  C Ben continued by stating that "after a while, she was able to escape from her captures."Upon searching C Ben's phone, her family discovered that C Ben had not been kidnapped, But instead had called a taxi service that morning.  Minutes later, Detective Powell informed C Ben that he conducted an interview with the cab driver whom had picked her up.  At that point, C Ben admitted "that she had used a taxi service to transport to a man's house, but they did not do anything." (ref Pg.#6A Para.#4 LN.#2-3 PCR) It should be noted that C Ben offered this statement despite the fact that Detective Powell had just advised her that he spoke to driver, and the fact that C Ben had Petitioner's full name, home address, and photos of Petitioner in her cell phone.  These facts would also suggest that C Ben was trying to protect Petitioner's identity for some apparent reason.  After Detective Powell continued to question C Ben for several more minutes, C Ben then Stated, "that she did have sex with the man, who she would not or did not want to identify. (Ref. Pg.#6A Para. #4 Ln.#5 PCR)  It should also be noted that C Ben did not make any allegations of being threatened, harmed, or raped throughout the entire interview with Detective Powell.

Also, C Ben's trial testimony also offers merit to Petitioner's claim.  During trial, C Ben testified to the fact that Petitioner never threatened her or forced her to do anything.  C Ben also

testified that at some point during that morning, she asked Petitioner to use his restroom, which she did. But, C Ben still did not try to call anyone to have her removed from Petitioner's residence, even when she was in the bathroom alone with her phone.

The State intends to support the guilty verdict by citing, state v Hampton, 97-2096 (La. App. 1 Cir 6/29/98 2d 417, 418, which states "the testimony of the victim alone is sufficient to prove the elements of the offense." This case may apply in most circumstances. But in C Ben's case, when the credibility of an alleged victim is severely tainted, the court must use it's discretion justly. The State used a recorded statement made by Petitioner as sufficient evidence to support a guilty verdict. Petitioner intends to defend against the use of that statement, within Claim #1, Claim #2, And Claim #5

In reviewing the facts and details of the evidence presented herein, it is clear that the State possessed less than sufficient proof of each and every element of the charged crime to support a guilty verdict. Therefore, Petitioner humbly request that this Honorable Court grant him relief to his Petition.

13

SUPPLEMENTAL BRIEF:  CLAIM #8

SUPPLEMENTAL ARGUMENT FOR CLAIM #8

Petitioner presents a claim of "Actual Innocence". Petitioner intends to offer merit to this claim by highlighting several statements and facts of the presented case, that was offered by the alleged victim [C. Ben], Detective Alvin Hotard and Sergeant Brian O'Cull of the Saint Tammany Parish Sheriff's Office, Edna Ben [alleged victim's mother], Detective Greg Powell of the New Orleans Police Department (NOPD), and witnesses, Gwen Walker and Trevon Eaglin [Petitioner's son].

First, Petitioner submits the initial report taken at the start of the cases investigation, which was taken by Detective Greg Powell of the NOPD. Detective Powell responded to a call regarding a missing/runaway juvenile, which documentation by the New Orleans Police Department indicates occurred at approximately 9:09 am, on Monday, January 16, 2012. (Ref. Pg. #8A Para #2 Ln #1 - #8 PCR) Within this report, C. Ben adimently refuses to give Detective Powell the Petitioner's name or address, despite having Petitioner's name, telephone number, physical address, and picture located within her cell phone. (Ref. Pg.8B Para #4 Ln #1 - #6 PCR)

During trial proceedings, the alleged victim [C. Ben] testified to several key facts that asserts merit to Petitioner's calim of " Actual Innocence":

   * C. Ben. testified that she falsely represented herself to be a nineteen (19) year old female on a social networking website, without her mother's consent
   * C. Ben testified that she intentionally turned her cell phone off to avoid her family's call.
   * C. Ben testified that she stole twenty (20) dollars cash and a credit card from her mother's purse.
   * C. Ben testified that she willingly called a taxi service to transport her over forty (40) miles to Petitioner's residence, and when the taxi driver would not accept the stolen credit card without an identification, C. Ben called Petitioner and ask him

⑭

to pay the fare.

* C. Ben testified that, while she was in Petitioner's
residence, Petitioner exited the residence to speak
with a neighbor for over thirty (30) minutes, leaving
her alone inside the residence.

* C. Ben testified that she was in possession of her
cell phone the entire time she was in the residence
alone, but did not make any attempt to call her family,
nor any form of law enforcement to extract her from
Petitioner's residence.

In fact, during trial proceedings, C. Ben testified that Petit-
ioner never threatened her or forced her to do anything. Further-
more, once C. Ben made contact with law enforcement, she initially
reported that she had been kidnapped by three (3) masked men, thrown
into a red van, and driven to Slidell, Louisiana.  C. Ben then stat-
ed that she had, in fact, called a taxi service to transport her
to a man's house, but "they did not do anything" (Ref. Pg. 8B Para.
#4 ln. #3 PCR)  After several minutes of questioning by Detective
Powell, C. Ben then stated that she had sex with the man, but
"did not, would not identify the man", again, despite having
all of the Petitioner's contact information and picture located
eithin her phone.  At no time, during this moment of questioning,
did C. Ben ever state, suggest, nor indicate that a rape had occur-
red.


    Second, Petitioner intends to present merit to this claim by
presenting statements made to several different agencies of law
enforcement by the alleged victim's mother, Edna Ben.  In her
initial report to the NOPD, Edna Ben stated that she heard the
front door of her residence open and close at approximately 7:50
am on the morning of the alleged incident.  But, the NOPD documents
that Edna Ben did not report her thirteen (13) year old daughter
missing until 9:09 am, suggesting that Edna Ben allowed her thirt-
een (13) year old daughter to go missing for an entire hour in the
city of New Orleans.  In addition, Detective Powell of the NOPD,
documents that NOPD dispatch notified him of the location of the
reported missing/ runaway at approximately 12:15 pm on the same
date, Edna Ben stated that she received a call from C. Ben at

approximately 2:00pm, same date.  Not only does the time frame present
an inaccurate line, but reviewing the documentation provided by Detect-
ive Powell, it clearly states that C. Ben never contacted her mother.
Instead, she contacted her sibling.

Furthermore, the alleged victim's mother, Edna Ben, offered the
Saint Tammany Parish Sheriff's Department a statement, saying that
she was aware of the Petitioner prior to the day in question, and
advised "that she thought Keefer [Petitioner] was a nineteen (19)
year old black male, and that she had seen his photo on a computer
website called, Tagged."  Therefore, it is evident that Edna Ben
permitted her thirteen (13) year old daughter to misrepresent her-
self on an adult website and communicate with older men whom per-
ceived her to be nineteen (19) years of age.  Since Edna Ben admitted
that she had seen the the Petitioner's picture on the computer, it
is apparent that she was aware that her daughter was misrepresenting
her age, and that the Petitioner was of adult age, because the ages
of the website's users are clearly displayed on the page.

Each of these elements surrounding this case provides merit
to the Petitioner's claim of "Actual Innocence".  The State claims
that, although the alleged victim [C. Ben] initially gave gave sev-
eral inconsistent statements to multiple law enforcement agencies,
that she consistently indicated that Petitioner physically forced
her to engage in several intercourse.  But, the facts of the case
clear, and proves otherwise.  C. Ben contacted the taxi service,
C. Ben stole cash and credit card from her mother's ourse.  C. Ben
had her phone within her possession the entire day of the alleged
incident, but deliberately turned it off.  C. Ben was left alone
in the Petitioner's residence for a significant amount of time,
but chose not to call anyone to extract from the residence, after
where she would later claim to have been raped.  C. Ben had packed
herself a bag of clothing, stolen money, and she testified during
trial, intended to leave home to escape a mother that she described
as "mean".

Even when her planned attempt to "leave home" failed, and she
was confronted by law enforcement, C. Ben still chose to develope

an elaborate tale of being kidnapped by three (3) masked men, thrown into a red van, and driven to Slidell, louisiana. A few minutes later, once it was discovered that she was not telling the truth, C. Ben told detective Powell "that she had used a taxi service to transport he a man's house in Slidell, Louisiana at 1326 Hickory street, but that they did not do anything." Ref. Pg. #8B Para.#4 Ln. #3 PCR) After more questioning by Detective Powell, C Ben then stated that "she had sex with a man, who she did not or would not identify."Ref. Pg. #8B Para. #4 Ln.#4-#5)

As Detective Alvin Hotard of the Saint Tammany Parish Sheriff's Department documents, Petitioner consistently stated that "at no time did he and C. Ben ever engage in any type of inappropriate or sexual activity (Ref. Pg.#8g Para. #4 Ln.#14),or Keefer [Petitioner] refused to answer anyquestions relative to having sexual intercourse with the victim.....(Ref. #8E Para. #7 Ln. #3 #4), which is consist-ent with the initial statements made to Detective Powell by C. Ben. The allegation of rape did not present itself until C. Ben was question by detectives from the Saint Tammany Parish Sheriff's Office without the presence of her parent or legal guardian. Det-ective Hotard of the Saint Tammany Parish Sheriff's Department even acknowledges that they perform questioning of C. Ben with the presence of her guardian by documenting, " at the conclusion of the interview with C. Ben, the detectives relocated to the second floor waiting room where Edna Ben was located. Upon their arrival to the waiting room, the detectives introduced themselves to Edna Ben, and explained their presence to her. At that time, the det ective conducted an interview with Edna Ben (Ref. Pg. #8D Para. #4 Ln.#1-#4)

Each of the presented facts that, not only was there not enough sufficient evidence to prove the elements of the charged crime, but that Petitioner is actually innocent of the charged crime entirely. Therefore, relief should be granted pursuant to Petitioner's claim,

WHEREFORE, mover prays this Court orders a contradictory hearing held in these proceedings between the State of Louisiana, represented by the Office of the District Attorney for the 22nd Judicial District Court, Parish of St. Tammany, and Keefer L. Eaglin.

Respectfully Submitted,

Keefer L. Eaglin #406762
Dixon Correctional Institute
P.O. Box 788 / U-1-D-G
Jackson, LA 70748-0988

STATE OF LOUISIANA      NUMBER: 519994

DIVISION "G"

VERSUS

22ND JUDICIAL DISTRICT COURT

KEEFER LAMAR EAGLIN     ST. TAMMANY PARISH

FILED: _____

                   DEPUTY CLERK

## ORDER AND REASONS

This matter comes before the court pursuant to an Application for Post Conviction Relief (the "Application") filed by Keefer Lamar Eaglin, ("Eaglin" "Defendant" or "Petitioner"), pro se. After review, the court finds that Petitioner has failed to meet his burden of establishing he is entitled to relief. Therefore, pursuant to La C. Cr. P. Art 929, Petitioner's Application is dismissed.

FACTS

Sometime in late 2011 or early 2012, Petitioner "met" the victim, C. B. on a social media site, "Tagged." C.B. represented herself on the site as being nineteen when in fact she was only thirteen. Thirty-two year old Eaglin also misrepresented his age, claiming to be several years younger than he was. They communicated several times, exchanged photos and finally made arrangements to meet at Defendant's home on Martin Luther King Day, January 16, 2012 when C. B. would be out of school and Eaglin's wife at work.

That morning, the victim took $20 cash and a credit card from her mother's purse and called a cab to take her from her home in Algiers to Petitioner's home in Slidell. The cab fare was more than $80 and the driver would not accept C. B.' s

1

mother's credit card. C.B. then called Eaglin from the cab outside of his house, and he paid the cab fare. They then entered Eaglin's bedroom and had intercourse. Thereafter, Petitioner drove C.B. to New Orleans East where he stopped at a gas station. C.B. exited the vehicle and went to a neighboring business.

Eaglin admitted all of these facts to law enforcement. During the course of the investigation, the victim changed her version of what happened several times. What is in dispute is whether or not the intercourse was consensual as Petitioner alleges, or "forced" as that term is defined under the statute, R.S. 14:42.1, as the victim claimed.

Once victim's mother realized she had left the house, she searched the neighborhood and eventually reported her daughter as "missing" to the New Orleans police. Later that day, C.B. called a family member from a hotel in New Orleans East claiming that she had been kidnaped. New Orleans Police picked her up from that location and brought her home for further questioning. Eventually, C.B.'s phone was searched and she admitted to taking the taxi to Defendant's home where she had sexual intercourse with "Keefer."

At the suggestion of the officers, C.B.'s mother then took her to Children's Hospital where she was examined and a standard sexual assault evidence collection performed. The examination was consistent with the victim's recently having had intercourse. Since the sexual relations occurred in Slidell, the investigation was turned over to the St. Tammany Parish Sheriff's Department.

Pursuant to warrant, Defendant was arrested several hours later and taken to police headquarters for questioning. During the first interrogation, Defendant gave

2

the officers some information and then invoked his right to counsel. Further

interrogation was then stopped. Later, officers obtained a search warrant for

Defendant's home and his person in order to obtain evidence for further

examination by the crime lab and coroner's office. None of C.B.'s DNA was

found at Defendant's residence. However, DNA consistent with Eaglin's was

found on the sexual assault evidence taken from C.B. at Children's.

The "search" of Eaglin's person was conducted by a coroner's officer who

was accompanied by Sergeant Bryan Ocull, the supervisor of the arresting officer.

During that search, Eaglin asked to speak to the arresting officer about the events

leading up to his arrest.  Ocull advised Eaglin of his <u>Miranda</u>[1] rights after which he

agreed to being questioned.  During that interview, Defendant admitted to having

intercourse with the victim but claimed that it was consensual. The reading of the

Miranda warnings and the interview was video taped and played for the jury at

trial.

Eaglin was charged with Forcible Rape, a violation of <u>R.S. 14:42.1</u>. He was

tried and found guilty. He was later adjudicated a second felony offender[2] and

sentenced to serve eighty years at hard labor without benefit of probation, parole,

or suspension of sentence.  His conviction, adjudication and sentence were

affirmed by the First Circuit Court of Appeal and writs denied by the Supreme

Court.

---

[1]. <u>Miranda v. Arizona,</u> 384 U.S. 436 (1966).

[2]. The State's Habitual Offender Bill of Information sought adjudication as a third offender. However, an out of Parish predicate was quashed for lack of confirming fingerprint evidence.

Claims One and Two

Defendant lists eight claims. His first and second claims allege that the recorded statement he gave to police was obtained in violation of his constitutional rights. He argues that he had previously invoked his right to counsel but was later coerced by threats to himself and his family. He offers no evidence of any form of coercion.  It is true that Eaglin invoked his right to counsel during the initial interrogation. When that occurred, all further questioning ceased.

However, several days later, Eaglin asked to speak with the police about what occurred that morning. Prior to asking any further questions, Sergeant Ocull read Eaglin his Miranda rights, asked if he understood those rights and if he wished to waive them, which he did. These facts are evident from Eaglin's two signatures on the Waiver of Rights form and in the video taped interview.

> Once an individual in custody expresses a desire to deal with police only through counsel, all questioning must cease immediately and he is not subject to further interrogation until an attorney is present, unless the suspect initiates further communication, exchanges, or conversation with the police and validly waives his earlier request for counsel. *State v. Koon,* 96–1208, pp. 6–9 (La.5/20/97), 704 So.2d 756, 762–763, *cert. denied, Koon v. Louisiana,* 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997) (citing *Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 440–445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *State v. Abadie,* 612 So.2d 1, 4–5 (La.1993), *cert. denied, Louisiana v. Abadie,* 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); *State v. Lee,* 524 So.2d 1176, 1183 (La.1987)). When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether the police have "scrupulously honored" his right to cut off questioning. *State v. Koon, supra* (citing *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). However, police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as those statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response." *Id.* (Citing *State v. Ross,* 95–1798 (La.3/8/96), 669 So.2d 384, 386 (per curiam)). Nor does a previous assertion of the right to counsel bar admission of such statements.

4

*Id.* When an accused invokes his *Miranda* right to counsel, the admissibility of a subsequent confession is determined by a two-step inquiry: (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. *Id.; State v. Abadie, supra* at pp. 5-6. *State v. Tilley,* 1999-0569 (La. 7/6/00), 767 So. 2d 6, 11.

Eaglin's appointed counsel filed a Motion to Suppress the Confession. That Motion was heard prior to trial and denied, based on Sergeant Ocull's testimony and the evidence offered. The court found that Eaglin initiated the later conversation and that the statement was taken only after Defendant waived his rights voluntarily, knowingly and intelligently. These claims therefore, are denied.

**Claim Three**

Petitioner alleges that his pre-trial bond was excessive, thereby preventing him from preparing his defense or securing counsel of his choice. A defendant does not have a right to be released on bond in order to better investigate his case.

A similar issue was addressed in State v. Nance, 315 So. 2d 695, 698 (La. 1975). Nance, a North Dakota resident, was charged with armed robbery which carried the potential of a ninety-nine year sentence. He was apprehended shortly after the offense, wearing clothing matching that worn by the robber, with money taken in the robbery.

Nance's bail had been reduced significantly but counsel urged that it was still too high. Citing C.Cr.P. Art. 317 the reviewing court found no abuse of discretion on the part of the trial judge in denying the further reduction based on the seriousness of the offense and the weight of the evidence.

Eaglin's initial bond was set by the Commissioner at $100,000 and increased to $500,000 in August, 2013. The subject record is not clear why the

increase was requested. However, the record of the predicate listed on the Habitual

Offender Bill of Information arising out of this Parish (docket # 443438)

evidences that Defendant's probation on that case was revoked and on February

16, 2012, Defendant was ordered to serve the sentence originally imposed [3].

Therefore, regardless of the amount of the bond on the subject offense, Eaglin

could not have bonded out until he finished serving that sentence. His inability to

prepare his defense during that time frame, if that was in fact the case, had nothing

to do with the amount of the bond in the subject case.

Petitioner mentions that he was not transported for a hearing on an

Application for Reduction of Bond filed on his behalf. The subject record

demonstrates that during his incarceration on his revoked probation, Eaglin was

housed in a Department of Corrections facility outside of the Parish. Transportation

at that time would have been costly and futile.

Petitioner states that he "completed his term of imprisonment on August 24,

2013" and was transferred back to St Tammany Parish jail. Once he had served his

sentence on that prior offense, he might have been able to post bond and be

released. However, prior to his return to Parish jail, the court ordered Eaglin's

bond increased [4]. If convicted, defendant faced a possible adjudication as a habitual

offender with a sentence over and above the maximum of forty years provided for

---

[3]. Defendant had been charged with Theft of Identity, R.S. 14:67.16 (Count One) and Theft of between $300 and $500, R.S. 14:67 (Count Two) occurring during October, 2007. He was sentenced to five years suspended on Count One, and two years suspended on Count Two, with probation of five years on both Counts. The probation and fees were ordered to be served concurrently but the fines to run consecutively.

[4]. The record does not contain a Motion to increase the bond. All that exists in the record demonstrative of that action is a "Jail Slip" noting the new bond amount.

the charged offense.

Forcible Rape[5] was a crime of violence under R.S. 14:2 (B) as well as a sex offense under R.S. 15:535 et seq. C.Cr.P Art. 334 sets forth the factors to be considered in determining the amount of bail which include the seriousness of the offense, the weight of the evidence against the defendant, and the nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release.[6]   Given these factors and the ease with which Defendant perpetrated the charged offense, a substantial bond was justified.

Petitioner also alleges that the "excessive bond" prevented him from obtaining "suitable representation of choice." Once again, this argument fails.   He could have retained counsel regardless of whether or not he could bond out.  Many incarcerated individuals have counsel of their own choosing. That could have been accomplished with a phone call.

Eaglin did not post bond. If his argument is based on the financial burden of posting bond alone, the fact that he did not use that money for bond premium would leave those funds for payment of counsel.

Lastly, Petitioner makes a statement that the average bail amount for the past 10 years for "this particular charge" was $40,000[7]. He offers no authority for that

---

[5] R.S. 14:42.1 Forcible Rape has since been replaced by R.S. 14:42.1 Second Degree Rape.

[6] C.Cr.P Art. 330 prohibits the setting of bond prior to trial for persons charged with crimes of violence.

[7]. The court is unaware of any source or process by which Defendant could have obtained this information, if in fact he attempted to do so. Given Defendant's meticulous efforts to provide evidence by way of Exhibits to this Application, the lack of any reference here suggests that no such investigation was done.

"Purpose underlying use or postur:
is to assist parties in making full and fair showings
on ineffective assistance claims, thereby creating adequate
record for appellate review"

statement and the seriousness of forcible rape of a thirteen year old would suggest

that the statement is not true. This claim is denied.

**Claim Four** (State v Hudson, 520 So. 2d 504 (La. App. 5th Cir. 1990))

Petitioner's fourth claim is one of ineffectiveness of counsel. The Supreme

Court in Strickland v. Washington 466 U.S. 668, 104 S Ct. 2052, 80 L Ed. 2d 674

(1984) set forth the standard for analysis of an ineffectiveness of counsel claim as

follows:

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or death sentence has two components. First,
> the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. Unless a defendant makes both showings, it cannot be said
> that the conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable...

> Judicial scrutiny of counsel's performance must be highly deferential. It is all
> too tempting for a defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to conclude that a
> particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac,
> 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982).
> A fair assessment of attorney performance requires that every effort be made
> to eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time. Because of the difficulties inherent in
> making the evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under
> the circumstances, the challenged action "might be considered sound trial
> strategy." See Michel v. Louisiana, supra, 350 U.S., at 101, 76 S.Ct., at 164.
> There are countless ways to provide effective assistance in any given case.
> Even the best criminal defense attorneys would not defend a particular client
> in the same way. See Goodpaster, The Trial for Life: Effective Assistance of
> Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983)...

8

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364–365, 101 S.Ct. 665, 667–668, 66 L.Ed.2d 564 (1981). The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

In so far as Petitioner's claim that his attorney should have investigated the details of New Orleans Police Officer Greg Powell's initial report, all of those details were brought out at trial either through other officers or other witnesses.

Defendant places great significance on the circumstances surrounding the Preliminary Examination. The purpose of a Preliminary Examination is only to determine whether probable cause exists to believe that defendant has committed a crime. State v. Maxwell, 97-1927 (La. App. 4 Cir. 9/15/97), 699 So. 2d 512, 514, Louisiana Constitution Art. 1 § 14:35. It is, by definition, only a preliminary matter and not a substitute for a trial. The standard of proof is less than at trial and even if no probable cause is found, the result would not be dismissal of the charges, but rather only release of the bond obligation.

Petitioner faults counsel for not having "any preparation in place to adequately and sufficiently represent Petitioner during the Preliminary Examination." He claims "no witnesses were summoned on Petitioner's behalf." In the case at bar, days after his arrest, Eaglin admitted to having sex with the thirteen year old victim. Even assuming the sex was consensual, criminal culpability attached to those facts. That is, Eaglin admitted to there being probable cause for his arrest, if only for a different charge. Since C.Cr.P. Art. 294 et seq

9

provides that the testimony taken at a Preliminary Examination is admissible at trial, counsel certainly would have advised him not to testify.

Eaglin had told the police that his thirteen year old son, Trevon was in his room at the time of the events giving rise to the charges and heard nothing. The police spoke with Trevon and noted that interview on one of their reports. That report was provided to Eaglin's attorney by the State. Trevon did not testify at trial.

Once again, Petitioner admitted all of the following to police: he had made previous arrangements for a girl to come to his home; at the time of the arranged meeting, his wife was at work; the girl represented herself to be nineteen, or thirteen years his junior; in establishing the communication, he had represented that he was only five years older than the victim had claimed; when the girl arrived, she was clearly much younger than what she had represented; and, despite all of those morally questionable factors, and the victim's apparent age, he had adulterous sexual intercourse with the victim in his bed.

Petitioner suggests that counsel should have called his son who would have testified that he was home the entire time and heard nothing. "Courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential." Rose v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000). For many reasons, counsel's choice not to call Trevon at trial was not unreasonable.

At this stage in these proceedings, Petitioner cannot simply rely on

unsupported statements. It is his burden to establish his claims and that burden is great. To his credit, Petitioner has prepared a very lengthy, comprehensive and meticulously referenced brief in support of his Application. Most notably, however, despite all of the other exhibits attached in the form of investigation reports, minute entries, medical records, dictionary definitions, news articles and lists, his claimed "proof" in the form of the affidavit from his son is not attached to the Application, nor is it referenced by Exhibit, as were all of Eaglin's other items of "evidence."

In terms of the prejudice prong, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. 466 U.S. at 694, 104 S. Ct. 2068. "The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." Ransom V. Johnson 126 F. 3d 716, 721 (5th Cir 1997) cert. denied 522 U.S. 944, 118 S. Ct. 361, 139 L. Ed. 281 (1997).

Petitioner argues that traffic cameras would have verified that he was "not anywhere near the convenience store, nor the intersection of which it is located." He has not offered any evidence of that assertion. Again, Eaglin admitted that he drove the victim to a convenience store in New Orleans East. In this Application he has not identified a specific location. Even if he did, and cameras do not show him to be at there, that negative result would not establish that he was not there, or at another convenience store in the area and perhaps one that did not have surveillance cameras. "A defendant who asserts a claim of ineffective counsel

based on a failure to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome of a trial. General statements and conclusory charges will not suffice." State v. Casteneda, 94-1118 (La. App. 1st Cir. 6/23/95), 658 So 2d 297, 306. Proving a negative is close to impossible and here, Eaglin has not succeeded.

      Eaglin also asserts without support that the various attorneys assigned to represent him from the Public Defender's Office failed to "communicate with their successor." If this is in fact true, it fails to recognize that all of the discovery pertaining to the case including the Police reports, video tape of Eaglin's interview with Detective Ocull, Childrens Advocacy Center tape, DNA evidence, as well as counsels' notes would have remained in file for new counsel to review.

      This claim lacks merit and is denied.

**Claim Five** { Nix v Whiteside 475 U.S. 157 (1986)
{ Napue v. Illinois 360 U.S. 264 (1959)

      Petitioner claims that the State used perjured testimony of Detectives Ocull and Hotard in order to obtain a conviction. He argues that both detectives answered "No" when asked whether Petitioner ever asked for an attorney. This issue as to Detective Ocull was previously addressed in Claims One and Two.  As to Detective Hotard's testimony, Petitioner invoked his right to counsel during the initial investigation and all discussions ceased at that time.  Petitioner did not "ask" for an attorney but declared that he would not talk to the officer without counsel being present.  Therefore, Hotard's testimony and Petitioner's reference to it can be reconciled without there being any basis for this claim.

      This claim has no merit and is denied.

Claim Six

Petitioner's sixth claim alleges insufficient evidence. This claim was raised by appellate counsel. The First Circuit noted as follows:

> The constitutional standard for testing the sufficiency of the evidence, as adopted by the legislature in enacting LSA-C.Cr.P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979)

Because the claim was previously raised, it would be precluded under C.Cr.P. Art. 930.4. Petitioner argues that it should be considered here "on the interest of justice." In support of that assertion Eaglin "quotes" what he maintains is the statutory definition of Forcible Rape as follows: "Done by force, (of a man) force (another person) to have sexual intercourse with him against their will. (CT 1 R.S. 14:42.1)" He further "quotes" "A section within the criminal terminology pertaining the crime of "forcible rape" states, "...the act of resisting would not prevent the rape"" (pg. #6D[8] Oxford University Press).

Justice requires ethical compliance with the law. Petitioner's proffered language does not exist in the forcible rape statute. In fact, it does not appear in the Oxford Dictionary as Petitioner claims. Petitioner takes the liberty of completely misquoting Jackson v Virginia supra in his Seventh claim as follows: "In reviewing the sufficiency of evidence presented by Petitioner, the Court must decide whether viewing the evidence in the light most favorable to Petitioner, any rational trier of fact would have found that Petitioner proved the essential

---

[8](Petitioner's Exhibit to the Application)

elements of innocents (sic) beyond a reasonable doubt"(emphasis added to show misstatements of the law).

"The testimony of the victim alone is sufficient to prove the elements of the offense." State v. Hampton, 97-2096 (La. App. 1 Cir. 6/29/98), 716 So. 2d 417, 418. A review of the trial transcript and the evidence introduced demonstrates that all of the discrepancies noted by Petitioner were brought out at trial and again by appellate counsel. Petitioner (in Claim Seven) correctly notes that "A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and it's determination will not be disturbed unless it is contrary to the evidence." [9] The First Circuit noted on page 12 of its opinion

> In finding defendant guilty of forcible rape, it is obvious that the jury believed the testimony and pretrial statements of the victim and rejected the defense's claim of consensual sexual intercourse. While, as defendant notes, the victim initially gave inconsistent statements about being kidnapped, as opposed to taking a taxicab to defendant's residence, she consistently indicated that defendant physically forced her to engage in sexual intercourse.

Petitioner would have this court reject the jury's verdict, and the appellate court's affirmation of that verdict, "on the interest of justice." Justice would not be served in doing so based on this Application.

Petitioner again argues that he had filed a "Notice of Appearance" seeking to enroll as co-counsel. That request was denied by the trial court. Petitioner offers no support of why that relief should have been granted or how a grant would have aided his defense beyond that which was provided by appointed counsel.

This claim has no merit and is denied.

---

[9] Petitioner attributes this "quote" to State v. Vessell 450 So.2d 938 (La 1984). The language is not exact but the principal is correct.

14

AND DEFENDANT'S CUSTODIAN
Warden,
Elayn Hunt Correctional Center
PO Box 174
St. Gabriel, La 70776

16