EAGLIN JEFFERY
2/ M DOB 10/12/1979
57227 OSULLIVAN PA
MRN 000158648 PTN

000158648
ADMDT 07/12/1
FC B
2302217

- Deterioration/decrease in vision
- Increase in eye pressure (glaucoma)

- Visual disturbance
- Need for surgery inside of the eye

- treatment to correct clouding of vision



- death
- brain damage
- disfiguring scars
- pain

- quadriplegia (paralysis from the neck down)
- paraplegia (paralysis from the waist down)

- the loss of or loss of function of any organ or limb
- infection
- bleeding

**5. Reasonable Therapeutic Alternatives**

**6. Acknowledgement, Authorization and Consent**

a) No Guarantees: All information given me and, in particular, all estimates made as to the likelihood of occurrence of risks of this or alternate procedures or as to the prospects of success, are made in the best professional judgement of my physician. The possibility and nature of complications cannot always be accurately anticipated and, therefore, there is and can be no guarantee, either express or implied, as to the success or other results of the medical treatment or surgical procedure.

b) Additional Information: Nothing has been said to me, no information has been given to me, and I have not relied upon any information that is inconsistent with the information set forth in this document.

c) Particular Concerns: I have had an opportunity to disclose to and discuss with the physician providing such information, those risks or other potential consequences of the medical treatment or surgical procedure that are of particular concern to me.

d) Questions: I have had an opportunity to ask, and I have asked, any questions I may have about the information in this document and any other questions I have about the proposed treatment or procedure, and all such questions were answered in a satisfactory manner.

e) Authorized Physician: The physician (or physician group) authorized to administer or perform the medical treatment, surgical procedures or other therapy in item 2 is

☒ LSUHSC, Dept. of _____
☐ Tulane University HSC, Dept. of _____

HCSD 1901 CONT (Rev 6/05)

# LOUISIANA STATE UNIVERSITY
## Ophthalmic Clinic

eefer Eaglin
R# 158648
hysician: O'Sullivan

7/12/201
Photographer: BWI



OIS WINSTATION XP

2 Willis Ave
galusa, LA  70427

Phone: (985) 730-2145
FAX: (985) 730-2142

4-Q

# LOUISIANA STATE UNIVERSITY
## Ophthalmic Clinic

Keefer Eaglin
MR# 158648
Physician: O'Sullivan

7/12/201
Photographer: BW



OIS WinStation XP

712 Willis Ave
Bogalusa, LA  70427

Phone: (985) 730-214
FAX: (985) 730-214

Macula Map(EMM5) Retina Report

Patient: Eaglin, Keefer L
Physician:
Operator:                                          Gender: M
Disease:                                           ID:

Exam Date: 07/12/2011
DOB(age): 10/12/1979 (31)
Ethnicity: African Descendant
Algorithm Version: A6, 1, 0, 4



Exam Date: 07/12/2011, SSI= 54.2                   Exam Date: 07/12/2011, SSI= 60.3

Significance from Normal Map                        Significance from Normal Map

### Global RPE/Choroid Disruption

|            | OD | OS |
|------------|----|----|

Report Date: Tuesday July 12 10:36:13 2011        Software Version #6, 1, 0, 4

Comments:

Signature:

Defining the OCT Revolution                        opt•vue

EAGLIN ,KEEFER L
2/ M DOB 10/12/19
50803 BERGSMA DONA FC 8
MRN UOO158648 PT# 2308478

Gender:
Age: 31
Eye Meds:
ROS: LM
PFSH:
Med Reconciled ☑ yes ☐ no
.skd

CC: presents for PRP -1x today

Alleg: NKDA

| VA (SC) | Right Eye 20/HM | N J J | VA cc | Right Eye | N J J |
|---|---|---|---|---|---|
| | Left Eye 20/125 | | | Left Eye | |

Present R
glasses L                    M  R
                                L

| | | R | | L | | | nl ab |
|---|---|---|---|---|---|---|---|
| lids | | nl | ab | nl | ab | pupils | |
| lacrimal glands | | | | | | EOM | |
| lacrimal drainage | | | | | | CF | |
| orbits | | | | | | | |
| preauricular lymph nodes | | | | | | | |

Tonometry 7
A R   time 815 date 7/26/11
P L   tech initial AP

SLE Both Eyes, Right Eye, Left Eye

| | | nl | ab |
|---|---|---|---|
| conjunctiva: | bulbar | | |
| | palpebral | | Quiet ou. |
| Cornea: | epithelium | | |
| | stroma | | Clear ou |
| | endothelium | | |
| | tear film | | |
| Anterior Chamber: | depth | | D+Q ou |
| | cell | | |
| | flare | | |
| Iris: | size | | |
| | shape | | 6 mu ou |
| | direct & cons. reaction | | |
| | morphology | | |
| Lens: | clarity | | |
| | ant. & post. capsule | | |
| | cortex | | 1-2 NSC ou |
| | nucleus | | |
| Optic Disc: | size | | |
| | C/D ratio | | |
| | appearance | | |
| | nerve fiber layer | | |
| Vitreous | | | |
| Retina: | macula | | |
| | vessels | | |
| | periphery | | |

| T | P | R | BP |
|---|---|---|---|
| 97.5 | 102 | 17 | 161/89 |

Level of pain: (0) 1 2 3 4 5 6 7 8 9 10
(Mild)    (Mod)    (Severe)

Patient has no transportation - Hdp.
He drove himself here.



TRD                    NVD.        regressed
NOT DILATED                        NVD
NO DRIVER

pre retina
neuo

IMPRESSION: 31 yo AAM c
① 100m c PDR ou s/p PRP x1 OS 7/12/11

will need
Sx OD c PRP

RECOMMENDATION:
① Control BP/BS
② Plan PRP OD Friday 7/29/11
③ pt to come c driver
④ Discussed no driving 2° to
   poor vision ou
⑤ Refer to Endo/LSU

RV: Days ___ Wks. ___ Months ___ yrs. ___
Nurse initial AP

Physician's Signature  ___ Pham

Date/Time 7/26/11  850

EAGLIN ,KEEFER L
2/ M DOB 10/12/1979 ADMDT 07/26/11
50803 BERGSMA DONA FC 8
MRN 00158648 PT# 2308478

00158648

> 7/29/11 pm

BMC 11 (Rev 05/10)     WHITE = Original     YELLOW = Billing     PINK = Shadow Chart

7/29/11
i:30

4-T

50803   BERGSMA DONA
MR# 000 158648 PT#   2309487

RECEIVED
APR 17 2012
WASHINGTON MEDICAID

RE. DR.:
Eye Meds:
ROS:
PFSH:
Med Record:

cc:

Alleg:

| VA | $\overline{SC}$ | Right Eye CF @ 4ft | N | J |
|----|----|----|----|----|
| | | Left Eye 20/100 | | J |

PH 20/60-2

| VA | $\overline{CC}$ | Right Eye | N | J |
|----|----|----|----|----|
| | | Left Eye | | J |

Present glasses R
L

M R
L

14

lids
lacrimal glands
lacrimal drainage
orbits
preauricular lymph nodes

R ab   L ab
nl ab

| | T | P | R | BP |
|---|---|---|---|---|

pupils
EOM
CF

nl ab
Tonometry   time   date
A  R
P  L
tech initial _____

12

SLE   Both Eyes,  Right Eye,  Left Eye

nl ab

Level of pain: 0  1  2  3   4  5  6   7  8  9  10
              (Mild)      (Mod)      (Severe)

Conjunctiva:  bulbar
              palpebral      OU
Cornea: epithelium
        stroma            clear OU
        epithelium
        tear film
Anterior Chamber:   depth
                    cell    D+F OU
                    flare
Iris:  size
       shape            BNVI OU
       direct & cons. reaction
       morphology
Lens:  clarity
       ant & post. capsule   HMSC OU
       cortex
       nucleus
Optic Disc:   size
              C/D ratio
              appearance
              y / nerve fiber layer
Vitreous:
Retina:  macula
         vessels
         periphery

NVE
TRD
NVE
VH
NVD

IMPRESSION: 31 y/o AAM c̄
① PDR OU c̄ TRD OD

RECOMMENDATION:
- PRP OD today
- PF QID OD x 7days
- RTC Aug 9th.

00015864B
EAGLIN ,KEEFER L
2/ M  DOB 10/12/1979   ADMDT 07/29/11
50803  BERGSMA DONA      FC 8
MR# 00015864B PT#   2309487

RV: Days ____ Wks. ____ Months ____ Yrs. ____
Nurse initial                                          Physician's Signature
Aug. 9th            Date/Time  7/29/11   1530
BMC 11 (Rev 05/10)
        WHITE = Original     YELLOW = Billing    PINK = Shadow Chart

4-U

VS: Family, Past Medical & Social History Reviewed    CC:

Subjective

OS: ☑ negative, note positives | Diagnostics

Constitutional | Pulse Ox PSA
HEENT | HOT
Resp/Chest | A1C
ABD/GI | HbA1c TSH
CVS
GU
Skin/ms/ext
Nerbo
☑ NL | PE Normal Findings

**Gen** — Well-developed. Well-nourished. No acute distress. Normal habitus & grooming.

**Skin** — No: lesions rashes ulcers hair patterns.

**Eyes** — Normal conjunctiva, lids, globe & symmetry. PERRLA.

**Fundus** — Normal optic disc, red retinal reflexes, no exudates or hemorrhages.

**Ears** — Normal external appearance. Auditory canals & drums. Hearing grossly normal.

**Nose** — Normal external appearance, mucosa, septum & turbinates.

**Mouth** — No: lesions of the gums, tongue, palates or oropharynx. No masses, lymphadenopathy. Lips, teeth, & gums grossly normal.

**Neck** — Symmetrical. Trachea midline. No: lymphadenopathy, masses, or crepitus.

**Thyroid** — Smooth, symmetrical, no nodules, non-tender, not enlarged.

**Heart** — NSR, no murmur. No thrills on palpitation. PMI normally placed.

**Lungs** — Clear to auscultation. Normal respiratory effort.

**Limbs** — Normal inspection & function. Normal peripheral pulses and reflexes.

**Breasts** — Symmetrical. Non-tender. No: masses, nipple discharge or skin changes. Retraction, axillary or supra-clavicular lymphadenopathy.

**Abd** — Soft, non-tender. No masses, hernias detected. Normal liver and spleen. No groin lymphadenopathy.

**Pelvic** — Normal external, female hair pattern & urethral meatus. Non-tender urethra & bladder. Vagina without discharge /lesion. Cervix smooth, without discharge/lesion, no CMT. Uterus normal size, shape & contour, non -tender, mobile. Pelvic support adequate. Adnexa have no masses or tenderness.

**Rectal** — Normal sphincter tone. No hemorrhoids, masses or bleeding.

**Prostate** — No enlargement noted.

**Psych** — No current evidence of depression, anxiety or agitation.

**Neuro** — Oriented x 3. No sensory or motor loss. DTRs symmetrical.

PE Abnormal Findings

lower leg ulcers

open blister

Impression | Controlled Uncontroll

**Asthma:** ☐ Intermitt ☐ Mild ☐ Mod ☐ Severe
☐ steroid inhaler for mild, mod or severe    ACT | ☑ Nasal Exam
**Diabetes:** ☐ I ☐ II
**CHF NYHA:** ☐ I ☐ II ☐ III ☐ IV
**HTN:** ☐ Pre ☐ Stage 1 ☐ Stage 2   Uncontrolled
**CKD:** ☐ I ☐ II ☐ III ☐ IV ☐ V
**Other:**

(1) Type I diabetes                    (1) Osteopeni
                                       (2) Anemia
(2) Non compliance
    ↓ GFR
(3) bilateral lower extremity pain

**Plan:** ☐ DM Orders
Make the appt opthalmolog
Stop smoking
↑ Humulin 10/day/until
until CBS 150
refill
Hydralent w/ osteopenia
Vitamin D

Procedures/Treatments

Refer podiatry

Reassessment

Faculty Note: ☐ Hx Reviewed ☐ Pt Examined ☐ Labs/x-rays reviewed ☐ I Agree w/Assessment and Plan
Physician Signature ➤                   Date ➤ 10/13/11    Time ➤

# *INTERNAL MEDICINE ASSOCIATES*

## *OF NEW ORLEANS, LLC*

*618 North Carrollton Avenue*
*New Orleans, La. 70119*
*504-486-4201*
*Fax 504-488-9659*

August 16, 2011

C. Shaffer
Disability Determinations
P.O. Box 5916
Metairie, Louisiana 70009

Re:  Keefer Lamar Eaglin
SS#:  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

Dear Mr. / Mrs. Shaffer:

I had the opportunity to evaluate the above named patient in my office on 08-02-0211.  The patient's major complaints are high blood pressure, diabetes and blurred vision.

HISTORY OF PRESENT ILLNESS: The patient is a 31-year-old black male with type I insulin dependant diabetes since the age of 8. He says that he is on high blood pressure medications since January of this year,. He is not aware of any kidney problems. He was hospitalized for cellulitis of the left lower leg in July of last year and says that he still has some pain and swelling in the left lower leg with prolonged standing and walking.

The patient also says that he started experiencing blurred vision in the right eye last year. According to the records from Ochsner he was seen by an eye doctor there on July 14th of 2010 for sudden onset of seeing red in the right eye and painless blurred vision. The uncorrected visual acuity was 20/400 in the right eye and 20/200 in the left eye. The best corrected visual acuity was 20/200 on the right and 20/30 on the left. He had normal intraocular pressures. He was found to have a large pre-retinal hemorrhage covering the macular in the right eye as well as proliferative retinopathy of both eyes with early fibrosis seen in the right eye. The patient did not have follow-up at that time due to lack of insurance. He was referred to LSU in New Orleans. There is one ophthalmology clinic note from July 12th of this year when apparently the patient had no vision in the right eye and uncorrected visual acuity of the left eye was 20/125. The patient says that he has had two lazer surgeries on the left eye and one on the right eye and will have another one done on August 9th. He says that he still can only see light and shape with the right eye.

Re: Keefer Lamar Eaglin
SS#: 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

MEDICATIONS: The patient is presently taking Lisinopril HCTZ 20/12.5 mg. once a day, Ibuprofen 800 mg. twice a day, Novolin 20 units in the morning and 15 units at night and Prednisolone Forte eye drops four times a day in the right eye.

PAST HISTORY: The patient has had no major surgeries. He says that he broke his collarbone and left heel in a car accident in 2001 and also had back injury. He is not allergic to any medications.

PERSONAL AND SOCIAL HISTORY: The patient is right-handed and completed 12th grade. He worked as a restaurant manager until last year when he developed cellulitis in the left lower leg. He denies the use of alcohol and drugs. She smokes two or three cigarettes a day since 1997. He is now married for a year and he is the father of three children ages 14, 13 and 8.

## REVIEW OF SYSTEMS

General: The patient denies frequent headaches, frequent fatigue, and lightheadedness.

Central Nervous System: The patient denies syncope, convulsions, paralysis and involuntary movements and disorders of coordination. There are no problems with speech or memory.

Psychological: The patient denies suicidal ideation, paranoid ideation or hallucinations.

Eyes: See present illness.

Ears: The patient has no complaints.

Nose & Sinuses: The patient has no complaints.

Larynx & Pharynx: The patient has no complaints.

Mouth: The patient has no complaints.

Cardiovascular & Respiratory: The patient denies chronic cough and expectoration as well as wheezing, palpitations, claudications and chest pain. The patient denies orthopnea and paroxysmal nocturnal dyspnea.

Gastrointestinal: The patient has no complaints.

Genitourinary: The patient has no complaints.

Skeletal & Muscular: See present illness. Medical records show that an x-ray done in January of this year showed an old fracture of the left calcaneus with some osteopenia.

2

Re:  Keefer Lamar Eaglin
SS#:  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

Skin & Hair: The patient has noted no changes.

## PHYSICAL EXAMINATION

The patient is a slender male who ambulates without difficulty, without a limp or use of a cane.

| | |
|---|---|
| *Height:* | *63" tall without shoes* |
| *Weight:* | *132 lbs in street clothing* |
| *Temperature:* | *98.6 F* |
| *Pulse:* | *80 and regular* |
| *Respirations:* | *16 per minute* |
| *Blood Pressure:* | *156/92, left arm, standard cuff* |

Eyes:  Pupils are equal, round, and react to light and accommodation.  Funduscopic examination was not done because of the availability of medical records. The patient's uncorrected visual acuity is 20/125 on the left. The patient says that the vision is blurred on the right. He can see light and shapes of objects.

Ears:  The patient hears normal conversation without any difficulty.

Nose:  No abnormalities are noted.

Mouth:  No abnormalities are noted.

Larynx & Pharynx: No abnormalities are noted.

Neck:  There is no enlargement of the thyroid gland and no enlarged cervical lymph nodes or cervical masses.  No abnormal pulsations or bruits are noted.

Chest:  The chest is symmetrical in configuration and both hemi diaphragms move equally on inspiration and expiration. The lungs are clear to auscultation and percussion with normal breath sounds bilaterally. There are no wheezes, rhonchi or rales.

Spine and Back: The patient ambulates without self support. He has normal range of motion. He can walk on heels and toes and squat more than 2/3 of the way down and rise without support. The straight leg raise test was negative bilaterally.

Cardiovascular:  The PMI is in the 5th left intercostal space, in the midclavicular line.  The borders of cardiac dullness are within normal limits. First and second heart sounds are normal. There are no third or fourth heart sounds.  No murmurs, shocks, thrills, gallops or clicks are appreciated.

3

4

Re:  Keefer Lamar Eaglin
SS#:  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

<u>Arteries & Veins</u>:  There is no edema or color changes of the lower extremities.

<u>Breasts</u>:  No abnormalities are noted.

<u>Lymphatics</u>:  No abnormalities are noted.

<u>Abdomen</u>:  The abdomen is soft and nondistended without abnormal pulsations or bruits.  There is no abdominal hernia, organomegaly or mass.

<u>Genitourinary</u>:  No abnormalities are noted.

<u>Rectal</u>:  Not performed.

<u>Extremities</u>:  There is a tiny abrasion on the medial aspect of the left ankle just below the medial malleolus which appears to be from friction from a shoe. He has symmetrical circumferences of the ankles and calves.

<u>Skin & Mucous Membranes</u>: No abnormalities are noted.

<u>Hair and Nails</u>: No abnormalities are noted.

<u>Neurological</u>:  Cranial nerves II-XII are intact bilaterally.  Muscle bulk, tone and strength are preserved in all four extremities.  The patient has normal grip strength, grasping and dexterity bilaterally. All modalities of sensation are intact and there are no abnormalities of coordination or involuntary movements.  Superficial reflexes are intact.  The deep tendon reflexes are intact. There are no pathological reflexes. Romberg was negative and cerebellar examination is normal. The patients gait is normal.

<u>Mental Status</u>:  The patient exhibits normal understanding, cooperation, concentration, attention and memory. The personality estimate seems to be within normal limits. There is no visible nervousness or depressed mood.

## ADDITIONAL MEDICAL INFORMATION

Medical records were received and reviewed.

*Medical Assessment for is attached.*

## DIAGNOSES

1.  Type I diabetes since the age of 8.
2.  Diabetic proliferative retinopathy. The patient has had lazer procedures on both eyes and is anticipating another one on the right eye later this month.
3.  History of cellulitis left lower leg last year. Resolved.

4

@005/015                                                    08/16/2011 15.32 FAX

Re:  Keefer Lamar Eaglin
SS#:  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

## SUMMARY

The patient is a 31-year-old male  with history as in present illness. He has not worked since he was treated for cellulitis in the left lower leg in the summer of 2010. He is currently being treated for diabetic retinopathy. According to the records from Oehsner from July of last year he also had a large pre-retinal hemorrhage covering the macula in the right eye which caused sudden loss of vision in the right eye last year. He has had two lazer surgeries one in the right and two on the left and is going to have another one on the right eye on August 9th. Visual acuity uncorrected on the left side is 20/125. He can see light and shapes and shadows of objects with the right eye. The rest of his physical exam is completely unremarkable except his blood pressure of 156/92. The patient can perform all physical activities without restrictions. He should not operate machinery or motor vehicles or on unprotected heights because of the current vision problems. This should be reevaluated after he has completed the treatment and achieved the best possible result.

Thank you for referring this patient to me.

Sincerely,

Miljana Mandich, M.D.
Louisiana License No. 14385
Expiration Date: June 3, 2012

MM/jam

5



**Offender Collaborative Care**

LSU
Hospitals
Write
legibly

**Communication Form**

**Summary of Care and Recommendations**

To be completed on all offender LSU Health System visits in addition to the
medical record. Place a copy in the medical record.
Guard is to take this completed form to their facility. Do not inform
offender of follow up dates or times.

All follow up requests are reviewed for effectiveness and are to be scheduled by either the CPSO or the hospital's scheduling office.

Acct #10531933
LMRN:   98334594
EAGLIN, KEEFER L
10/12/1979     1/26/2012
                    2   M   J

Place label inside dotted box above or fill out info

---

LSU HCSD Clinic/Specialty: ___ E D ___   **OFFENDER FACILITY** (REQUIRED): _____

**EVALUATION**                          *This section is for LSU Provider's Use Only*

Reason for Specialty Consult/Visit:   Retinal detachment

Pertinent History and Physical Exam:   Vision problems for the past year, missed his
appt. No new changes.

Pertinent Study Results:

Medical Decision Making and Treatment Provided:   Seen by opthalmology, will follow-up as
Impression:   outpt.

---

**RECOMMENDATIONS/PLAN**                *This section is for LSU Provider's Use Only*

Note that you are making recommendations to medical personnel at the Offender's facility who will care for the patient.

Recommended Medications: All pain management will be prescribed by the offender's facility. DO NOT prescribe pain medications.

Recommended Treatment:
- Bedrest with head of bed elevated @ 30°
- Limited activity
- Home diabetic meds
Recommended Tests/Studies:   - See prison MD in the am.   Indication:

☐ Specialty follow up is not needed. Medical personnel at the offender's facility can provide care for the patient.

☒ Specialty follow up **may be/is** needed for:   Lord & Taylor Optho clinic on 1/27/12 @ 8 AM,
(circle one)

In **less/greater** than 2 weeks at:   clinic: _____   hospital: _____
(circle one)              Telemedicine will be scheduled if appropriate and available.

LSU PROVIDERS:  Do not schedule offender follow-up.  The offender's healthcare provider at their
facility must request ALL follow-up, if needed.

LSU Provider's Signature: _____   Print Name:   Jan Allen
ID Number:   57887   Today's Date:   1/26/12   Time:   11:45 am

---

If follow up is needed, THIS SECTION MUST BE COMPLETED BY JAIL / PRISON:
For Exceptionist users: Complete this bottom section and fax with barcode cover page to 504-568-3360.
Fax users, fax to hospital fax numbers: Bogalusa Medical Center 504-680-0711   Earl K Long  504-680-0712  ILH/MCL (New Orleans) 504-680-0262
Lallie A Kemp 504-680-0713    Leonard J Chabert 504-680-0714    University MC (Lafayette) 504-680-0715    William O Moss 504-680-0716
→ A follow up consult is requested because: _____
→ List completed tests/studies/treatments and results: _____
Prison Provider's Signature: _____   Print Name: _____   Date: _____
Offender Facility: _____   Anticipated release date is  less/greater  than 3 months.
                                                              (circle one)

4/04/2011 HCSD ICF 926

EAGLIN ,KEEFER L
29 M DOB 10/12/1979
57227   OSULLIVAN PA   FC J
MR# 00015864B PT#   2408270

REF. DR:
Age:
Eye Meds:
ROS:
PFSH:
Med Reconciled ☐ yes ☐ no

Alleg:

| VA | SC | Right Eye | | N | J |
| | | Left Eye | | | J |

| VA | CC | Right Eye | | N | J |
| | | Left Eye | | | J |

Present   R
glasses   L

M   R
L

| | R | | L | | | | nl | ab | Tonometry |
| | nl | ab | nl | ab | | pupils | | | A   R |   time   date |
| lids | | | | | | EOM | | | P   L |
| lacrimal glands | | | | | | CF | | | tech initial _____ |
| lacrimal drainage | | | | | | | | | |
| orbits | | | | | | | | | |
| preauricular lymph nodes | | | | | | | | | |

| | T | P | R | BP |
| | | | | |

SLE   Both Eyes,   Right Eye,   Left Eye
nl   ab

Level of pain: 0  1  2  3   4  5  6   7  8  9  10
(Mild)      (Mod)      (Severe)

Conjunctiva: bulbar
palpebral
Cornea: epithelium
stroma
endothelium
tear film
Anterior Chamber: depth
cell
flare
Iris: size
shape
direct & cons. reaction
morphology
Lens: Clarity
ant. & post. capsule
cortex
nucleus
Optic Disc: size
C/D ratio
appearance
nerve fiber layer
Vitreous
Retina: macula
vessels
periphery

IMPRESSION:

RECOMMENDATION:

RV: Days ____ Wks. ____ Months ____ Yrs. ____
Nurse initial _____
BMC 11 (Rev 05/10)

Physician's Signature _____
Date/Time _____

WHITE = Original     YELLOW = Billing     PINK = Shadow Chart

EAGLIN ,KEEFER L
2/ M DOB 10/12/1979   ADMDT 02/14/12
57227   OSULLIVAN PA   FC J
MR# 00015864B PT#   2408270

000158648

# DIABETIC FOOT EXAM

Exam Date _____

Check all that apply:

Skin: ☑ Unremarkable ☐ Lesion ☐ Callus ☐ Onychomycosis ☐ Other _____

Soft Tissue: ☑ Unremarkable ☐ Edema ☐ Other _____

Vascular: Pulses: DP ⊕⊕ PT _____

Musculoskeletal: ☑ Unremarkable ☐ Deformity ☐ Other_____

Mark the sensation in the circles:

+ = Can feel the 10 Gm filament
-- = Cannot feel the 10 Gm filament

RIGHT        LEFT

CHECK THE APPROPRIATE RISK CATEGORY BASED ON THE FOLLOWING FINDINGS:

Can the patient feel the 10 gram filament at all four sites on the foot? If YES, then check RISK 0.

If the patient CANNOT feel the 10 gram filament at any of the four sites, BUT there is NO focal callus, deformity or absent pulses, then check RISK 1.

If the patient CANNOT feel the 10 gram filament at any of the four sites AND there is focal callus, deformity or absent pulses, then check RISK 2.

Is there a history of foot ulceration or Charcot fracture? If YES, then check RISK 3.

| Foot Injury Risk | Intervention |
|---|---|
| ☐ 0 - No loss of protective sensation | ☑ Foot Care Education Done (Risk 0-1) |
| ☑ 1 - Loss of protective sensation | ☐ Diabetes Foot Program Referral Made (Risk 2-3) |
| ☐ 2 - Loss of protective sensation and high pressure (callus or deformity) and/or poor circulation | ☐ Other_____ |
| ☐ 3 - History of foot ulcer or Charcot fracture· | |

Provider Signature _____ Date 12/13/4

Rev 10/2010

4–Z

IN THE

COURT OF APPEAL

FIRST CIRCUIT

STATE OF LOUISIANA

#2014-KA-1729

STATE OF LOUISIANA,
Appellee

VS.

KEEFER LAMAR EAGLIN,
Appellant

On Appeal From
The 22nd Judicial District Court for the Parish of St. Tammany
State of Louisiana
No. 51994

Honorable Scott Gardner, presiding

ORIGINAL BRIEF ON BEHALF OF KEEFER LAMAR EAGLIN,
APPELLANT

COUNSEL FOR THE APPELLANT
LOUISIANA APPELLATE PROJECT
Katherine M. Franks  Bar Roll # 19240
P.O. Box 1677
Abita Springs, Louisiana 70420
Phone: (225) 485-0076

CRIMINAL APPEAL

1

## JURISDICTIONAL STATEMENT

Jurisdiction vests in this Court pursuant to *La. Const. art. V, Sec. 10* which states pertinently that, "[e]xcept as otherwise provided by this constitution, a court of appeal has appellate jurisdiction of . . . (3) all criminal cases triable by a jury. . . ." Mr. Eaglin was charged with a violation of *La. R.S. 14:42.1*, a felony triable by a jury, and sentenced on March 28, 2014 to serve eighty (80) years imprisonment at hard labor without benefit of parole. As a sentence has been imposed, the judgment is a final appealable one. *C.Cr.P. art. 912*. The record reflects that counsel notified the court on March 28, 2014 of an intent to appeal and filed a written motion on April 15, 2014, within thirty (30) days of the sentence/ ruling on the motion for reconsideration of sentence in accordance with *C.Cr.P. art. 914*. (R.pp. 41, 163, 164)

## STATEMENT OF THE CASE

Keefer Eaglin was arrested on January 17, 2012 and sat in jail, writing often to ascertain his status, until the state decided to file a bill of information on May 3 charging him with the forcible rape of C.B.. (R.p. 49)  Mr. Eaglin went to trial in November 2013. The jury found Mr. Eaglin guilty as charged. Prior to sentencing, the state charged that Mr. Eaglin was a third felony offender. The defense filed for quashal of the multiple offender bill. (R.p. 153) At the hearing, the trial judge quashed the bill as to a conviction emanating from St. Landry Parish in 1999 but adjudicated Mr. Eaglin a second offender and sentenced him to serve eighty (80) years imprisonment without benefit of parole. Mr. Eaglin asked for reconsideration of the sentence which was denied and appealed. (R.pp. 161-163, 164)

Keefer said that the two had texted the day before and arranged that she spend the day with him. He had told C.B. to bring pajamas so that they could relax together and later go out to eat.

After entering the house, the two went to his bedroom to watch T.V. and he told her to get comfortable, thinking she would change into the pajamas. He told police that she disrobed, as did he.

Keefer and C.B. then engaged in sex, first with him on top and later her. Afterward, he went outside to smoke. When he returned to the bedroom, C.B. was curled up on her side. When he asked her what was wrong, she told him her stomach hurt. He offered her both food and a drink, but she did not accept either. She said she wanted to use the bathroom and he removed his two dogs from the room so she could. He said she appeared depressed and was upset about lying to her mother. When she dressed and left the house walking, Keefer got in his car and offered to take her home. During the ride, she insisted she did not want to go home. She tried once to get out of the car. When he stopped for gas, she ran away.

After initially telling police that she had been kidnaped, C.B. testified that she went into the house and into Keefer's bedroom. She said she wanted to watch T.V. and Keefer turned on the television for her, but also turned on some music. As the two were on the bed, she said Keefer took her sweater off as well her pants. He also disrobed. All the while telling her to relax and enjoy herself, she testified Keefer had sex with her, telling her how to move and asking what he could do to make it more pleasurable for her. She said she told him to stop but she said he just told her to relax and continued. She said once he went outside to bring something to someone who had pulled up in the driveway and she got dressed while he was outside. However, she said when he returned to the house, he wanted to have sex again. In a later statement

4

she said she went along with it because she was unsure of his intentions.

After the second sexual encounter, she said told Keefer she wanted to leave, got dressed, and left the house. As she was walking down the street, she said he pulled up in a car and told her to get in, that he would bring her home. In New Orleans East, he stopped for gas. She got out of the car and ran to a nearby hotel. Using the hotel phone, she called her grandmother and spoke with her sister. She told them she had been kidnaped by three men. She told the New Orleans police, who had already been notified of her disappearance, the same. It was not until she got home that she told her mother that she and Keefer Eaglin had had sex, but that Keefer had forced her. Her mother took C.B. to Children's Hospital for an examination. Based upon the findings of vaginal tearing, the St. Tammany Parish police were called.

Keefer Eaglin said he called C.B. after she ran away to make sure she was safe and received a phone call in return by someone advising him that C.B. was only thirteen, the same age as his son. His phone records showed he a call to C.B's number sometime after 5 P.M. as well as a call made from an unknown 504 number.

Keefer Eaglin was arrested based upon C.B.'s claim of rape.


## SUMMARY OF THE ARGUMENTS

While credibility calls are generally left to the jury, in this case, C.B.'s trial testimony differs in critical respects from her interviews with police, Ann Troy and the CAC interviewer. From the initial story of a kidnaping, to the story of being forced to have sex with a person she rode forty miles in a cab to be with and had even packed a bag intending to stay, C.B. offered various versions of what occurred, all to relieve herself of responsibility for her actions. Her inconsistent statements should have caused her trial testimony with regard to her lack of consent to be so suspect that

Case Number: 2012-00840

At some point during the meeting, the victim advised that "Keefer" forced her to have sex with him, however, during the act she did not believe he ejaculated. Once "Keefer" stopped raping the victim, she subsequently got dressed and told him her real age. At that time "Keefer" advised her to get into his vehicle, which she did. Once in the vehicle, "Keefer" drove to a gas station in New Orleans East, at which time the victim exited the vehicle and ran to a local hotel, where she called her mother and sister, who called the police. The Victim was then transported to Children's Hospital in New Orleans for treatment and examination.

During a sexual assault examination conducted by Children's Hospital staff doctors, it was discovered that the victim suffered obvious and significant vaginal trauma, to include a torn and bleeding hymen.

While conducting the investigation, Detective Alvin Hotard spoke to the victim's mother who was aware of a subject named "Keefer" and advised that she had seen "Keefer's" picture on the victim's phone. At that time Detective Hotard viewed the phone, which had been brought to the hospital by the victim's sister. Upon looking through the text messages listed under the contact name of "Keefer" Detective Hotard viewed a picture of the subject, which had been sent to the phone. Detective Hotard also saw a message where the sender listed the address of 1326 Hickory Street as his home.

Upon completing the preliminary investigation at the hospital, Detective Hotard proceeded to the Saint Tammany Parish Sheriff's Office Slidell Investigations Division, where he located the one individual with the first name of "Keefer" in the report management system. The individual's full name was Keefer Lamar Eaglin (B/M, 10-12-79) and he resided in the Slidell area. Detective Hotard then viewed a prior arrest photograph of the subject and it appeared to be the same individual that had sent his picture to the victim's phone under the contact name of "Keefer". Upon retrieving the name, Detective Hotard entered it into the Louisiana Justice network database and learned that one of Eaglin's listed addresses was 1326 Hickory Street, Slidell, Louisiana.

It should be noted that upon viewing Eaglin's criminal history, Detective Hotard noted that he had a prior arrest for Carnal Knowledge of a juvenile in 1998.

Based on the above details, a search warrant was obtained for Keefer Eaglin's residence of 1326 Hickory Street on January 17, 2012 and an arrest warrant was obtained for Keefer Eaglin for the offense of Forcible Rape at the same time. At approximately 0200 hours on said date the issued Search warrant was executed at 1326 Hickory Street. Upon doing such contact was established with Keefer Eaglin and he returned to the Slidell Law Enforcement complex with Detective Hotard.

After being advised of his Rights per Miranda, Keefer Eaglin provided Detective Hotard with a short account of what occurred at 1326 Hickory on January 16, 2012. Detective Hotard found Keefer's statements to be supportive of what the victim reported, acknowledging that she was present at his residence with him on said date. Keefer refused to answer any questions relative to having sexual intercourse with the victim stating "that he had been down this road before and wanted an attorney". Keefer was subsequently charged accordingly per the issued arrest warrant for the offense of forcible rape. Keefer was then transported to the St. Tammany Parish Jail by uniform personnel and booked accordingly.

*Page 4*

ITEM # 2012-0084    DATE 1-17-12    EVI. CE # _____

     Additional

I   Name of Defendants:  #1 _____  #4 _____

                    #2 _____  #5 _____

                    #3 _____  #6 _____

II  Type of Offense __42__    Date/Time of Recovery _1·17·12_

III Victim(s) __Channel Bon__

VI Reason Seized   Analysis    Trial

V   Owner of Property _____

VI Chain of Custody:           I.D. Made By Owner       YES _____ NO _____

     Person Who Recovered Evidence _____ #7003/1717  (YES)  NO _____

                         Signature(s) & Radio #

     Turned Over To _____  Date _3-14-12_ Time _0950_

     Turned Over To _____  Date _____ Time _____

     Turned Over To _____  Date _____ Time _____

VII Description of Evidence Seized:

| Exhibit # | Quantity | Description |
|---|---|---|
| a-1 | 1 | one (1) comforter. color: Gray |
| a-2 | 2 | two (2) pillowcases |
| a-3 | 1 | one (1) comforter. color: Brown |
| a-4 | 2 | two (2) pillowcases |
| a-5 | 1 | one (1) fitted sheet color: Red |
| a-6 | 1 | one (1) pair of sweat pants color: Gray |
| a-7 | 1 | one (1) tank top. color: Black |
| a-8 | 1 | one (1) baseball hat. color: Brown |

Storage Bin #: U-8023

III-35

ITEM # 2012-0006 10 DATE 1-16-12 EVIDENCE # 2012-0840

Additional

I   Name of Defendants:   #1 K. EAGLIN          #4 _____

                          #2 _____          #5 _____

                          #3 _____          #6 _____

II  Type of Offense 14:42.1          Date/Time of Recovery 01-16-12

III Victim(s) C. BEN

VI  Reason Seized   (Analysis)        (Trial)

V   Owner of Property _____

                          I.D. Made By Owner          (YES)     NO

VI  Chain of Custody:

    Person Who Recovered Evidence  al Holl  7113/1683          Evidence Marked By Initials

                          Signature(s) & Radio #          (YES)     NO

    Turned Over To  RL2  Lews          Date 6.5.17     Time 0800 1300

    Turned Over To 020 dfc Dra Sandal          Date 10.12.12     Time 1153

    Turned Over To _____          Date _____     Time _____

VII Description of Evidence Seized:

| Exhibit # | Quantity | Description |
|---|---|---|
| 013 | 1 | BLK T-PHONE 4G BEARING ID NUMBER BCG-E2422A w/Epoxt+Onycase |
| 014 | 1 | BLK & BLUE SANYO, BOOST MOBILE PHONE BEARING ID # V65SCP27 w/charger |
| 015 | 1 | BLK COMPAQ PRESARIO CQ57 LAPTOP COMPUTER BARCODE #'s (001)76-159-978-85 w/powercord, (584037-001) |
| 016 | 1 | BLK HP 2000 VISION LAPTOP COMPUTER #'s (584037-001) (001)8-188-417-323 w/powercord |
| 17 | 1 | WHITE X-BOX CAMERA CONSOLE BEARING SERIAL # 811645560806 |
| 18 | misc | X-BOX CAMERA ACCESSORIES INCLUDING GAME CONTROLLERS AND A BLACK IN COLOR X-BOX 360 KINECT VIDEO SYSTEM BEARING BARCODE #093632804325 |
| 19 | 1 | WHT X-BOX 360 MEMORY UNIT BEARING BARCODE #'s X809156-0021 152510138847827 |
| 20 | 1 | CD CONTAINING PHOTOGRAPH'S OF X-BOX CAMERA, EQUIPT. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Storage Bin #: U-8022          III-35

5-C

5/22/2012 11:43 AM                    A-21124-12                           Page 2 of 2

## NARRATIVE

ON 01-18-12, APPROXIMATELY 9:45 AM, THE REPORTING PERSON, MS. EDNA BEN, REPORTED HER DAUGHTER, CHANEL BEN; BF, 09/07/1998 MISSING OR AS A RUNAWAY. THE REPORT WAS TAKEN BY PO OFFICER D. BANKS, UNIT 421.

ON 01-18-12, APPROXIMATELY 12:15 PM, CHANEL BEN CALLED HER SISTER AND INFORMED HER THAT SHE WAS KIDNAPPED AND SHE ESCAPED FROM THE MEN WHO KIDNAPPED HER. SHE ALSO TOLD HER SISTER THAT SHE WAS AT A HOTEL AT 7001 BULLARD AVE. CHANEL BEN'S SISTER APPARENTLY NOTIFIED POLICE WHO IN TURN PUT THE CALL OUT FOR 7TH DISTRICT OFFICERS TO RESPOND TO. LT. GERVAIS, UNIT 710A AND DETECTIVE POWELL, UNIT 1711 RESPONDED TO 7001 BULLARD AND LOCATED CHANEL BEN. CHANEL BEN INFORMED THE OFFICERS THAT ON 01-16-12, APPROXIMATELY 7:00 AM, SHE WENT OUTSIDE AS USUAL AND FOUND AN UNKNOWN BAG ON THE FRONT PORCH BEHIND THE FLOWER POT. CHANEL WENT ON TO SAY SHE ATTEMPTED TO OPEN THE PORCH DOOR WITH THE BAG IN HER HAND BUT THE DOOR WAS STUCK. CHANEL THEN SAID AT THAT TIME, THREE MASK MEN RAN UP TO THE PORCH, OPENED THE DOOR AND FORCED HER IN AN UNKNOWN RED CAR, PUT SOMETHING OVER HER HEAD AND DROVE HER TO AN UNKNOWN LOCATION. CHANEL STATED AFTER A WHILE, SHE WAS ABLE TO ESCAPE FROM HER CAPTURES AND RUN TO THE HOTEL AT 7001 BULLARD AVENUE WHERE THE POLICE PICKED HER UP.

OFFICERS NOTIFIED THE 4TH DISTRICT THAT THE 21J, MISSING PERSON/RUNAWAY, HAD BEEN LOCATED. OFFICERS RELOCATED MS. CHANEL BEN TO THE SEVENTH DISTRICT STATION TO BE REUNITED WITH HER MOTHER, MS. EDNA BEN, AND OTHER FAMILY MEMBERS. CHANEL'S FAMILY MEMBERS BEGAN TO SEARCH HER CELL PHONE AND LEARNED THAT SHE CALLED A UNITED CAB FROM HER CELL PHONE APPROXIMATELY 7:45 AM. DETECTIVE POWELL CALLED THE CAB COMPANY, 522-9771, AND LEARNED THAT CAB NO. 146, MR. ELLIOTT FLOOD, PICKED UP A FARE AT CHANEL'S RESIDENCE AT 3601 LENNOX BLVD. DETECTIVE POWELL INTERVIEWED MR. FLOOD WHO STATED HE PICKED UP A YOUNG LADY FROM 3601 LENNOX BLVD. MR. FLOOD SAID THE YOUNG LADY WENT ON TO SAY THAT SHE WAS GOING TO 1326 HICKORY STREET, SLIDELL, LA; AND INFORMED HIM THAT SHE WAS A STUDENT AT DILLARD UNIVERSITY AND SHE WORKED AT THE OAKWOOD MALL. MR. FLOOD SAID HE PULLED UP TO A BLUE HOUSE ON A SHORT STREET OFF OF SOUTH STREET. HE ASKED THE YOUNG LADY WHO WAS SHE INTENDING TO PAY FOR THE FARE, WHICH WAS $85.00. MR. FLOOD SAID THE YOUNG LADY SAID SHE WAS GOING TO PAY BY CREDIT CARD AND HE ASKED HER FOR HER IDENTIFICATION. MR. FLOOD SAID THE YOUNG LADY WAS ALREADY TALKING TO SOMEONE ON THE PHONE AND HE HEARD THE YOUNG LADY ASKING THE PERSON ON THE PHONE IF THEY WERE GOING TO PAY FOR THE CAB FARE. MR. FLOOD SAID A FEW MINUTES LATER, A MAN APPROACHED THE CAB, PAYED HIM $85.00 IN CASH AND THE YOUNG LADY GOT OUT OF THE CAB AND HE PULLED OFF.

DETECTIVE POWELL REINTERVIEWED MS. CHANEL AND HER MOTHER AND INFORMED THEM THAT HE HAD JUST INTERVIEWED THE CAB DRIVER AND INFORMED CHANEL WHAT THE CAB DRIVER SAID. MS. CHANEL BEGAN TO CRY AGAIN THEN ADMITTED THAT SHE HAD CAUGHT THE CAB TO A MAN'S HOUSE AT 1326 HICKORY ST. IN SLIDELL, LA AND THE MEN DID NOT DO ANYTHING. AFTER SEVERAL MINUTES OF TALKING TO CHANEL, CHANEL ADMITTED TO HER MOTHER, MS EDNA BEN, THAT SHE DID HAVE SEX WITH THE MAN WHO SHE DID NOT OR WOULD NOT IDENTIFY, AND THAT THE MAN HAD UNPROTECTED SEX WITH HER THEN BROUGHT HER BACK TO NEW ORLEANS AND DROPPED HER OFF ON BULLARD AVENUE.

DETECTIVE POWELL INFORMED MS. EDNA BEN TO TAKE HER DAUGHTER TO CHILDREN'S HOSPITAL AND DETECTIVE POWELL NOTIFIED SEX CRIMES UNIT 4553, DETECTIVE COREY GERVAIS, WHO STATED TO DO A SUPPLEMENTAL AND NOTIFY ST. TAMMANY PARISH'S SEX CRIMES UNIT.

ANY ADDITIONAL INFORMATION WILL FOLLOW IN A SUPPLEMENTAL REPORT.

6-A

## SUPPLEMENT - NARRATIVE CONTINUATION

| | | | Juvenile | 1. Original |
|---|---|---|---|---|
| | | | | 2. Supplement    2 |

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| A0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported | Incident Type | |
| 1/16/2012 | Rape-forcible | |

### NARRATIVE CONTINUATION

On Monday, January 16, 2012, at approximately 5:35 pm, Detective Alvin Hotard of the Saint Tammany Parish Sheriff's Office Major Crimes Unit was notified by Central Dispatch to contact Lieutenant Wharton Muller of the Criminal Patrol Division relative to a signal 42 (aggravated rape).

After receiving the message, Detective Hotard contacted Lieutenant Muller who advised that he had received a telephone call from a staff member at Children's Hospital in New Orleans.  The staff member advised that a thirteen year old black female was brought in by her mother after being raped in Slidell, Louisiana. Lieutenant Muller further advised that the incident took place at the address of 1326 Hickory Street in Slidell, Louisiana.  Lieutenant Muller had no further information relative to the incident and advised that a criminal patrol unit had not been dispatched to children's hospital to take an initial report.

*An initial report had been taken* [handwritten]

Upon concluding the conversation with Lieutenant Muller, Detective Hotard contacted Major Crimes Unit Sergeant Brian O'Cull and advised him of the information.  At that time Sergeant O'Cull advised that he would contact Detective Rachel Smith of the Major Crimes Unit so that she could assist Detective Hotard with the investigation.

Shortly after ending the conversation with Sergeant O'Cull, Detective Hotard was contacted by Detective Smith and the two agreed to meet at Children's hospital in New Orleans to begin the investigation.  Detective Hotard subsequently departed Saint Tammany Parish en route to Children's Hospital located at 1101 Calhoun Street, New Orleans, Louisiana.

Upon arrival at approximately 7:00 pm, Detective Hotard proceeded to the juvenile trauma unit located on the second floor.  Once at the unit, Detective Hotard met with Detective Smith who had already arrived.  At that time the detectives conducted an interview with registered nurse Lisa Lupin of Children's Hospital.  From the interview the following information was learned:

*her memory is that she was raped* [handwritten left margin]

Lupin advised that the victim, identified as Chanel Ben (Black Female, DOB: 09-07-1998) had been brought to the hospital at approximately 2:00 pm by her mother, Edna Ben (Black female, DOB: 07-24-1949).  C. Ben had called 911 and her mother from a hotel in New Orleans east and advised that she had been kidnapped and raped in Slidell, Louisiana.  After receiving the call Officers from the New Orleans

*Called Mother kidnapped and Rape* [handwritten right margin]

### ADMINISTRATIVE

| Report Contains | | | | | Related Report Number(s) | | |
|---|---|---|---|---|---|---|---|
| Officer(s) Reporting | ID. Number | Name | | ID. Number | Unit | Date | |
| HOTARD, ALVIN A | 1683 | | | | 7113 | 02/15/2012 | |
| Officer Reviewing (if Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Routed To | | Referred To | | | | | |
| MAJOR CRIMES | | | | | | | |
| Assigned To | | By | | | | Assigned Date | |
| | | | | | | | |
| Case Status | | Exception Type | | | | Date Cleared | |
| CLEARED BY ARREST | | | | | | | |

6-B

SUPPLEMENT - NARRATIVE CONTINUATION

| | | | | Juvenile | | 1. Original | |
|---|---|---|---|---|---|---|---|
| | | | | | | 2. Supplement | 2 |

| ncy ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| 0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| inal Date Reported | Incident Type | |
| /16/2012 | Rape-forcible | |

## NARRATIVE CONTINUATION

After speaking with Whitmore, Detective Smith conducted an interview Trevon Eaglin, Keefer Eaglin's thirteen year old son.  From the interview Detective Smith learned that T. Eaglin was present at the residence during the time the incident took place, however he was in his room with the door closed.  Upon waking he stayed in his room and played video games until sometime in the afternoon.  At no time did he see his father or anyone else in the residence.

While the aforementioned scene investigation was being conducted, Detective Hotard arrived at the Slidell Law Enforcement Complex and conducted an interview with Eaglin, who had been transported.

Before Beginning the interview, Detective Hotard advised Eaglin of his rights per Miranda, as well as, his waiver of rights.  Detective Hotard then allowed Eaglin to read the form, and Eaglin subsequently signed his name in both places.  At that time Detective Hotard began the interview and learned the following information:

Eaglin advised that he met Ben through a website called "Tagged" and according to her profile she was nineteen years old.  Upon meeting each other they chatted online for three or four days, until Sunday, January 15, 2012 when they spoke over the phone.  Eaglin advised that during the conversation, they planned to meet at Eaglin's residence the following day, Monday, January 16, 2012 and Ben advised she would drive there.  Eaglin further advised that sometime in the morning on Monday, January 16, 2012, Ben arrived at his residence in a cab, which he was forced to pay for because Ben had no money.  Upon seeing Ben, Eaglin asked her to see some identification, because he thought she looked younger than nineteen years old.  When Ben could not provide any identification, Eaglin told her to get into his car because he was going to take her back home to the Westbank of New Orleans.  Upon driving there on Interstate 10, Eaglin advised he stopped at a gas station and during that time Ben ran off, but he did not know where Ben ran off to.  Eaglin then drove back home. Eaglin advised that at no time did he and Ben ever engage in any type of inappropriate or sexual activities.

Upon concluding the interview, Detective Hotard completed the proper booking paperwork and Eaglin was subsequently transported to criminal patrol deputies to the Saint Tammany Parish Jail where he was booked accordingly.

On Thursday January 19, 2012 at approximately 10:51 am, Sergeant Brian O'Cull presented before Judge William Knight of the 22nd Judicial Court an affidavit for a

### ADMINISTRATIVE

| ort Contains | | | | | Related Report Number(s) | | | |
|---|---|---|---|---|---|---|---|---|
| er(s) Reporting | ID. Number | Name | | | ID. Number | Unit | Date | |
| OTARD, ALVIN A | 1683 | | | | | 7113 | 02/15/2012 | |
| er Reviewing (If Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| ed To | | Referred To | | | | | | |
| JOR CRIMES | | | | | | | | |
| gned To | | By | | | | | Assigned Date | |
| Status | | Exception Type | | | | | Date Cleared | |
| EARED BY ARREST | | | | | | | | |

6-C

SUPPLEMENT - NARRATIVE CONTINUATION

|  |  | Juvenile ☐ | 1. Original ☐ |
|  |  |  | 2. Supplement ☒ |

| Agency ORI Number | Agency Name | Agency Report Number |
| IJA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported | Incident Type | |
| 01/16/2012 | Rape-forcible | |

## NARRATIVE CONTINUATION

After speaking with Whitmore, Detective Smith conducted an interview Trevon Eaglin, Keefer Eaglin's thirteen year old son.  From the interview Detective Smith learned that T. Eaglin was present at the residence during the time the incident took place, however he was in his room with the door closed.  Upon waking he stayed in his room and played video games until sometime in the afternoon.  At no time did he see his father or anyone else in the residence.

While the aforementioned scene investigation was being conducted, Detective Hotard arrived at the Slidell Law Enforcement Complex and conducted an interview with Eaglin, who had been transported.

Before Beginning the interview, Detective Hotard advised Eaglin of his rights per Miranda, as well as, his waiver of rights.  Detective Hotard then allowed Eaglin to read the form, and Eaglin subsequently signed his name in both places.  At that time Detective Hotard began the interview and learned the following information:

Eaglin advised that he met Ben through a website called "Tagged" and according to her profile she was nineteen years old.  Upon meeting each other they chatted online for three or four days until Sunday January 15, 2012 when they spoke over the phone.  Eaglin advised that during the conversation they planned to meet at Eaglin's residence the following day Monday January 16, 2012 and Ben advised she would drive there.  Eaglin further advised that sometime in the morning on Monday January 16, 2012, Ben arrived at his residence in a cab which he was forced to pay for because Ben had no money.  Upon seeing Ben, Eaglin asked her to see some identification because he thought she looked younger than nineteen years old.  When Ben could not provide any identification, Eaglin told her to get into his car because he was going to take her back home.  Eaglin advised as he was driving to New Orleans and during that time he stopped at a gas station and during the ride to New Orleans he did not know where Ben lived.  Eaglin then drove back home.  Eaglin advised that at no time did he and Ben ever engage in any type of inappropriate or sexual activities.

Upon concluding the interview, Detective Hotard completed the proper booking paperwork and Eaglin was subsequently transported to criminal patrol deputies to the Saint Tammany Parish Jail where he was booked accordingly.

On Thursday January 19, 2012 at approximately 10:51 am, Sergeant Brian O'Cull presented before Judge William Knight of the 22nd Judicial Court an affidavit for a

## ADMINISTRATIVE

| Report Contains | | | Related Report Number(s) | |
|  |  |  |  |  |

| Officer(s) Reporting | ID. Number | Name | ID. Number | Unit | Date |
| HOTARD, ALVIN A. | 1683 | | | 7113 | 02/15/2012 |

| Officer Reviewing (If Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
|  |  |  | 0 | 0 | 0 | 0 | 0 | 0 |

| Routed To | Referred To | | |
| MAJOR CRIMES | | | Assigned Date |
| Assigned To | By | | |
|  |  | | Date Cleared |

| Case Status | Exception Type | |
| CLEARED BY ARREST | | |

6-C

DICTIONARY   THESAURUS   GRA. 1AR   EXPLORE   BLOG   SIGN IN

DICTIONARY   forcible    

WORD OF THE DAY

attrit 🔊

VERB

Home   British & World English   forcible

Definition of *forcible* in English:

# forcible   

---

**ADJECTIVE**

1   Done by force.
    '*signs of forcible entry*'
       More example sentences        Synonyms

1.1   Vigorous and strong; forceful.
      '*they could only be deterred by forcible appeals*'
         More example sentences        Synonyms

---

### Origin
Late Middle English: from Old French, from force (see force).

---

### Pronunciation
forcible /ˈfɔːsɪb(ə)l/



The Oxford Dictionaries Word of the Year 2016 is...



Drunk Texts, Squad Goals, and Brewer's Droop: an Oxford Dictionaries update



10 mistakes made by learners of English

 

DICTIONARY   forcible   

MENU

6–D

## SUPPLEMENT - NARRATIVE CONTINUATION

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| LA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported 01/19/2012 | Patient Type Rape-forcible | |

### NARRATIVE CONTINUATION

back inside of the residence. Upon seeing "Keefer", C. Ben told him that she wanted to leave, but he would not let her. "Keefer" then took off all of her clothes again and pushed her back down onto the bed, where he "raped" her again. After being "raped" again, she began to cry, and "Keefer" told her to get out of his residence.

At that time, C. Ben and "Keefer", while still inside of his residence, began to talk some more. During the conversation, "Keefer" asked C. Ben if she wanted to go home, to which she replied, "yes". "Keefer" then told her that he was worried that she would get him into trouble, but subsequently let her leave the residence anyway. At that time C. Ben followed him to his car, but walked past him down the street. "Keefer" subsequently caught up with her in his vehicle, and she got in. Once C. Ben was inside the car, "Keefer" told her that he was going to bring her to the police station. At that time "Keefer" drove her to a gas station in New Orleans East and stopped. Once the vehicle was stopped, C. Ben got out of the car and ran to a nearby hotel where she called her mother and the police.

C. Ben advised that at no time did she tell "Keefer" how old she was or did they ever discuss age.

At the conclusion of the interview with C. Ben, the detectives relocated to the second floor waiting room where E. Ben was located. Upon their arrival to the waiting room the detectives introduced themselves to E. Ben and explained their presence to her. At that the detectives conducted an interview with E. Ben where the following information was learned:

E. Ben stated that on the morning of Monday, January 16, 2012 at approximately 7:50 am she heard the front door of her house open and close and realized that her daughter, C. Ben had left the residence. E. Ben then left the residence and went looking for C. Ben, however her efforts proved fruitless. At that time E. Ben returned to her residence, called the NOPD, and filed a missing person's report under NOPD Item number A-21124-12. E. Ben then realized that C. Ben had left the residence with a change of clothes, E. Ben's debit card, and a twenty (20) dollar bill. E. Ben did not know the reason why C. Ben left and explained that they had not been arguing or had any type of disagreement during the morning.

Later in the afternoon around 2:00 pm, E. Ben received a phone call from C. Ben. During the conversation, C. Ben advised E. Ben that she was at a hotel in New Orleans East and had been kidnapped. C. Ben was then transported to the NOPD's

### ADMINISTRATIVE

| Report Contains | | | Related Report Number(s) | | |
|---|---|---|---|---|---|
| Officer(s) Reporting HOTARD, ALVIN A | I.D. Number 1683 | Name | I.D. Number | Unit 7113 | Date 02/16/2012 |
| Officer Reviewing (if Applicable) | I.D. Number | Approved Date | # Offenses 0 | # Offenders 0 | # Vehicles Stolen 0 | # Arrested 0 |
| | | | # Victims 0 | # Premises Ent. 0 | | |
| Routed To MAJOR CRIMES | | Referred To | | | Assigned Date |
| Assigned To | | By | | | Date Cleared |
| Case Status CLEARED BY ARREST | | Exception Type | | | |

Tagged - Terms of Service

**Join Tagged now - it's free!**
Tagged is a great place to socialize with friends and meet new people.
Make your own profile, share photos, chat, flirt, play games, and have fun!

**TAGGED**

Sign in to Tagged

[Join Tagged >]    Connect with Facebook

# TERMS OF SERVICE

Jump to Privacy Policy

## Terms of Service

Updated as of January 8, 2013

Please read the following important Terms of Service Agreement (the "Agreement") before accessing or using any of the various services (the "Services") made available to you (the "Member") by Tagged, Inc. ("Tagged") through http://www.tagged.com. Tagged mobile applications or otherwise. ONLY USERS WHO ARE 13 YEARS OF AGE OR OLDER MAY REGISTER FOR TAGGED. By completing the registration process for the Tagged website, you represent that you are 13 years of age or older, and can and will be legally bound by this Agreement. If you are a minor, your parent or guardian must read and accept the terms of this Agreement before you register. No Member may participate where doing so would be prohibited by any applicable law or regulation.

### A) Modifications

Tagged reserves the right to modify or amend this Agreement at any time, for any reason, or for no reason at all, at Tagged's sole discretion. The most recent version of this Agreement will be posted on the Tagged website. Although Tagged will provide notice of material changes to this Agreement on the Tagged website, as a Member it is your sole responsibility to keep yourself apprised of any such modifications or amendments. Should Member object to any terms and conditions of the Agreement or any subsequent modifications thereto or become dissatisfied with Tagged in any way, Member's only recourse is to immediately: (1) discontinue use of Tagged; (2) terminate Tagged registration; and (3) notify Tagged of termination.

### B) Description of Services

As a Member, you will be provided with a variety of Services, as described on the Tagged website. Members may also utilize certain additional services offered from time to time such as shopping and e-commerce offerings and various informational services. Tagged reserves the right to enhance, modify, or discontinue the Services, in whole or in part, at any time, for any reason, or for no reason at all, at Tagged's sole discretion, with or without notice to Members, and with no obligation to Members.

### C) Member Conduct

Use of the Services by you, as Member, is subject to all applicable local, state, national and international laws and regulations. Tagged reserves the right, but does not assume any obligation, to monitor the Services to enforce this Agreement. Nor does Tagged guarantee that any monitoring it does perform will be to the Member's satisfaction. Upon learning of any violation of this Agreement, Tagged, at its sole discretion, may terminate your access to and use of the Services, require you to remedy your violation, and/or take any other actions that Tagged deems appropriate to enforce its rights and pursue all available remedies. Without limitation, Tagged reserves the right to terminate your access to and use of the Services if, in your view, your conduct fails to meet any of the following guidelines:

1. Members shall not engage in any activity that constitutes harassment, including, but not limited to, excessive repetition when listing a person as a referral, repeated unwanted contact, interfering with a Member's use of site or stalking.
2. Members shall not list the email addresses of people unknown to them.
3. Members shall not list as referrals any email addresses that are fake, fictitious, or made up.
4. Members shall not list as referrals any email addresses which are owned by or belong to that member.
5. Members shall not attempt to interfere with any other person's use of the Services.
6. Members shall not misrepresent their identity or impersonate any person or entity, including, but not limited to, a Tagged employee, forum leader, guide or host.
7. Members shall not hold themselves out as sponsored by, endorsed by, or affiliated with the Tagged website.
8. Members shall not use any portion of the Tagged website or the Services to post, upload, email, transmit or otherwise make available junk mail, commercial advertisements, or any other form of commercial solicitation.
9. Members shall not use any portion of the Tagged website or the Services to post, upload, email, transmit or otherwise making available content, comments and friend list names, that is harmful, threatening, abusive, vulgar, obscene, profane, defamatory, libelous, hateful, or racially, ethnically or otherwise objectionable.
10. Members shall not engage in any activity that is patently offensive or promote or otherwise incite racism, bigotry, hatred or physical harm of any kind against any group or individual.
11. Members shall not use any portion of the Tagged website or the Services to post, share, promote, depict, encourage, solicit or exchange Content Harmful to Minors.
12. Members shall not upload photos, graphics or other content that contain or promote illegal substances or activities, including, but not limited to, underage drinking or smoking, substance abuse, weapon use, or gang affiliation.
13. Members shall not post content that displays pornographic or sexually explicit material of any kind.
14. Members shall not provide material that exploits people under the age of 18 in a sexual or violent manner, or solicits personal information from anyone under 18.
15. Members shall not provide instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses.
16. Members shall not attempt to gain unauthorized access to Tagged's database or other computer systems.
17. Members shall not attempt to modify, translate, adapt, edit, decompile, disassemble, or reverse engineer any software programs used by Tagged in connection with the Tagged website or the Services.
18. Members shall not engage in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of, the Services or the Tagged website.
19. Members shall not collect or store personal data about other Members in connection with the prohibited conduct and activities set forth in paragraph #1 through #18 above.
20. Members shall not use any portion of the Tagged website or the Services for any unlawful purpose.
21. Members shall not engage in any activity that solicits or is designed to solicit password or personal identifying information for commercial or unlawful purposes from other Members.
22. Members shall not use the account, username, or password of another Member at any time or disclose their password to any third party or permit any third party to access their account.
23. Members shall not publicly post information that poses or creates a privacy or security risk to another person.

All judgments concerning the applicability of these guidelines shall be at the sole and exclusive discretion of Tagged and its designees. Tagged has the right in its sole discretion to pre-screen, refuse or remove any content that is available via the Tagged Services. Tagged and its designees shall have the right to remove any Content that violates this Agreement or is otherwise objectionable. An account may be terminated at any time, without notice, depending on the severity of the offense, which is determined exclusively at the discretion of Tagged. Tagged is not obligated to provide a Member with a warning prior to removal.

### D) Privacy

Tagged has established a Privacy Policy to explain to Members how their information is collected and used, which Member can read by clicking http://www.Tagged.com/terms_of_service.html?privacy#privacy_policy. The policy explains how and when Tagged may use Member information and content. Member's use of the Tagged website or the Services signifies acknowledgment of and agreement to Tagged's Privacy Policy. Members further acknowledge and agree that Tagged may disclose Member's personal information if required to do so by law or in the good faith belief that such preservation or disclosure is reasonably necessary to comply with legal process, enforce this Agreement, or to protect the rights, property, or personal safety of Tagged, its employees, users and third parties, and the public, or as otherwise described in the Privacy Policy. The Find Friends feature is an easy way for Tagged users to invite friends through email. The email address(es) that you supply to use this service will only be used to send invitations to connect with you on Tagged.

© 2013 Tagged Inc.

Mobile  About  Blog  Users  Privacy  Terms  Online Safety  Report Abuse  Help          English

STATE OF LOUISIANA               NUMBER: 519994  E

VERSUS                           22ND JUDICIAL DISTRICT CO

KEEFER L. ENGLIN                 PARISH OF ST TAMMANY

_8/13/12_                        _Rachel Sharp_
Filed:                           Deputy Clerk

### NOTICE OF APPEARANCE

The Defendant Keefer L. Englin, the captioned defendant moves the Court take notice and allow him to enroll as co-counsel in the captioned matter. The defendant is currently imprisoned in the Louisiana Department of Public Safety and Corrections and has lodged a Motion for Discovery.

Respectfully,          Dated:  8 - 10 - 12

_Keefer Englin_
Keefer Englin

### CERTIFICATE OF SERVICE

The undersigned deposes and says that he has served opposing counsel of record a true and correct copy of the same by depositing the same in the United States Mail.

Keefer Englin

Greater New Orlear

# Walter Reed guilty on 18 of 19 charges: Follow live coverage



By Robert Rhoden, NOLA.com | The Times-Picayune
Email the author | Follow on Twitter
on May 02, 2016 at 6:30 PM, updated May 03, 2016 at 7:33 AM

Walter Reed was convicted Monday night (May 2) on 18 of 19 charges of conspiracy, wire fraud, mail fraud, money laundering and making false statements on his federal income tax returns. Jurors also convicted his son, Steven Reed, of conspiracy, wire fraud and money laundering.

- *Follow the comments stream of this story, where NOLA.com is reporting the verdict on each of the counts as it is read aloud in court.*

The verdicts made for a swift and decisive rebuke to Walter Reed, 69, who served for 30 years as district attorney for St. Tammany and Washington parishes and never shied away from his home parish's tough-on-crime nickname of "St. Slammany." The most powerful politician in St. Tammany, Reed did not seek re-election in 2014 as the federal investigation of his activities built toward the grand jury indictment.

Convictions came on the 11th day of the father-son political corruption trial in Judge Eldon Fallon's courtroom in U.S. District Court in New Orleans. The jury deliberated about five hours.

The government accused Reed of illegally spending more than $100,000 in campaign funds for personal use, failing to report that money as income and giving his son money disguised as legitimate campaign expenses. He also was charged with taking money from St. Tammany Parish Hospital in Covington for legal services, when that money should have gone to the district attorney's office.

Reed was charged with 19 crimes, his son with four. Each was acquitted of a single charge of money laundering, in count 10 of the indictment.

When sentenced, Walter Reed by law faces more than 275 years in prison, Steven Reed more than 50 years. Both also could be fined, with Walter Reed looking at more than $4.5 million in penalties.

Still, maximum sentences in federal court are rare for first offenders. Instead, probation and parole officers conduct an investigation into the defendants and the crimes and apply sentencing guidelines that establish a range of prison time, almost always much shorter than the maximum. The judge determines the sentence but may deviate from the range, up or down.

Fallon, whom President Bill Clinton appointed to the court, scheduled sentencing Sept. 15.



Walter Reed's fate now in hands of jury

The charges against the defendants were:

- **Count 1 conspiracy --** An overarching count accusing both defendants of conspiring to defraud and obtain money and property from the Walter Reed campaign and from campaign contributors. The allegations include Walter Reed using campaign money to recruit potential clients for his private law practice, paying off expenses incurred by Steven Reed and spending campaign funds for private and personal dinners. Reed allegedly overpaid his son's companies for an anti-drug video and for work supposedly performed for the campaign, and arranged for two fundraising event vendors to funnel money to Steven Reed.
- **Count 2, wire fraud -** That Walter Reed illegally used campaign funds in June 2010 to pay for a $2,635 dinner for preachers at Gerald's Steakhouse in Washington Parish to recruit them to refer cases to his private law firm. In the process, Reed caused electronic bank transactions to take place, constituting wire fraud, according to the indictment.
- **Count 3, wire fraud -** That Walter Reed spent $589.68 in campaign funds in June 2010 to throw a birthday party for his girlfriend's 17-year-old son and nine friends at Annadele's Plantation in Covington. In doing so, Reed caused bank transfers and committed wire fraud, according to the indictment.
- **Count 4, wire fraud -** That Walter Reed spent $1,885.36 in campaign funds in 2011 at The Dakota restaurant near Covington for a Thanksgiving Day dinner for relatives and to buy a $500 gift card for his future personal use. The activity sparked wire transfers between banks and violated the wire fraud statute, according to the indictment.
- **Count 5 wire fraud --** That Walter Reed used $614.49 in campaign funds in April 2012 to send flowers to several people, including his daughter and a woman who accompanied him to the prison rodeo at Louisiana State Penitentiary at Angola. The action led to monetary transfers between banks and violated the wire fraud statue, according to the indictment.
- **Count 6, wire fraud --** That Walter Reed spent $4,701.79 in campaign funds in August 2012 to buy dinner for a gathering of preachers in Little Rock, Ark., to recruit them to send legal cases to the private law firm with which he was affiliated. The activity caused wire transfers between banks and was a violation of the wire fraud statute, according to the indictment.
- **Count 7, wire fraud --** That both defendants committed wire fraud in October 2012 when Walter Reed used campaign funds to pay his son's company, Liquid Bread, $29,400, which included expenses unrelated to the elder Reed's campaign.
- **Count 8, wire fraud --** That Walter Reed gave a $25,000 check to Faith Tabernacle Church in Franklinton in November 2013 to get referrals to the law firm with which he was affiliated. The activity triggered bank transactions that violated the wire fraud law, according to the indictment.
- **Counts 9, 10, money laundering --** That both defendants violated the law in September 2012 when Walter Reed arranged for two of his fundraising event vendors each to pay $5,000 to a company owned by Steven Reed in a way to disguise the payments as legitimate campaign expenses.
- **Counts 11-14, false statements on tax returns --** That Walter Reed submitted tax returns that did not include all of his income for 2009 through 2012.
- **Counts 15-19, mail fraud --** That Walter Reed arranged for checks from St. Tammany Parish Hospital to be mailed to the district attorney's office but deposited them into a personal bank account. The money was supposed to go into a district attorney's account, according to the indictment.

 Meet the key players in U.S. v. Walter Reed

Registration on or use of this site constitutes acceptance of our **User Agreement and Privacy Policy**

© 2016 NOLA Media Group. All rights reserved **(About Us).**
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of NOLA Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ Ad Choices

# Former St. Tammany Parish DA Walter Reed found guilty counts of corruption charges

WWLTV.com , WWL     8:13 P.M. CDT May 02, 2016



*(Photo: WWL)*

NEW ORLEANS -- Former St. Tammany District Attorney Walter Reed was found guilty on 18 corruption-related counts.

Reed was only found not guilty on one count of money laundering. The verdict comes after little more than four hours of deliberations.

"As the jury found, the defendants' actions were not innocent 'mistakes,' as Walter Reed claimed during his testimony. They were crimes," U.S. Attorney Kenneth Polite tweeted following the verdict.

"As a community, we are tired of hearing, and accepting, excuses from public officials who violate the public trust to enrich themselves."

For the past two weeks, Reed has been in a federal courtroom, facing multiple counts of criminal accusations, along with his oldest son Stephen Reed.

The government lodged against the pair allegations of mail and wire fraud, conspiracy, money laundering and making false statements on tax documents.

Evidence presented included campaign fund purchases of large group dinners, gift cards and flowers, as well as checks to a church and his son for campaign events and public service announcements.

The government argued it was a case of greed, entitlement and excuses that led to Reed using his campaign fund as a personal ATM for $150 thousand, then defrauded his own office by keeping money from a St. Tammany Hospital deal for legal representation.

U.S. Attorney Kenneth Polite tweeted his reaction to the verdict.

"As the jury found, the defendants' actions were not innocent "mistakes," as Walter Reed claimed during his testimony," Polite said. "They were crimes."

Both Walter and Stephen remain free on bond until Sept. 15, when sentencing will take place.

The counts are as follows:

Count 1 – Conspiracy, GUILTY
Count 2 – Wire fraud, Gerald's Steak House, GUILTY
Count 3 – Wire fraud, Annadele's Plantation, GUILTY
Count 4- Wire fraud, Dakota Restaurant, GUILTY
Count 5- Wire fraud, Flowers N. Fancies, GUILTY
Count 6- Wire fraud, First Pentecostal Church, GUILTY
Count 7 – Wire fraud, Liquid Bread, GUILTY
Count 8 – Faith Tabernacle Church, GUILTY
Count 9 – Money laundering through The Lake House, GUILTY
Count 10 – Money laundering through White Oak Productions, NOT GUILTY
Count 11 – False statement on income tax returns, GUILTY
Count 12 – False statement on income tax returns, GUILTY
Count 13 – False statement on income tax returns, GUILTY
Count 14 – False statement on income tax returns, GUILTY
Count 15 -- Mail fraud, St. Tammany Parish Hospital, GUILTY
Count 16 – Mail fraud, St. Tammany Parish Hospital, GUILTY
Count 17- Mail fraud, St. Tammany Parish Hospital, GUILTY
Count 18 - Mail fraud, St. Tammany Parish Hospital, GUILTY
Count 19 - Mail fraud, St. Tammany Parish Hospital, GUILTY

(© 2016 WWL)



WWL

Jury begins deliberations in the trial of former St. Tammany Parish DA Walter Reed

7-C

| 01 Build | 02 Oddities | 03 Scars | 04 Tattoos | 05 Apparel |
|---|---|---|---|---|
| 03 Medium | | | | |
| 06 Speech | 07 Accent | 08 Facial Odd. | 09 Eyes | 10 Nose |
| | 01 Afro/American | | 02 Brown | 02 Small |
| 11 Teeth | 12 Hair Color | 13 Hair Style | 14 Facial Hair | 15 Complexion |
| | 04 Black | 08 Medium | | 08 Brown |

Additional Description
RED SWEATER, BLUE SHIRT, AND GRAY SWEATPANTS

## MODUS OPERANDI

| 16 Criminal Activity | 17 Motive | 18 Targets | | |
|---|---|---|---|---|
| 19 Method of Entry | 20 Point of Entry/Exit | 21 Security Used | | Security Defeated |
| 22 Residential | 23 Outdoor Area | 24 Comm. Establishment | | 25 Public Access Area |
| 26 Movable | 27 Structure Type | 28 Structure Status | | |
| 29 Off. Approach | 30 Impersonated | 31 Weapon/Tool | | 32 Firearm Features |
| 33 Property Crimes | 34 Person Crimes | Sex Crime Specific | | |

Additional Descriptions

### NARRATIVE

ON MONDAY, JANUARY 16, 2012 AT ABOUT 9:09 AM, OFFICER DERRICK BANKS UNIT #31A, WAS DISPATCHED VIA N.O.P.D. DISPATCHER TO INVESTIGATE A SIGNAL 21J, RELATIVE TO A MISSING/RUNAWAY JUVENILE AT 3801 LENNOX BLVD.

UPON ARRIVAL, THE OFFICER MET WITH THE REPORTING PERSON, MS. EDNA BEN. MS. BEN, WHO WAS THE MOTHER OF THE MISSING/RUNAWAY JUVENILE, (CHANEL BEN -DF, D.O.B. 9-7-1994) STATED ON 1-16-2012 AT ABOUT 8:00 AM, HER DAUGHTER INFORMED HER, SHE WANTED TO START JOGGING. MS. BEN STATED A FEW MINUTES LATER, SHE HEARD A VEHICLE HORN BLOW AND THE FRONT DOOR OF HER RESIDENCE OPEN. MS. BEN STATED SHE WAS IN BED BUT SHE IMMEDIATELY GOT UP AND DRESSED. SHE STATED WHEN SHE LOOKED OUT OF HER WINDOW, THE VEHICLE WAS GONE AND HER DAUGHTER WAS NO WHERE IN SIGHT. MS. BEN STATED SHE DROVE AROUND IN HER VEHICLE TO SEE IF CHANEL WAS JOGGING BUT DID NOT LOCATE HER. SHE THEN NOTIFIED THE POLICE. MS. BEN INFORMED THE OFFICER, SHE CONTINUED TO TRY AND REACH CHANEL ON HER MOBILE CELL PHONE BUT THERE WAS NO ANSWER.

MS. BEN STATED CHANEL WAS LAST SEEN WEARING A BLUE SHIRT, RED SWEATER AND GRAY SWEATPANTS. SHE DESCRIBED CHANEL AS A BROWN SKINNED BLACK FEMALE STANDING ABOUT 5'05, AND 133 POUNDS.

SGT. B. WAX, UNIT 420A, WAS NOTIFIED OF THE INCIDENT. OFFICER BANKS GAVE MS. BEN A AFFIDAVIT TO MISSING PERSON FORM TO BE FILLED OUT AND SIGNED. MS. BEN ALSO PROVIDED THE OFFICER WITH A PHOTOGRAPH OF CHANEL WHICH WAS MADE PART OF THIS REPORT.

MS. BEN INFORMED THE OFFICER, SHE AND CHANEL WAS NOT INVOLVED IN AN ARGUMENT AND THIS WAS THE FIRST TIME ANYTHING LIKE THIS HAD HAPPEN. MS. BEN COULD NOT GIVE THE OFFICER ANY FURTHER INFORMATION ON THE VEHICLE OR THE DRIVER.

DETECTIVE QARAUDY, UNIT 4402, OF THE JUVENILE BUREAU WAS NOTIFIED OF THE INCIDENT.

BULLETIN NUMBER 651,236 WAS SENT.

ANY FURTHER INFORMATION WILL BE ADDED VIA SUPPLEMENTAL REPORT.

NARRATIVE

ON 01-16-12, APPROXIMATELY 9:45 AM, THE REPORTING PERSON, MS. EDNA BEN, REPORTED HER DAUGHTER, CHANEL BEN, 8F, 090201928 MISSING OR AS A RUNAWAY. THE REPORT WAS TAKEN BY PD OFFICER D. BANKS, UNIT 421.

ON 01-16-12, APPROXIMATELY 12:15 PM, CHANEL BEN CALLED HER SISTER AND INFORMED HER THAT SHE WAS KIDNAPPED AND SHE ESCAPED FROM THE MEN WHO KIDNAPPED HER, SHE ALSO TOLD HER SISTER THAT SHE WAS AT A HOTEL AT 7001 BULLARD AVE. CHANEL BEN'S SISTER APPARENTLY NOTIFIED POLICE WHO IN TURN PUT THE CALL OUT FOR 7TH DISTRICT OFFICERS TO RESPOND TO. LT. GERVAIS, UNIT 710A AND DETECTIVE POWELL, UNIT 1711 RESPONDED TO 7001 BULLARD AND LOCATED CHANEL BEN. CHANEL BEN INFORMED THE OFFICERS THAT ON 01-16-12, APPROXIMATELY 7:00 AM, SHE WENT OUTSIDE AS USUAL AND FOUND AN UNKNOWN BAG ON THE FRONT PORCH BEHIND THE FLOWER POT. CHANEL WENT ON TO SAY SHE ATTEMPTED TO OPEN THE PORCH DOOR WITH THE BAG IN HER HAND BUT THE DOOR WAS STUCK. CHANEL THEN SAID AT THAT TIME, THREE MASK MEN RAN UP TO THE PORCH, OPENED THE DOOR AND FORCED HER IN AN UNKNOWN RED CAR, PUT SOMETHING OVER HER HEAD AND DROVE HER TO AN UNKNOWN LOCATION. CHANEL STATED AFTER A WHILE, SHE WAS ABLE TO ESCAPE FROM HER CAPTURES AND RUN TO THE HOTEL AT 7001 BULLARD AVENUE WHERE THE POLICE PICKED HER UP.

OFFICERS NOTIFIED THE 4TH DISTRICT THAT THE 21J, MISSING PERSON/RUNAWAY, HAD BEEN LOCATED. OFFICERS RELOCATED MS. CHANEL BEN TO THE SEVENTH DISTRICT STATION TO BE REUNITED WITH HER MOTHER, MS. EDNA BEN, AND OTHER FAMILY MEMBERS. CHANEL'S FAMILY MEMBERS BEGAN TO SEARCH HER CELL PHONE AND LEARNED THAT SHE CALLED A UNITED CAB FROM HER CELL PHONE APPROXIMATELY 7:45 AM. DETECTIVE POWELL CALLED THE CAB COMPANY, 522-9771, AND LEARNED THAT CAB NO. 146, MR. ELLIOTT FLOOD, PICKED UP A FARE AT CHANEL'S RESIDENCE AT 3801 LENNOX BLVD. DETECTIVE POWELL INTERVIEWED MR. FLOOD WHO STATED HE PICKED UP A YOUNG LADY FROM 3801 LENNOX BLVD. MR. FLOOD SAID THE YOUNG LADY WENT ON TO SAY THAT SHE WAS GOING TO 1328 HICKORY STREET, SLIDELL, LA, AND INFORMED HIM THAT SHE WAS A STUDENT AT DILLARD UNIVERSITY AND SHE WORKED AT THE OAKWOOD MALL. MR. FLOOD SAID HE PULLED UP TO A BLUE HOUSE ON A SHORT STREET OFF OF SOUTH STREET. HE ASKED THE YOUNG LADY WHO WAS SHE INTENDING TO PAY FOR THE FARE, WHICH WAS $85.00. MR. FLOOD SAID THE YOUNG LADY WAS SAID SHE WAS GOING TO PAY BY CREDIT CARD AND HE ASKED HER FOR HER IDENTIFICATION. MR. FLOOD SAID THE YOUNG LADY WAS ALREADY TALKING TO SOMEONE ON THE PHONE AND HE HEARD THE YOUNG LADY ASK THE PERSON ON THE PHONE IF THEY WERE GOING TO PAY FOR THE CAB FARE. MR. FLOOD SAID A FEW MINUTES LATER, A MAN APPROACHED THE CAB, PAYED HIM $85.00 IN CASH AND THE YOUNG LADY GOT OUT OF THE CAB AND HE PULLED OFF.

DETECTIVE POWELL REINTERVIEWED MS. CHANEL AND HER MOTHER AND INFORMED THEM THAT HE HAD JUST INTERVIEWED THE CAB DRIVER AND INFORMED CHANEL WHAT THE CAB DRIVER SAID. MS. CHANEL BEGAN TO CRY AGAIN THN ADMITTED THAT SHE HAD, CAUGHT THE CAB TO A MAN'S HOUSE AT 1328 HICKORY ST., IN SLIDELL BUT SAID THEY DID NOT DO ANYTHING. AFTER SEVERAL MINUTES OF TALKING TO CHANEL, CHANEL ADMITTED TO HER MOTHER, MS. EDNA BEN, THAT SHE DID HAVE SEX WITH THE MAN, WHO SHE DID NOT OR WOULD NOT IDENTIFY, AND THAT THE MAN HAD UNPROTECTED SEX WITH HER THEN BROUGHT HER BACK TO NEW ORLEANS AND DROPPED HER OFF ON BULLARD AVENUE.

DETECTIVE POWELL INFORMED MS. EDNA BEN TO TAKE HER DAUGHTER TO CHILDREN'S HOSPITAL AND DETECTIVE POWELL NOTIFIED SEX CRIMES UNIT 4653, DETECTIVE COREY LINIOUS, WHO STATED TO DO A SUPPLEMENTAL AND NOTIFY ST. TAMMANY PARISH'S SEX CRIMES UNIT.

ANY ADDITIONAL INFORMATION WILL FOLLOW IN A SUPPLEMENTAL REPORT.

SUPPLEMENT NARRATIVE CONTINUED

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| LA052000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported | Incident Type | |
| 01/18/2012 | Rape-forcible | |

## NARRATIVE CONTINUATION

Police Department (NOPD), as well as, E. Ben arrived on the scene, and E. Ben then transported C. Ben to the hospital.

Lupin further advised that Doctor Lucinda McCaslin conducted a forensic rape examination on C. Ben at approximately 3:00 pm, same date. During the examination Doctor McCaslin discovered obvious vaginal trauma to include a torn and bleeding Hymen. However there was no evidence of bruises or abrasions to C. Ben's extremities. (For a detailed description on C. Ben's injuries and condition refer to the medical paperwork produced by Doctor McCaslin and other hospital staff).

After concluding the interview with Lupin, the detectives were escorted to C. Ben's examination room. Upon arrival, the detectives introduced themselves to C. Ben and explained their presence to her. The detectives then conducted an interview with C. Ben and learned the following information:

C. Ben advised that earlier in the month, she met a black male named "Keefer" on a social networking website called "Tagged". C. Ben would go to the website because she wanted to find someone to "relate to". While on the site one time, "Keefer" "added" her and they began to talk, so she eventually "added" him. After talking for sometime, "Keefer" told her that he wanted to meet her. On Monday, January 16, 2012, after texting and talking about it, C. Ben called a taxi cab and got a ride to "Keefer's" house in Slidell, Louisiana. Upon arrival, "Keefer" emerged from his residence and paid the cab fare for her because she didn't have any money.

After paying the cab fare, C. Ben and "Keefer" went into his residence and talked for a while. Eventually "Keefer" asked her what she wanted to do, and she responded by saying she wanted to watch a movie. "Keefer" subsequently agreed and they began to watch a movie. At some point during the movie, "Keefer" began to remove C. Ben's shirt. C. Ben tried to stop "Keefer" from doing it, but he responded by telling her that if she wanted to have a good time she needed to listen to him. Eventually, "Keefer" pushed her onto his bed and began to remove all of her clothing, while telling her to relax and enjoy herself. Once her cloths were off, "Keefer" began "raping" her, forcefully putting his penis into her vagina against her will. C. Ben continuously told him that he was hurting her and wanted him to stop, but after a while she stopped resisting and "just let him go". After being "raped" for a while, she heard a car horn blow outside of the residence. At that time "Keefer" got up and went outside to see who was there. While "Keefer" was outside, C. Ben got up and put all of her cloths back on. C. Ben then attempted to leave the residence, but "Keefer" had returned

*[handwritten notes in right margin: "Never said she was ___"]*

## ADMINISTRATIVE

| Report Contains | | | | Related Report Number(s) | | |
|---|---|---|---|---|---|---|
| Officer(s) Reporting | I.D. Number | Name | | I.D. Number | Unit | Date |
| HOTARD, ALVIN A | 1683 | | | | 7113 | 02/15/2012 |
| Officer Reviewing (if Applicable) | I.D. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Routed To | | Referred To | | | | |
| MAJOR CRIMES | | | | | | |
| Assigned To | | By | | | | Assigned Date |
| | | | | | | |
| Case Status | | Exception Type | | | | Date Cleared |
| CLEARED BY ARREST | | | | | | |

## NARRATIVE CONTINUATION

back inside of the residence. Upon seeing "Keefer", C. Ben told him that she wanted to leave, but he would not let her. "Keefer" then took off all of her cloths again and pushed her back down onto the bed, where he "raped" her again. After being "raped" again, she began to cry, and "Keefer" told her to get out of his residence.

At that time, C. Ben and "Keefer", while still inside of his residence, began to talk some more. During the conversation, "Keefer" asked C. Ben if she wanted to go home, to which she replied, "yes". "Keefer" then told her that he was worried that she would get him into trouble, but subsequently let her leave the residence anyway. At that time C. Ben followed him to his car, but walked past him down the street. "Keefer" subsequently caught up with her in his vehicle, and she got in. Once C. Ben was inside the car, "Keefer" told her that he was going to bring her to the police station. At that time "Keefer" drove her to a gas station in New Orleans East and stopped. Once the vehicle was stopped, C. Ben got out of the car and ran to a nearby hotel where she called her mother and the police.

C. Ben advised that at no time did she tell "Keefer" how old she was or did they ever discuss age.

At the conclusion of the interview with C. Ben, the detectives relocated to the second floor waiting room where E. Ben was located. Upon their arrival to the waiting room the detectives introduced themselves to E. Ben and explained their presence to her. At that the detectives conducted an interview with E. Ben where the following information was learned:

E. Ben stated that on the morning of Monday, January 16, 2012 at approximately 7:50 am she heard the front door of her house open and close and realized that her daughter, C. Ben had left the residence. E. Ben then left the residence and went looking for C. Ben, however her efforts proved fruitless. At that time E. Ben returned to her residence, called the NOPD, and filed a missing person's report under NOPD Item number A-21124-12. E. Ben then realized that C. Ben had left the residence with a change of clothes, E. Ben's debit card, and a twenty (20) dollar bill. E. Ben did not know the reason why C. Ben left and explained that they had not been arguing or had any type of disagreement during the morning.

Later in the afternoon around 2:00 pm, E. Ben received a phone call from C. Ben. During the conversation, C. Ben advised E. Ben that she was at a hotel in New Orleans East and had been kidnapped. C. Ben was then transported to the NOPD's

| ADMINISTRATIVE | | | | | | | |
|---|---|---|---|---|---|---|---|
| Report Contains | | | | Related Report Number(s) | | | |
| Officer(s) Reporting | I.D. Number | Name | | | I.D. Number | Unit | Date |
| HOTARD, ALVIN A. | 1683 | | | | | 7113 | 02/16/2012 |
| Officer Reviewing (if Applicable) | I.D. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Routed To | | Reviewed To | | | | | |
| MAJOR CRIMES | | | | | | | |
| Assigned To | | By | | | | | Assigned Date |
| Case Status | | Exception Type | | | | | Date Cleared |
| CLEARED BY ARREST | | | | | | | |

Case Number: 2012-00840

At some point during the meeting, the victim advised that "Keefer" forced her to have sex with him, however, during the act she did not believe he ejaculated. Once "Keefer" stopped raping the victim, she subsequently got dressed and told him her real age. At that time "Keefer" advised her to get into his vehicle, which she did. Once in the vehicle, "Keefer" drove to a gas station in New Orleans East, at which time the victim exited the vehicle and ran to a local hotel, where she called her mother and sister, who called the police. The Victim was then transported to Children's Hospital in New Orleans for treatment and examination.

During a sexual assault examination conducted by Children's Hospital staff doctors, it was discovered that the victim suffered obvious and significant vaginal trauma, to include a torn and bleeding hymen.

While conducting the investigation, Detective Alvin Hotard spoke to the victim's mother who was aware of a subject named "Keefer" and advised that she had seen "Keefer's" picture on the victim's phone. At that time Detective Hotard viewed the phone, which had been brought to the hospital by the victim's sister. Upon looking through the text messages listed under the contact name of "Keefer" Detective Hotard viewed a picture of the subject, which had been sent to the phone. Detective Hotard also saw a message where the sender listed the address of 1326 Hickory Street as his home.

Upon completing the preliminary investigation at the hospital, Detective Hotard proceeded to the Saint Tammany Parish Sheriff's Office Slidell Investigations Division, where he located the one individual with the first name of "Keefer" in the report management system. The individual's full name was Keefer Lamar Eaglin (B/M, 10-12-79) and he resided in the Slidell area. Detective Hotard then viewed a prior arrest photograph of the subject and it appeared to be the same individual that had sent his picture to the victim's phone under the contact name of "Keefer". Upon retrieving the name, Detective Hotard entered it into the Louisiana Justice network database and learned that one of Eaglin's listed addresses was 1326 Hickory Street, Slidell, Louisiana.

It should be noted that upon viewing Eaglin's criminal history, Detective Hotard noted that he had a prior arrest for Carnal Knowledge of a juvenile in 1998.

Based on the above details, a search warrant was obtained for Keefer Eaglin's residence of 1326 Hickory Street on January 17, 2012 and an arrest warrant was obtained for Keefer Eaglin for the offense of Forcible Rape at the same time. At approximately 0200 hours on said date the issued Search warrant was executed at 1326 Hickory Street. Upon doing such contact was established with Keefer Eaglin and he returned to the Slidell Law Enforcement complex with Detective Hotard.

After being advised of his Rights per Miranda, Keefer Eaglin provided Detective Hotard with a short account of what occurred at 1326 Hickory on January 16, 2012. Detective Hotard found Keefer's statements to be supportive of what the victim reported, acknowledging that she was present at his residence with him on said date. Keefer refused to answer any questions relative to having sexual intercourse with the victim stating "that he had been down this road before and wanted an attorney". Keefer was subsequently charged accordingly per the issued arrest warrant for the offense of forcible rape. Keefer was then transported to the St. Tammany Parish Jail by uniform personnel and booked accordingly.

8-E

## NARRATIVE CONTINUATION

Street as his home.

Upon completing the preliminary investigation at the hospital, Detective Hotard proceeded to the Saint Tammany Parish Sheriff's Office Slidell Investigations Division, where he located the one individual with the first name of "Keefer" in the report management system. The individual's full name was Keefer Lamar Eaglin (B/M, 10-12-79) and he resided in the Slidell area. Detective Hotard then viewed a prior arrest photograph of the subject and it appeared to be the same individual that had sent his picture to the victim's phone under the contact name of "Keefer". Upon retrieving the name, Detective Hotard entered it into the Louisiana Justice network database and learned that one of Eaglin's listed address was 1326 Hickory Street, Slidell, Louisiana.

~It should be noted that upon viewing Kefer Eaglin's criminal history, Detective Hotard learned that Keefer had a prior arrest for Carnal Knowledge of a juvenile in 1998.

Based on the above details, a search warrant was obtained for 1326 Hickory Street and a arrest warrant was obtained for Keefer Eaglin for the offense of Forcible Rape. At approximately 0200 hours the issued Search warrant was executed at 1326 Hickory Street. Upon doing such contact was established with Keefer Eaglin and he voluntarily returned to the Slidell Law Enforcement complex with Detective Hotard.

After being advised of his Rights per Miranda, Keefer Eaglin provided Detective Hotard with a short account of what occurred at 1326 Hickory on 01/16/2012. Detective Hotard found Keefer's statements to be supportive of what the victim reported. Keefer was subsequently charged accordingly per the issued arrest warrant for the offense of forcible rape. Keefer was then transported to the St. Tammany Parish Jail by uniform personnel and booked accordingly.

No further information to report.

## ADMINISTRATIVE

| Report Contains | | | | | Related Report Number(s) | | | |
|---|---|---|---|---|---|---|---|---|
| Officer(s) Reporting HOTARD, ALVIN A | ID. Number 1683 | Name | | | | ID. Number | Unit 7113 | Date 01/17/2012 |
| Officer Reviewing (if Applicable) O'CULL, Brian | ID. Number 379 | Approved Date 01/17/2012 | # Offenses 1 | # Victims 1 | # Offenders 1 | # Premises EnL 0 | # Vehicles Stolen 0 | # Arrested 0 |
| Routed To CRIM RECORDS | | Referred To | | | | | | |
| Assigned To | | Assigned By | | | | | | Date |
| Case Status CLEARED BY ARREST | | Exception Type | | | | | | Date Cleared |

| Agency ORI Number | Agency Name | | | Juvenile | | 1. Original |
|---|---|---|---|---|---|---|
| LA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | | | | | 2. Supplement 2 |
| Original Date Reported | Incident Type | | Agency Report Number | | | |
| 01/16/2012 | Rape-forcible | | 2012-000840 | | | |

## NARRATIVE CONTINUATION

After speaking with Whitmore, Detective Smith conducted an interview Trevon Eaglin, Keefer Eaglin's thirteen year old son. From the interview Detective Smith learned that T. Eaglin was present at the residence during the time the incident took place, however he was in his room with the door closed. Upon waking he stayed in his room and played video games until sometime in the afternoon. At no time did he see his father or anyone else in the residence.

While the aforementioned scene investigation was being conducted, Detective Hotard arrived at the Slidell Law Enforcement Complex and conducted an interview with Eaglin, who had been transported.

Before Beginning the interview, Detective Hotard advised Eaglin of his rights per Miranda, as well as, his waiver of rights. Detective Hotard then allowed Eaglin to read the form, and Eaglin subsequently signed his name in both places. At that time Detective Hotard began the interview and learned the following information:

Eaglin advised that he met Ben through a website called "Tagged" and according to her profile she was nineteen years old. Upon meeting each other they chatted online for three or four days, until Sunday, January 15, 2012 when they spoke over the phone. Eaglin advised that during the conversation, they planned to meet at Eaglin's residence the following day, Monday, January 16, 2012 and Ben advised she would drive there. Eaglin further advised that sometime in the morning on Monday, January 16, 2012, Ben arrived at his residence in a cab, which he was forced to pay for because Ben had no money. Upon seeing Ben, Eaglin asked her to see some identification, because he thought she looked younger than nineteen years old. When Ben could not provide any identification, Eaglin told her to get into his car because he was going to take her back home to the Westbank of New Orleans. Upon driving there on Interstate 10, Eaglin advised he stopped at a gas station and during that time Ben ran off, but he did not know where Ben ran off to. Eaglin then drove back home. Eaglin advised that at no time did he and Ben ever engage in any type of inappropriate or sexual activities.

Upon concluding the interview, Detective Hotard completed the proper booking paperwork and Eaglin was subsequently transported to criminal patrol deputies to the Saint Tammany Parish Jail where he was booked accordingly.

On Thursday January 19, 2012 at approximately 10:51 am, Sergeant Brian O'Cull presented before Judge William Knight of the 22nd Judicial Court an affidavit for a

## ADMINISTRATIVE

| port Contains | | | | Related Report Number(s) | | | | |
|---|---|---|---|---|---|---|---|---|
| icer(s) Reporting | ID. Number | Name | | ID. Number | Unit | Date | | |
| OTARD, ALVIN A | 1683 | | | | 7113 | 02/15/2012 | | |
| icer Reviewing (if Applicable) | ID. Number | Approval Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| ated To | | Referred To | | | | | | |
| AJOR CRIMES | | | | | | | | |
| signed To | | By | | | | | Assigned Date | |
| | | | | | | | | |
| e Status | | Exception Type | | | | | Date Cleared | |
| EARED BY ARREST | | | | | | | | |

COMPLAINT ARREST AFFIDAVIT · NARRATIVE CONTINUATION

| Agency ORI Number | Agency Name | | Agency Report Number |
|---|---|---|---|
| LA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | | 2012-000640 |
| Original Date Reported | Incident Type | | |
| 01/16/2012 | Rape-forcible | | |

### NARRATIVE CONTINUATION

On 01/16/2012 at approximately 1800 hours, the St. Tammany Parish Sheriff's Office was contacted by the New Orleans Police Department in reference to a rape that occurred at 1326 Hickory Street Slidell, Louisiana. The victim, a 13 year old black female, was being treated for injuries at Children's Hospital for injuries she sustained during the encounter. The subsequent investigation led to the apprehension of the offender, Keefer L. Eaglin b/m dob 10/12/1979 who was charged accordingly with L.R.S. 14:42.1 Forcible Rape.

On Sunday, January 15, 2012, The 13 year old victim, planned to spend the following day, Monday, January 16, 2012, with a subject known as "Keefer" at his residence located at 1326 Hickory Street, Slidell, Louisiana. The two individuals met on "TAG" a social networking website, and had been communicating via text messaging for several days prior. During the communication, the victim told "Keefer" that she was 19 years old. On the morning of Monday, January 16, 2012 at approximately 7:50 am, the victim took a cab from her residence in New Orleans, Louisiana and proceeded to "Keefer's" residence.

Upon arrival at the residence, "Keefer" paid the cab fare and the two of them went into the residence to watch movies and listen to music. At some point during the meeting, the victim advised that "Keefer" forced her to have sex with him, however, during the act she did not believe he ejaculated. Once "Keefer" stopped raping the victim, she subsequently got dressed and told him her real age. At that time "Keefer" advised her to get into his vehicle, which she did. Once in the vehicle, "Keefer" drove to a gas station in New Orleans East, at which time the victim exited the vehicle and ran to a local hotel, where she called her mother and sister, who called the police.

The Victim was then transported to Children's Hospital in New Orleans, Louisiana for treatment and examination. During a examination by Children's Hospital staff doctors, it was discovered that the victim suffered obvious and significant vaginal trauma to include a torn and bleeding hymen.

While conducting the investigation, Detective Alvin Hotard spoke to the victim's mother who was aware of a subject named "Keefer" and advised that she had seen "Keefer's" picture on the victim's phone. At that time Detective Hotard viewed the phone, which had been brought to the hospital by the victim's sister. Upon looking through the text messages listed under the contact name of "Keefer" Detective Hotard viewed a picture of the subject, which had been sent to the phone. Detective Hotard also saw a message where the sender listed the address of 1326 Hickory

| ADMINISTRATIVE | | | | | Related Report Number(s) | | | |
|---|---|---|---|---|---|---|---|---|
| Report Contains | | | | | | ID. Number | Unit | Date |
| | | | | | | | 7113 | 01/17/2012 |
| Officer(s) Reporting | ID. Number | Name | | | | | | |
| HOTARD, ALVIN A | 1683 | | | | | | | |
| Officer Reviewing (if Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| O'CULL, Brian | 379 | 01/17/2012 | 1 | 1 | 1 | 0 | 0 | 0 |
| Routed To | | Assigned To | | | | | | |
| CRIM RECORDS | | | | | | | | |
| Assigned To | | Assigned By | | | | | | Date |
| | | | | | | | | |
| Case Status | | Exception Type | | | | | | Date Cleared |
| CLEARED BY ARREST | | | | | | | | |

SUPPLEMENT—NARRATIVE CONTINUATION

| | | Juvenile ☐ | 1. Original |
| | | | 2. Supplement ☐ 2 |

| Agency ORI Number | Agency Name | Agency Report Number |
| LA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported | Incident Type | |
| 01/16/2012 | Rape-forcible | |

### NARRATIVE CONTINUATION

On Monday, January 16, 2012, at approximately 5:35 pm, Detective Alvin Hotard of the Saint Tammany Parish Sheriff's Office Major Crimes Unit was notified by Central Dispatch to contact Lieutenant Wharton Muller of the Criminal Patrol Division relative to a signal 42 (aggravated rape).

After receiving the message, Detective Hotard contacted Lieutenant Muller who advised that he had received a telephone call from a staff member at Children's Hospital in New Orleans. The staff member advised that a thirteen year old black female was brought in by her mother after being raped in Slidell, Louisiana. Lieutenant Muller further advised that the incident took place at the address of 1326 Hickory Street in Slidell, Louisiana. Lieutenant Muller had no further information relative to the incident and advised that a criminal patrol unit had not been dispatched to children's hospital to take an initial report.

Upon concluding the conversation with Lieutenant Muller, Detective Hotard contacted Major Crimes Unit Sergeant Brian O'Cull and advised him of the information. At that time Sergeant O'Cull advised that he would contact Detective Rachel Smith of the Major Crimes Unit so that she could assist Detective Hotard with the investigation.

Shortly after ending the conversation with Sergeant O'Cull, Detective Hotard was contacted by Detective Smith and the two agreed to meet at Children's hospital in New Orleans to begin the investigation. Detective Hotard subsequently departed Saint Tammany Parish en route to Children's Hospital located at 1101 Calhoun Street, New Orleans, Louisiana.

Upon arrival at approximately 7:00 pm, Detective Hotard proceeded to the juvenile trauma unit located on the second floor. Once at the unit, Detective Hotard met with Detective Smith who had already arrived. At that time the detectives conducted an interview with registered nurse Lisa Lupin of Children's Hospital. From the interview the following information was learned.

Lupin advised that the victim, identified as Chanel Ben (Black Female, DOB: 09-07-1998) had been brought to the hospital at approximately 2:00 pm by her mother, Edna Ben (Black female, DOB: 07-24-1949). C. Ben had called 911 and her mother from a hotel in New Orleans east and advised that she had been kidnapped and raped in Slidell, Louisiana. After receiving the call Officers from the New Orleans

### ADMINISTRATIVE

| Report Contains | | Arrestee Report Number(s) | |

| Officer(s) Reporting | ID. Number | Name | | ID. Number | Unit | Date |
| HOTARD, ALVIN A | 1683 | | | | 7113 | 02/16/2012 |
| Officer Reviewing (if Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Ent. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Routed To | | Referred To | |
| MAJOR CRIMES | | | |
| Assigned To | | By | | | | Assigned Date |
| | | | | | | |
| Case Status | | Exception Type | | | | Date Cleared |
| CLEARED BY ARREST | | | | | | |

STYLE GMRSU  NARRATIVE CONTINUATION

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| LA0520000 | ST TAMMANY PARISH SHERIFF'S OFFICE | 2012-000840 |
| Original Date Reported | Incident Type | |
| 01/16/2012 | Rape-forcible | |

### NARRATIVE CONTINUATION

Seventh District Station located in New Orleans East, by NOPD officers. E. Ben subsequently proceeded to NOPD's Seventh District Station and upon arrival met with C. Ben and Officers from the NOPD. During that time, E. Ben began looking through C. Ben's phone, and saw that C. Ben had called a United Cab at approximately 7:45 am, same date. E. Ben relayed the information to NOPD Detective Greg Powell who called the cab company. During the conversation with the cab company, Detective Powell learned that cab number 146, operated by cab driver Elliott Flood picked up a fare at C, Ben's residence earlier that morning. Detective Powell then spoke with flood, who advised that he had dropped off a black female at 1326 Hickory Street in Slidell, Louisiana. Once at the residence an unknown black male paid Flood $85.00 in cash to cover the fare. Flood then departed the location.

After the conversation with the Flood, Detective Powell re-interviewed C. Ben in E. Ben's presence, and C. Ben then admitted to taking the cab to Slidell and having unprotected sex with a male subject that she would not identify. After learning that C. Ben had been involved in unprotected sexual intercourse Detective Powell advised E. Ben to transport C. Ben to Children's Hospital in New Orleans to be examined.

Detectives then asked E. Ben if she had ever heard of an individual named "Keefer". E. Ben then advised that she thought "Keefer" was a nineteen (19) year old black male and that she had seen his picture on a computer website called "Tag". E. Ben further stated that C. Ben had "Keefer's" contact information in her phone along with a picture of him.

At the conclusion of the interview with E. Ben, the detectives introduced themselves to C. Ben's sister, Len Ben, who had arrived on the scene. L. Ben had both C. Ben's phone and laptop with her. At that time, E. Ben, who was the owner of both the computer and cell phone, signed a consent to search form allowing Detective Hotard to collect both for evidentiary purposes.

Upon receiving the telephone, Detective Hotard found the contact information for "Keefer" and scrolled through the text messages. While looking at the to and from messages under the contact name "Keefer", Detective Hotard came across a photograph of a slender black male who was possibly the "Keefer" in question. Detective Hotard also viewed a message sent from "Keefer" where the sender listed the address of 1326 Hickory Street as their home address.

Before departing the hospital Detective Smith received the rape examination kit

### ADMINISTRATIVE

| Report Contains | | | | Related Report Number(s) | | | |
|---|---|---|---|---|---|---|---|
| Officer(s) Reporting | ID. Number | Name | | | ID. Number | Unit | Date |
| HOTARD, ALVIN A | 1683 | | | | | 7113 | 02/15/2012 |
| Officer Reviewing (If Applicable) | ID. Number | Approved Date | # Offenses | # Victims | # Offenders | # Premises Enl. | # Vehicles Stolen | # Arrested |
| | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Routed To | | Referred To | | | | | |
| MAJOR CRIMES | | | | | | | |
| Assigned To | | By | | | | | Assigned Date |
| Case Status | | Exception Type | | | | | Date Cleared |
| CLEARED BY ARREST | | | | | | | |

| 101 | 9856858019 | * Tyraneka | 01/18/12 21:50:44 | | Unread | Inbox | Phone | Incoming | Hey hw r u doing |
| 102 | 9857072503 | * Savanna | 01/19/12 00:12:53 | | Unread | Inbox | Phone | Incoming | Hey |
| 103 | 9103730485 | N/A | 01/19/12 05:13:40 | | Unread | Inbox | Phone | Incoming | Gm honey |
| 104 | 6785177623 | N/A | 03/26/12 15:39:48 | | Unread | Inbox | Phone | Incoming | This is Tesha this is my new number |

\* Phonebook name lookup used to retrieve names

# Phone Incoming Calls List

CLOG MD5 Hash: 97788CB314A2273E8046BEE198C878C3

CLOG SHA256 Hash: E5DA2568 EE475CD D861569 B8DF049 C7A4523 9E109DC A991954 65502B7 7D480AB

| # | Type | Number | Name | Date & Time | Duration |
|---|------|--------|------|-------------|----------|
| 1 | Incoming | 9859602699 | Wife | 01/16/12 12:23:28 | N/A |
| 2 | Incoming | 9859602699 | Wife | 01/16/12 13:20:37 | N/A |
| 3 | Incoming | 9857072503 | Savanna | 01/16/12 15:59:04 | N/A |
| 4 | Incoming | 9859602699 | Wife | 01/16/12 16:36:33 | N/A |
| 5 | Incoming | 6618682146 | N/A | 01/16/12 16:48:09 | N/A |
| 6 | Incoming | 9857888679 | Shawn | 01/16/12 18:16:01 | N/A |
| 7 | Incoming | 9857888679 | Shawn | 01/16/12 18:50:56 | N/A |
| 8 | Incoming | 9859602699 | Wife | 01/16/12 18:54:47 | N/A |
| 9 | Incoming | 9859602699 | Wife | 01/16/12 18:58:38 | N/A |
| 10 | Incoming | 6618682146 | N/A | 01/16/12 19:08:20 | N/A |
| 11 | Incoming | 5046713916 | N/A | 01/16/12 20:01:44 | N/A |
| 12 | Incoming | 9859602699 | Wife | 01/16/12 20:42:26 | N/A |

file://D:\SANYO\Backup 2012_03_29 (001)\Report.htm

11/15/2013

# Phone Outgoing Calls List

CLOG MD5 Hash: 97788CB314A2273E8046BEE198C878C3

CLOG SHA256 Hash: E5DA2568 EE475CD D861569 B8DF049 C7A4523 9E109DC A991954 65502B7 7D480AB

| # | Type | Number | Name | Date & Time | Duration |
|---|------|--------|------|-------------|----------|
| 1 | Outgoing | 2282341748 | Mufflin | 01/16/12 13:13:35 | N/A |
| 2 | Outgoing | 8007496193 | T To Know When U | 01/16/12 14:23:27 | N/A |
| 3 | Outgoing | 6613306696 | Sexy L | 01/16/12 14:46:36 | N/A |
| 4 | Outgoing | 6613306696 | Sexy L | 01/16/12 14:46:47 | N/A |
| 5 | Outgoing | 5046713916 | N/A | 01/16/12 20:15:02 | N/A |
| 6 | Outgoing | 9859602699 | Wife | 01/16/12 20:45:20 | N/A |
| 7 | Outgoing | 9859602699 | Wife | 01/16/12 20:47:24 | N/A |
| 8 | Outgoing | 9859817164 | Shantell | 01/16/12 22:11:08 | N/A |

# Phone Missed Calls List

CLOG MD5 Hash: 97788CB314A2273E8046BEE198C878C3

CLOG SHA256 Hash: E5DA2568 EE475CD D861569 B8DF049 C7A4523 9E109DC A991954 65502B7 7D480AB

| # | Type | Number | Name | Date & Time | Duration |
|---|------|--------|------|-------------|----------|
| 1 | Missed | 3377079959 | N/A | 01/18/12 16:05:17 | N/A |
| 2 | Missed | 7205396698 | N/A | 01/18/12 17:27:49 | N/A |
| 3 | Missed | 3377079959 | N/A | 01/18/12 17:54:32 | N/A |
| | | | | 01/18/12 | |

file://D:\SANYO\Backup 2012_03_29 (001)\Report.htm                    11/15/2013

August 5, 2010

Re:    Keefer Eaglin
DOB:   10/12/1979

Dear Mr. Eaglin,

Per request of your wife, this letter is a summary of your visit dated July 14, 2010.

Mr. Eaglin is a 30 year old black male who presented with a sudden onset of things appearing red in the right eye. The symptoms began suddenly on the afternoon of the day before presentation, and this was accompanied by painless blurred vision. He denies any previous episodes.

Past medical history is significant for juvenile-onset diabetes since age 6. He reported that he was followed by Dr. Nix in Opelousas until recently moving to the Slidell area. He reported his last hemoglobin A1c was around 7. He denies any prior eye trauma or surgery. He does not wear glasses. He had not had an eye exam within the past several years, despite recommendations by Dr. Nix. Medication includes insulin. There are no known drug allergies. Social history is positive for tobacco. He does drive, and works as a manager at Burger King. He denies alcohol or illicit drugs. Review of systems was positive for left lower leg edema and recent cellulitis. The review of systems was otherwise negative.

On exam, uncorrected visual acuity was 20/400 in the right eye, 20/200 in the left. Cycloplegic refraction revealed best corrected visual acuity of 20/200 in the right eye, 20/30 in the left. Pupils were unequal but round and reactive to light, with no afferent pupil defect noted. Motility was full. Applanation tonometry was 12 in the right eye, 13 in the left. Slit lamp examination of the anterior

Ochsner Health System, a part of Ochsner Clinic Foundation
2750 Gause Blvd • Slidell, LA 70461 • phone 985-639-3777 • fax 985-639-3725 • www.ochsner.org

MC 9
Rev. 3/10

**Bogalusa Medical Center**

EAGLIN, KEEFER L
2/M  DOB 10/12/1979  ADMIT 09/30/10
80901  HORTMAN RICH
MR# 000158648  FIN#

**OUTPATIENT CLINIC VISIT RECORD**                      RECEIVED

| CLINIC | ☐ Two Identifiers Used | Age | Date | Chart No. | APR 17 2012 | SEX: ☐ YES ☐ NO |

**MODE OF ARRIVAL**                                    ALLERGIES

| | Med: | Other: |
| ☐ Ambulatory | | |
| ☐ Wheelchair | | WASHINGTON MEDICAID |
| ☐ Other | Medication Record Reconciled ☐ Yes ☐ No ☐ Did not bring Meds | |

MEDICATION RECORD RECONCILED ☐ YES ☐ NO   ☐ DID NOT BRING MEDS

| TEMP | PULSE | RESP. | B/P | WEIGHT | HEIGHT | BMI | FOOT EX. | PULSE OX | ACCU | PAIN |
| | | | | | | | | | | Scale | Location | Type |
| 98 | 114 | 18 | 160/ 111 | 132 | 60 | 22.79 | 00 | | | Duration 24 | Relief |

**GYN:** Birth Control _____ Gravida _____ Para _____ Ab _____ LMP _____ TAH _____ BSO _____ ☐ Post menopause

**NUTRITION:** ☐ Unintentional Weight Loss > 10# in last month   ☐ Unintentional Weight Gain > 10# in last month
Special Diet: _____  If Yes, diet teaching in last year: ☐ YES ☐ NO   Appetite: ☐ Good ☐ Fair ☐ Poor

**FUNCTIONAL:** ☐ Ambulatory ☐ Performs ADL's Independently ☐ Walker/Cane/Prosthesis ☐ Wheelchair ☐ Bedridden
☐ Home O₂ ☐ HH ☐ Hospice ☐ Agency ☐ Other _____

**ABUSE:** ☐ None ☐ Complaint ☐ Suspected   If YES, referred to: _____

**LIMITATIONS / BARRIERS** ☐ Reading/Comprehension/Low Literacy ☐ Psychological ☐ Financial Implications ☐ Language Reference
☐ None ☐ Cultural/Religious Practices ☐ Hearing ☐ Vision ☐ Motivation ☐ Other _____ ☐ Needs Interpreter
☐ Physical/Cognitive

**SOCIAL:** Tobacco Use: ☐ Yes ☐ No   2nd Hand Smoke Exposure: ☐ Yes ☐ No   Other _____
Illegal Drug Use: ☐ Yes ☐ No   ETOH Use: ☐ Yes ☐ No   Other _____

| FEMALE | MALE | IMMUNIZATIONS |
| 18-39 Yearly Pap Last Ex. | 40-49 Yearly PSA Last Ex. | ☐ Flu ☐ T dap |
| 40-49 Yearly Pap Last Ex. | 50+ Yearly PSA Last Ex. | ☐ Pneumonia ☐ Hep B |
| 40-49 Mammo Last Ex. | 50+ Colonoscopy Last Ex. | ☐ Shingles |
| 50+ Yearly Paps 70 Last Ex. | | |
| 50+ Mammo yearly Last Ex. | | |
| 50+ Colonoscopy Last Ex. | | |

**NURSES NOTES:** _____

BP 170 102

Nurse Signature _____ Date _____ Time _____

**DISEASE MANAGEMENT ORDERS**

| DIABETES | | ASTHMA | CHF |
| *Check your feet regularly and report any changes | ☐ ACE/ARB: | *Follow your action plan | *Call your doctor if you have 3-5 lbs |
| *Monitor your blood sugar at home | ☐ Contradictions: | ☐ Education Referral | of weight gain within one week |
| *Education Referral | | ☐ Clinic | ☐ Education Referral |
| ☐ Diabetic Foot Clinic - Call appointment desk | ☐ ASA _____ mg every day | ☐ Beta agonist: | ☐ Clinic |
| ☐ Foot Exam | ☐ Contradictions: | ☐ Steroid: | ☐ ACE/ARB: |
| ☐ Nutrition Referral | | ☐ Not Indicated/Intermittent | ☐ Beta Blocker: |
| ☐ Eye Exam, ☐ LSU ☐ Private | ☐ Labs Ordered | ☐ ACT Score _____ | ☐ Contraindications: |
| | ☐ Procedures Ordered | ☐ Procedures Ordered | ☐ Labs Ordered |
| | | ☐ PFT | ☐ Procedures Ordered |

| HYPERTENSION | CKD | IMMUNIZATIONS | GENERAL | EDUCATION |
| ☐ Clinic: | ☐ Education Referral | ☐ Flu | *Do not smoke or use tobacco products | Learns Best: ☐ Visual ☐ Hearing |
| (BP > 130/85 X 3 visits) | ☐ Basic | ☐ Pneumonia | *Avoid excessive alcohol/illegal drug use | ☐ Reading ☐ Doing |
| ☐ Labs Ordered | ☐ Advanced | ☐ Shingles | ☐ Nutritional Referral | Plan: ☐ Read to Patient ☐ Interpreter |
| ☐ Procedure Ordered | ☐ Clinic | ☐ Tdap | BMI ☐ < 18.5 ☐ > 30 | ☐ Audio Visual ☐ Sign Language |
| **CANCER SCREENING** | ☐ Labs Ordered | ☐ Hep B | ☐ Special Diet: _____ | ☐ Instruct/Demo |
| ☐ Mammogram ☐ PSA | ☐ Procedures Ordered | ☐ Other: _____ | ☐ Exercise as tolerated/instructed by your doctor | ☐ Family Member Assist |
| ☐ Colonoscopy ☐ PAP | | | ☐ Wound Clinic | |

**RETURN APPOINTMENTS AND REFERRALS**

Method of teaching: ☐ Explanation ☐ Demonstration ☐ Audio Visual ☐ Handout _____ ☐ POC
Response to teaching: ☐ Return Demonstration ☐ Verbalization ☐ Additional Instructions Required _____
Comments _____

If further treatment is required prior to scheduled appointment, call your doctor's office or report to the nearest Emergency Room. Take all medications as prescribed and report all reactions (Side Effects) to my Physician. I have reviewed and understand the above instructions with the Physician and/or the nurse and I have received a copy.

| Signature of Patient or Responsible Party | Relationship (if other than patient) | Discharge Nurse's Signature | Time |

WHITE COPY - CHART     YELLOW COPY - MEDICAL RECORD     PINK COPY - PATIENT

# LOUISIANA STATE UNIVERSITY
## Ophthalmic Clinic

eefer Eaglin
IR# 158648
hysician: O'Sullivan

7/12/2011
Photographer: BWE



OIS WinStation XP

2 Willis Ave
galusa, LA 70427

Phone: (985) 730-2145
FAX: (985) 730-2142

OD/OS

Macula Map(EMM5) Retina Report



| | |
|---|---|
| Patient: Eaglin, Keefer L | Exam Date: 07/12/2011 |
| Physician: | DOB(age): 10/12/1979 (31) |
| Operator: | Gender: M  Ethnicity: African Descendant |
| Disease: | ID:  Algorithm Version: A6, 1, 0, 4 |

### Full Retina Thickness Map

OD  OS  Threshold  0

Exam Date: 07/12/2011, SSI= 54.2          Exam Date: 07/12/2011, SSI= 60.3



Significance from Normal Map          Significance from Normal Map

### Global RPE/Choroid Disruption

OD    OS

Report Date: Tuesday July 12 10:36:13 2011          Software Version #6, 1, 0, 4

Comments:

Signature:

Defining the OCT Revolution          optovue

8-P

# LOUISIANA STATE UNIVERSITY

## Ophthalmic Clinic

Keefer Eaglin
MR# 158648
Physician: O'Sullivan

7/12/201
Photographer: BWI



OIS WinStation XP

2 Willis Ave
galusa, LA 70427

Phone: (985) 730-2145
FAX: (985) 730-2142

8–Q

000158648
EAGLIN ,KEEFER L
2/ M  DOB 10/12/1979   ADMDT 07/12/11
57227  OSULLIVAN PA  ' FC 8
MR# 000158648 PT#    230217

 **LSU** Health Sciences Center

Patient Consent to Medical Treatment or Surgical Procedure and
Acknowledgement of Receipt of Medical Information
### General Angiography

**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING**

TO THE PATIENT:

- You have been told that you should consider medical treatment/surgery. Louisiana law requires us to tell you
  - The nature of your condition
  - The general nature of the medical treatment /surgery
  - The risks of the proposed treatment/surgery, as defined by the Louisiana Medical Disclosure Panel or as determined by your doctor, and
  - Reasonable therapeutic alternatives and material risks associated with such alternatives.
- You have the right, as a patient, to be informed about your condition and the recommended surgical, medical or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved.
- In keeping with the Louisiana law of informed consent, you are being asked to sign a confirmation that we have discussed all these matters. We have already discussed with you the common problems and risks. We wish to inform you as completely as possible. Please read the form carefully. Ask about anything you do not understand and we will be happy to explain it.

**1. Patient Name:**

**2. Treatment/Procedure: General Angiography**

    a)    <u>Description, nature of the treatment/procedure:</u>

    ☐ Left    ☐ Right    Flouroscein angyography of the eye

    b) Purpose:   to image circulation in the eye

**3. Patient Condition**

- Patient's diagnosis, description of the nature of the condition or ailment for which the medical treatment, surgical procedure or other therapy described in item number 2 is indicated and recommended:

     retinal lesion

**4. Material Risks of Treatment/Procedure**

- a) All medical or surgical treatment involves risks. Listed below are those risks associated with this procedure that we believe a reasonable person in your (the patient's) position would likely consider significant when deciding whether to have or forego the proposed therapy. Please ask your physician if you would like additional information regarding the nature or consequences of these risks, their likelihood of occurrence, or other associated risks that you might consider significant but may not be listed below.

HCSD 6010 CAR (Rev 2/04)

# *INTERNAL MEDICINE ASSOCIATES*

## *OF NEW ORLEANS, LLC*

*618 North Carrollton Avenue*
*New Orleans, La. 70119*
*504-486-4201*
*Fax 504-488-9659*

August 16, 2011

C. Shaffer
Disability Determinations
P.O. Box 5916
Metairie, Louisiana 70009

Re:  Keefer Lamar Eaglin
SS#:  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

Dear Mr. / Mrs. Shaffer:

I had the opportunity to evaluate the above named patient in my office on 08-02-0211.  The patient's major complaints are high blood pressure, diabetes and blurred vision.

HISTORY OF PRESENT ILLNESS: The patient is a 31-year-old black male with type I insulin dependant diabetes since the age of 8. He says that he is on high blood pressure medications since January of this year,. He is not aware of any kidney problems. He was hospitalized for cellulitis of the left lower leg in July of last year and says that he still has some pain and swelling in the left lower leg with prolonged standing and walking.

The patient also says that started experiencing blurred vision in the right eye last year. According to the records from Ochsner he was seen by an eye doctor there on July 14th of 2010 for sudden onset of seeing red in the right eye and painless blurred vision. The uncorrected visual acuity was 20/400 in the right eye and 20/200 in the left eye. The best corrected visual acuity was 20/200 on the right and 20/30 on the left. He had normal intraocular pressures. He was found to have a large pre-retinal hemorrhage covering the macular in the right eye as well as proliferative retinopathy of both eyes with early fibrosis seen in the right eye. The patient did not have follow-up at that time due to lack of insurance. He was referred to LSU in New Orleans. There is one ophthalmology clinic note from July 12th of this year when apparently the patient had no vision in the right eye and uncorrected visual acuity of the left eye was 20/125. The patient says that he has had two lazer surgeries on the left eye and one on the right eye and will have another one done on August 9th. He says that he still can only see light and shape with the right eye.

8-S1

Re:  Keefer Lamar Eaglin
SS#:  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

<u>Skin & Hair</u>: The patient has noted no changes.

## PHYSICAL EXAMINATION

The patient is a slender male who ambulates without difficulty, without a limp or use of a cane.

| | |
|---|---|
| *Height:* | *63" tall without shoes* |
| *Weight:* | *132 lbs in street clothing* |
| *Temperature:* | *98.6 F* |
| *Pulse:* | *80 and regular* |
| *Respirations:* | *16 per minute* |
| *Blood Pressure:* | *156/92, left arm, standard cuff* |

<u>Eyes</u>:  Pupils are equal, round, and react to light and accommodation. Funduscopic examination was not done because of the availability of medical records. The patient's uncorrected visual acuity is 20/125 on the left. The patient says that the vision is blurred on the right. He can see light and shapes of objects.

<u>Ears</u>:  The patient hears normal conversation without any difficulty.

<u>Nose</u>:  No abnormalities are noted.

<u>Mouth</u>:  No abnormalities are noted.

<u>Larynx & Pharynx</u>: No abnormalities are noted.

<u>Neck</u>:  There is no enlargement of the thyroid gland and no enlarged cervical lymph nodes or cervical masses. No abnormal pulsations or bruits are noted.

<u>Chest</u>:  The chest is symmetrical in configuration and both hemi diaphragms move equally on inspiration and expiration. The lungs are clear to auscultation and percussion with normal breath sounds bilaterally. There are no wheezes, rhonchi or rales.

<u>Spine and Back</u>: The patient ambulates without self support. He has normal range of motion. He can walk on heels and toes and squat more than 2/3 of the way down and rise without support. The straight leg raise test was negative bilaterally.

<u>Cardiovascular</u>:  The PMI is in the 5th left intercostal space, in the midclavicular line.  The borders of cardiac dullness are within normal limits. First and second heart sounds are normal. There are no third or fourth heart sounds. No murmurs, shocks, thrills, gallops or clicks are appreciated.

3

@004/015

06/18/2011 15:32 FAX

4

Re:   Keefer Lamar Eaglin
SS#:  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

Arteries & Veins: There is no edema or color changes of the lower extremities.

Breasts:  No abnormalities are noted.

Lymphatics:  No abnormalities are noted.

Abdomen:  The abdomen is soft and nondistended without abnormal pulsations or bruits.  There is no abdominal hernia, organomegaly or mass.

Genitourinary:  No abnormalities are noted.

Rectal:  Not performed.

Extremities: There is a tiny abrasion on the medial aspect of the left ankle just below the medial malleolus which appears to be from friction from a shoe. He has symmetrical circumferences of the ankles and calves.

Skin & Mucous Membranes: No abnormalities are noted.

Hair and Nails: No abnormalities are noted.

Neurological:  Cranial nerves II-XII are intact bilaterally.  Muscle bulk, tone and strength are preserved in all four extremities.  The patient has normal grip strength, grasping and dexterity bilaterally. All modalities of sensation are intact and there are no abnormalities of coordination or involuntary movements.  Superficial reflexes are intact.  The deep tendon reflexes are intact. There are no pathological reflexes. Romberg was negative and cerebellar examination is normal. The patients gait is normal.

Mental Status: The patient exhibits normal understanding, cooperation, concentration, attention and memory. The personality estimate seems to be within normal limits. There is no visible nervousness or depressed mood.

## ADDITIONAL MEDICAL INFORMATION
Medical records were received and reviewed.

*Medical Assessment for is attached.*

## DIAGNOSES

1.  Type I diabetes since the age of 8.
2.  Diabetic proliferative retinopathy. The patient has had lazer procedures on both eyes and is anticipating another one on the right eye later this month.
3.  History of cellulitis left lower leg last year. Resolved.

4

5

Re:  Keefer Lamar Eaglin
SS#: 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

## SUMMARY

The patient is a 31-year-old male   with history as in present illness. He has not worked since he
was treated for cellulitis in the left lower leg in the summer of 2010. He is currently being treated
for diabetic retinopathy. According to the records from Ochsner from July of last year he also
had a large pre-retinal hemorrhage covering the macula in the right eye which caused sudden
loss of vision in the right eye last year. He has had two lazer surgeries one in the right and two on
the left and is going to have another one on the right eye on August 9th. Visual acuity uncorrected
on the left side is 20/125. He can see light and shapes and shadows of objects with the right eye.
The rest of his physical exam is completely unremarkable except his blood pressure of 156/92.
The patient can perform all physical activities without restrictions. He should not operate
machinery or motor vehicles or on unprotected heights because of the current vision problems.
This should be reevaluated after he has completed the treatment and achieved the best possible
result.

Thank you for referring this patient to me.

Sincerely,

Miljana Mandich, M.D.
Louisiana License No. 14385
Expiration Date: June 3, 2012

MM/jam

5

8-S4

## VII. ENVIRONMENTAL LIMITATIONS

How often can the individual tolerate exposure to the following conditions:

| Condition | Never | Occasionally (up to 1/3) | Frequently (1/3 to 2/3) | Continuously (over 2/3) |
|---|---|---|---|---|
| Unprotected Heights | ✓ | | | |
| Moving Mechanical Parts | ✓ | | | |
| Operating a motor vehicle | ✓ | | | |
| Humidity and wetness | | | ✓ | |
| Dust, odors, fumes and pulmonary irritants | | | ✓ | |
| Extreme cold | | | ✓ | |
| Extreme heat | | | ✓ | |
| Vibrations | | | ✓ | |
| Other: (identify) | | | ✓ | |

| Condition | Quiet (Library) | Moderate (Office) | Loud (Heavy Traffic) | Very Loud (Jackhammer) |
|---|---|---|---|---|
| Noise | | | ✓ | |

Identify the particular medical or clinical findings (i.e., physical exam findings, x-ray findings, laboratory test results, history, and symptoms including pain etc.) which support your assessment or any limitations and why the findings support the assessment.

*Vision problems - see report*

EAGLIN ,KEEFER L
2/ M  DOB  10/12/1979  ADMDT  08/16/.
50803   BERGSMA DONA      FC 8
MR# OOO158648 PT#    2318877

REF. DR.:
Age:
Eye Meds:
ROS:
PFSH:
Med Reconciled ☐ yes ☐ no

cc:

Alleg:

| VA (SC) | Right Eye | 2c/300 | N | J | VA cc | Right Eye | N | J |
|---|---|---|---|---|---|---|---|---|
| | Left Eye | | N | J | | Left Eye | | J |

Present   R
glasses   L          M   R
                         L

|  | R | | L | | | nl | ab | Tonometry |
|---|---|---|---|---|---|---|---|---|
| | nl | ab | nl | ab | pupils | | | A  R   time   date |
| lids | | | | | EOM | | | P  L |
| lacrimal glands | | | | | CF | | | 12  tech initial _____ |
| lacrimal drainage | | | | | | | | |
| orbits | | | | | | | | |
| preauricular lymph nodes | | | | | | | | |

|  | | T | P | R | BP |
|---|---|---|---|---|---|
| SLE   Both Eyes, Right Eye, Left Eye | | | | | |

|  | nl | ab |
|---|---|---|
| Conjunctiva:  bulbar | | |
| palpebral | | |
| Cornea:  epithelium | | |
| stroma | | |
| endothelium | | |
| tear film | | |
| Anterior Chamber:  depth | | |
| cell | | |
| flare | | |
| Iris:  size | | |
| shape | | |
| direct & cons. reaction | | |
| morphology | | |
| Lens:  clarity | | |
| ant. & post. capsule | | |
| cortex | | |
| nucleus | | |
| Optic Disc:  size | | |
| C/D ratio | | |
| appearance | | |
| nerve fiber layer | | |
| Vitreous | | |
| Retina:  macula | | |
| vessels | | |
| periphery | | |

Level of pain: 0  1  2  3   4  5  6  7   8  9  10
              (Mild)      (Mod)       (Severe)

IMPRESSION:
Ⓥ ① s/p PRP OD 7/29/11 for PDR
- iop ok, quiet + AC rxn, VA improved
bal but hx of TRD/VH → needs PPV/inj/ET

RECOMMENDATION:
Ⓥ
① needs urgent/(pre-op) retina for
sx OD within 2-4 wks

RV: Days ____ Wks. ____ Months ____ Yrs. ____
Nurse initial _____
BMC 11 (Rev 05/10)     WHITE = Original   YELLOW = Billing   PINK = Shadow Chart

Physician's Signature
Date/Time

Next pre-op day  return @ LSV1H
                NCLA

EAGLIN ,KEEFER L
2/ M  DOB  10/12/1979  ADMDT  08/16/11
50803   BERGSMA DONA      FC 8
MR# OOO158648 PT#    2318877

# DIABETIC FOOT EXAM

Exam Date _____

Check all that apply:

**Skin:** ☑ Unremarkable  ☐ Lesion  ☐ Callus  ☐ Onychomycosis  ☐ Other _____

**Soft Tissue:** ☑ Unremarkable  ☐ Edema  ☐ Other _____

**Vascular: Pulses:** DP _____  PT _____

**Musculoskeletal:** ☑ Unremarkable  ☐ Deformity  ☐ Other _____



Mark the sensation in the circles:

+ = Can feel the 10 Gm filament
– = Cannot feel the 10 Gm filament

RIGHT                    LEFT

CHECK THE APPROPRIATE RISK CATEGORY BASED ON THE FOLLOWING FINDINGS:

Can the patient feel the 10 gram filament at all four sites on the foot? If YES, then check RISK 0.

If the patient CANNOT feel the 10 gram filament at any of the four sites, BUT there is NO focal callus, deformity or absent pulses, then check RISK 1.

If the patient CANNOT feel the 10 gram filament at any of the four sites AND there is focal callus, deformity or absent pulses, then check RISK 2.

Is there a history of foot ulceration or Charcot fracture? If YES, then check RISK 3.

| Foot Injury Risk | Intervention |
|---|---|
| ☐ 0 - No loss of protective sensation | ☑ Foot Care Education Done (Risk 0-1) |
| ☑ 1 - Loss of protective sensation | ☐ Diabetes Foot Program Referral Made (Risk 2-3) |
| ☐ 2 - Loss of protective sensation and high pressure (callus or deformity) and/or poor circulation | ☐ Other _____ |
| ☐ 3 - History of foot ulcer or Charcot fracture | |

Provider Signature _____  Date 12/13/4

Rev 10/2010

BMC Outpatient Clinic Visit Record Physician/Provider Notes

EAGLIN, KEEFER L
2/11 DOB   10/12/1979DMDT   12/13/11
07992   WILLIAMS VER FC   8
000158648 PT#   2378961

☐ VS, Family, Past Medical & Social History Reviewed   CC: _32 y.o. A.A. male

Subjective: _last primary visit 6/6/11_
_medication compliance — states ran out of lisinopril_
_for 2 months today huven RX/refill_
_& Febuxic (?) [illegible] in arms (upper 200-300's)_
_[illegible] states when taking_
_meds he has CP in 2011_
_states can't walk [illegible]_
_vision and trying_
_to breathing [illegible]_
_smokes - 1ppd X_

| ROS: ☑ negative, note positives | Diagnostics |
|---|---|
| ☐ Constitutional | HCt __ |
| ☐ HEENT | Pulse Ox PSA |
| ☐ Resp/Chest | HbA1c-vit |
| ☐ ABD/GI | HbB12 TSH |
| ☐ CVS | |
| ☐ GU | |
| ☐ Skin/ms/ext | |
| ☐ Neuro | |

| ☑ NL | PE Normal Findings | Impression | Controlled Uncontroll |
|---|---|---|---|
| ☐ Gen | Well-developed. Well-nourished. No acute distress. Normal habitus & grooming. | Asthma: ☐ Intermit ☐ Mild ☐ Mod ☐ Severe ☐<br>☐ steroid inhaler for mild, mod or severe   ACT __ ☑ Nasal Exam | |
| ☐ Skin | No: lesions  rashes  ulcers  hair pattern. | Diabetes: ☑ I ☐ II  Controlled __ Unco HbA1c | |
| ☐ Eyes | Normal conjunctiva, lips, pupils symmetry, EOMI | CHF NYHA: ☐ I ☐ II ☐ III ☐ IV | |
| ☐ Fundus | Normal optic disc, vessel margin no exudate or hemorrhages. | HTN: ☐ Pre ☐ Stage 1 ☐ Stage 2 _uncontrolled_ | |
| ☐ Ears | Normal external appearance auditory canals & drums. Hearing grossly normal. | CKD: ☐ I ☐ II ☐ III ☐ IV ☐ V | |
| ☐ Nose | Normal external appearance mucosa, septum & turbinates. | Other: | |
| ☐ Mouth | No: lesions of the gums, tongue, palates or oropharynx. No masses, lymphadenopathy. Lips, teeth, & gums grossly normal. | ① type I diabetes<br>② non compliance | _(6) osteopen_<br>_(7) anemia_ |
| ☐ Neck | Symmetrical. Trachea midline. No: lymphadenopathy, masses, or crepitus. | | |
| ☐ Thyroid | Smooth, symmetrical, no nodules, non-tender, not enlarged. | ④ J GFR | |
| ☐ Heart | NSR, no murmur. No thrills on palpitation. PMI normally placed. | | |
| ☐ Lungs | Clear to auscultation. Normal respiratory effort. | ⑤ bilateral lower extremity ulcer | |
| ☐ Limbs | Normal in appearance and function. Normal peripheral pulses. No edema | **Plan:** ☐ DM Orders | |
| ☐ Breasts | Symmetrical. Non-tender. ed & feet to [illegible]<br>No: masses, nipple discharge, skin changes, axillary or supra-clavicular lymphadenopathy. | _Make f/u appt ophthalmology_<br>_[illegible]_ | |
| ☐ Abd | Soft, non-tender. No masses, hernias detected. Normal liver and spleen. No groin lymphadenopathy. | _Stop smoking_<br>_↑ insulin 15 day/until appt_<br>_until CBS <450._ | |
| ☐ Pelvic | Normal external, female hair pattern & urethral meatus. Non-tender urethra & bladder. Vagina without discharge/lesion. Cervix smooth, without discharge/lesion, no CMT. Uterus normal size, shape & contour, non-tender, mobile. Pelvic support adequate. Adnexa have no masses or tenderness. | _N Bill_<br>_Work out in osteopenia_<br>_Vitamin D   B cell Hep panel_ | |
| ☐ Rectal | Normal sphincter tone. No hemorrhoids, masses or bleeding. | **Procedures/Treatments** | |
| ☐ Prostate | No enlargement noted. | _HbA1c, CB, CM_<br>_[illegible] serum_ | |
| ☐ Psych | No current evidence of depression, anxiety or agitation. | | |
| ☐ Neuro | Oriented x 3. No sensory or motor loss. DTRs symmetrical. | ⑥ Osteopenia 75y hep pen | |
| PE Abnormal Findings | [illegible] spots & tenderness<br>R lower leg ulcers<br>2cm | _(refer) podiatry HEO 9/11_ | |
| | 8 → open blister | | |
| | 0 → these [illegible] | **Reassessment** | |
| | | _P [illegible]_ | |

Faculty Note: ☐ Hx Reviewed   ☐ Pt Examined   ☐ Labs/x-rays reviewed   ☐ Agree w/Assessment And Plan

Physician Signature→ _[signature]_   Date→ _12/13/11_   Time→ _1856_

## Offender Collaborative Care
## Communication Form
### Summary of Care and Recommendations

To be completed on all offender LSU Health System visits in addition to the
medical record. Place a copy in the medical record.
Guard is to take this completed form to their facility. Do not inform
offender of follow up dates or times.



Acct. #10531933
LMRN: 98334594
EAGLIN, KEEFER L    1/26/2012
10/12/1979              2  M  J

place label inside dotted box above or fill out info

All follow up requests are reviewed for effectiveness and are to be scheduled by either the CPSO or the hospital's scheduling office.

LSU HCSD Clinic/Specialty: _____ E.D _____  OFFENDER FACILITY (REQUIRED): _____

**EVALUATION**    *This section is for LSU Provider's Use Only*

Reason for Specialty Consult/Visit: Retinal detachment

Pertinent History and Physical Exam: Vision problems for the past year, missed his
appt. No new changes.

Pertinent Study Results:

Medical Decision Making and Treatment Provided: Seen by opthalmology, will follow up as
Impression:  outpt.

**RECOMMENDATIONS/PLAN**    *This section is for LSU Provider's Use Only*

Note that you are making recommendations to medical personnel at the Offender's facility who will care for the patient.

Recommended Medications: All pain management will be prescribed by the offender's facility, DO NOT prescribe pain medications.

Recommended Treatment:
- Bedrest with head of bed elevated @ 30"
- Limited activity
- Home diabetic meds
- See prison MD in the am,

Recommended Tests/Studies: _____  Indication: _____

☐ Specialty follow up is not needed. Medical personnel at the offender's facility can provide care for the patient.

☒ Specialty follow up may be/is needed for: Lord & Taylor Optho clinic on 1/27/12 @ 8AM,
   (circle one)

In less/greater than 2 weeks at: clinic: _____  hospital: _____
   (circle one)         Telemedicine will be scheduled if appropriate and available.

LSU PROVIDERS: Do not schedule offender follow-up. The offender's healthcare provider at their
facility must request ALL follow-up, if needed.

LSU Provider's Signature: _____  Print Name: Jason Ullor
ID Number: 57807  Today's Date: 1/26/12  Time: 11:45am

If follow up is needed, THIS SECTION MUST BE COMPLETED BY JAIL / PRISON:
For Receptionist users: Complete this bottom section and fax with barcode cover page to 504-568-3360.
Fax users, fax to hospital fax numbers: Bogalusa Medical Center 504-680-0711  Earl K Long  504-680-0712  ILH/MCL (New Orleans) 504-680-0262
Lallie A Kemp 504-680-0713    Leonard J Chabert 504-680-0714    University MC (Lafayette) 504-680-0715    William O Moss 504-680-0716
→ A follow up consult is requested because: _____
→ List completed tests/studies/treatments and results: _____
Prison Provider's Signature: _____  Print Name: _____  Date: _____
Offender Facility: _____  Anticipated release date is less/greater than 3 months.
                                                (circle one)

4/04/2011 HCSD ICF 926

EAGLIN ,KEEFER L
2/ M DOB 10/12/1979   ADMDT 02/14/12
57227   OSULLIVAN PA   FC J
MR# 000158648 PT#   2408270

REF. DR.:
Age:
Eye Meds:
ROS:
PFSH:
Med Reconciled ☐ yes ☐ no

CC:

Alleg:

| VA = SC | Right Eye | N | J | | VA = CC | Right Eye | N | J |
| | Left Eye | | J | | | Left Eye | | J |

Present  R
glasses  L

M  R
   L

| | R | | L | | | | nl | ab | Tonometry |
| | nl | ab | nl | ab | | | | | |
| lids | | | | | | pupils | | | A  R   time   date |
| lacrimal glands | | | | | | EOM | | | P  L |
| lacrimal drainage | | | | | | CF | | | tech initial _____ |
| orbits | | | | | | | | | |
| preauricular lymph nodes | | | | | | | | | |

| | T | | P | | R | | BP |

SLE   Both Eyes,  Right Eye,  Left Eye

Level of pain: 0  1  2  3  4  5  6  7  8  9  10
              (Mild)      (Mod)      (Severe)

| | nl | ab |
| Conjunctiva:  bulbar | | |
| palpebral | | |
| Cornea:  epithelium | | |
| stroma | | |
| endothelium | | |
| tear film | | |
| Anterior Chamber:  depth | | |
| cell | | |
| flare | | |
| Iris:  size | | |
| shape | | |
| direct & cons. reaction | | |
| morphology | | |
| Lens:  Clarity | | |
| ant. & post. capsule | | |
| cortex | | |
| nucleus | | |
| Optic Disc:  size | | |
| C/D ratio | | |
| appearance | | |
| nerve fiber layer | | |
| Vitreous | | |
| Retina:  macula | | |
| vessels | | |
| periphery | | |

IMPRESSION:

RECOMMENDATION:

EAGLIN ,KEEFER L
2/ M DOB 10/12/1979   ADMDT 02/14/12
57227   OSULLIVAN PA   FC J
MR# 000158648 PT#   2408270

CHARGES KEYED

RV: Days _____ Wks. _____ Months _____ Yrs. _____
Nurse initial _____
BMC 11 (Rev 05/10)

Physician's Signature
Date/Time

WHITE = Original    YELLOW = Billing    PINK = Shadow Chart

8-Y



Join Tagged now - it's free!
Tagged is a great place to socialize with friends and meet new people.
Make your own profile, share photos, chat, flirt, play games, and have fun!

**TAGGED**

Sign in to Tagged

[Join Tagged >]     Connect with Facebook

## TERMS OF SERVICE

Jump to Privacy Policy

### Terms of Service

Undated as of January 9, 2013

Please read the following important Terms of Service Agreement (the "Agreement") before accessing or using any of the various services (the "Services") made available to you (the "Member") by Tagged, Inc. ("Tagged") through http://www.tagged.com, Tagged mobile applications or otherwise. ONLY USERS WHO ARE 13 YEARS OF AGE OR OLDER MAY REGISTER FOR TAGGED. By completing the registration process for the Tagged website, you represent that you are 13 years of age or older, and can and will be legally bound by this Agreement. If you are a minor, your parent or guardian must read and accept the terms of this Agreement before you register. No Member may participate where doing so would be prohibited by any applicable law or regulation.

**A) Modifications**
Tagged reserves the right to modify or amend this Agreement at any time, for any reason, or for no reason at all, at Tagged's sole discretion. The most recent version of this Agreement will be posted on the Tagged website. Although Tagged will provide notice of material changes to this Agreement on the Tagged website, as a Member it is your sole responsibility to keep yourself apprised of any such modifications or amendments. Should Member object to any terms and conditions of the Agreement or any subsequent modifications thereto or become dissatisfied with Tagged in any way, Member's only recourse is to immediately: (1) discontinue use of Tagged; (2) terminate Tagged registration; and (3) notify Tagged of termination.

**B) Description of Services**
As a Member, you will be provided with a variety of Services, as described on the Tagged website. Members may also utilize certain additional services offered from time to time such as shopping and e-commerce offerings and various informational services. Tagged reserves the right to enhance, modify, or discontinue the Services, in whole or in part, at any time, for any reason, or for no reason at all, at Tagged's sole discretion, with or without notice to Members, and with no obligation to Members.

**C) Member Conduct**
Use of the Services by you, as Member, is subject to all applicable local, state, national and international laws and regulations. Tagged reserves the right, but does not assume any obligation, to monitor the Services to enforce this Agreement. Nor does Tagged guarantee that any monitoring it does perform will be to the Member's satisfaction. Upon learning of any violation of this Agreement, Tagged, at its sole discretion, may terminate your access to and use of the Services, require you to remedy such violation, and/or take any other actions that Tagged deems appropriate to enforce its rights and pursue all available remedies. Without limitation, Tagged reserves the right to terminate your access to and use of the Services if, in our view, your conduct fails to meet any of the following guidelines:

1. Members shall not engage in any activity that constitutes harassment, including, but not limited to, excessive repetition when listing a person as a referral, repeated unwanted contact, interfering with a Member's use of site or stalking.
2. Members shall not list the email addresses of people unknown to them.
3. Members shall not list as referrals any email addresses that are fake, fictitious, or made up.
4. Members shall not list as referrals any email addresses which are owned by or belong to that member.
5. Members shall not attempt to interfere with any other person's use of the Services.
6. Members shall not misrepresent their identity or impersonate any person or entity, including, but not limited to, a Tagged employee, forum leader, guide or host.
7. Members shall not hold themselves out as sponsored by, endorsed by, or affiliated with the Tagged website.
8. Members shall not use any portion of the Tagged website or the Services to post, upload, email, transmit or otherwise make available junk mail, commercial advertisements, or any other form of commercial solicitation.
9. Members shall not use any portion of the Tagged website or the Services to post, upload, email, transmit or otherwise making available content, including user names and friend list names, that is harmful, threatening, abusive, vulgar, obscene, profane, defamatory, libelous, hateful, or racially, ethnically or otherwise objectionable.
10. Members shall not engage in any activity that is patently offensive or promote or otherwise incites racism, bigotry, hatred or physical harm of any kind against any group or individual.
11. Members shall not use any portion of the Tagged website or the Services to post, share, promote, depict, encourage, solicit or exchange Content Harmful to Minors.
12. Members shall not upload photos, graphics or other content that contain or promote illegal substances or activities, including, but not limited to, underage drinking or smoking, substance abuse, weapon use, or gang affiliation.
13. Members shall not post content that displays pornographic or sexually explicit material of any kind.
14. Members shall not provide material that exploits people under the age of 18 in a sexual or violent manner, or solicits personal information from anyone under 18.
15. Members shall not provide instructional information about illegal activities such as making or buying illegal weapons, violating someone's privacy, or providing or creating computer viruses.
16. Members shall not attempt to gain unauthorized access to Tagged's database or other computer systems.
17. Members shall not attempt to modify, translate, adapt, edit, decompile, disassemble, or reverse engineer any software programs used by Tagged in connection with the Tagged website or the Services.
18. Members shall not engage in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of, the Services or the Tagged website.
19. Members shall not collect or store personal data about other Members in connection with the prohibited conduct and activities set forth in paragraph #1 through #18 above.
20. Members shall not use any portion of the Tagged website or the Services for any unlawful purpose.
21. Members shall not engage in any activity that solicits or is designed to solicit password or personal identifying information for commercial or unlawful purposes from other Members.
22. Members shall not use the account, username, or password of another Member at any time or disclose their password to any third party or permit any third party to access their account.
23. Members shall not publicly post information that poses or creates a privacy or security risk to another person.

All judgments concerning the applicability of these guidelines shall be at the sole and exclusive discretion of Tagged and its designees. Tagged has the right in its sole discretion to pre-screen, refuse or remove any content that is available via the Tagged Services. Tagged and its designees shall have the right to remove any Content that violates this Agreement or is otherwise objectionable. An account may be terminated at any time, without notice, depending on the severity of the offense, which is determined exclusively at the discretion of Tagged. Tagged is not obligated to provide a Member with a warning prior to removal.

**D) Privacy**
Tagged has established a Privacy Policy to explain to Members how their information is collected and used, which Member can read by clicking http://www.Tagged.com/terms_of_service.html?priv=yprivacy_policy. The policy explains how and when Tagged may use Member information and content. Member's use of the Tagged website or the Services signifies acknowledgment of and agreement to Tagged's Privacy Policy. Member further acknowledges and agrees that Tagged may disclose Member's personal information if required to do so by law or in the good faith belief that such preservation or disclosure is reasonably necessary to comply with legal process, enforce this Agreement, or to protect the rights, property, or personal safety of Tagged, its employees, users and third parties, and the public, or as otherwise described in the Privacy Policy. The Find Friends feature is an easy way for Tagged users to invite friends through email. The email address(es) that you supply to use this service will only be used to send invitations to connect with you on Tagged.

© 2013 Tagged Inc.                    Mobile  About  Blog  Users  Privacy  Terms  Online Safety  Report Abuse  Help                    English

http://www.tagged.com/terms_of_service.html                                                      5/10/2013

**EVIDENCE RECEIPT**

ITEM # 2019-000840 ___ DATE 1·17·12 ___ EVIDENCE # _____

I   Name of Defendants:   #1 _____   #4 _____
                          #2 _____   #5 _____

Additional

                          #3 _____   #6 _____

II   Type of Offense ___42___   Date/Time of Recovery _1·17·12_

III  Victim(s) Channel Ben _____

VI   Reason Seized   Analysis   ·   Trial

V    Owner of Property _____   I.D. Made By Owner   YES   NO

VI   Chain of Custody:                              Evidence Marked By Initials

     Person Who Recovered Evidence _____ Dan/ #013/1717   (YES)   NO
                                         Signature(s) & Radio #

     Turned Over To _____   Date 3-14-12   Time 0955

     Turned Over To _____   Date _____   Time _____

     Turned Over To _____   Date _____   Time _____

VII  Description of Evidence Seized:

| Exhibit # | Quantity | Description |
|---|---|---|
| a-1 | 1 | one (1) comforter. color: Gray |
| a-2 | 2 | two (2) pillow cases |
| a-3 | 1 | one (1) comforter. color: Brown |
| a-4 | 2 | two (2) pillow cases |
| a-5 | 1 | one (1) fitted sheet color: Red |
| a-6 | 1 | one (1) pair of sweat pants color: Gray |
| a-7 | 1 | one (1) tank top. color: Black |
| a-8 | 1 | one (1) baseball hat - color: Brown |

Storage Bin #: U-8023

III-35

STATE OF LOUISIANA          NUMBER: 519994 E

VERSUS                      22ND JUDICIAL DISTRICT CO

KEEFER L. ENGLIN            PARISH OF ST TAMMANY

8/13/12                     _Rachel Shapin_
_____            _____
Filed:                      Deputy Clerk

## NOTICE OF APPEARANCE

The Defendant Keefer L. Englin, the captioned defendant moves the Court take notice and allow him to enroll as co-counsel in the captioned matter. The defendant is currently imprisoned in the Louisiana Department of Public Safety and Corrections and has lodged a Motion for Discovery.

Respectfully,            Dated:  8-10-12

_Keefer Englin_
Keefer Englin

## CERTIFICATE OF SERVICE

The undersigned deposes and says that he has served opposing counsel of record a true and correct copy of the same by depositing the same in the United States Mail.

Keefer Englin










UNITED STATES POSTAL SERVICE®

PRIORITY MAIL

MEDIUM FLAT RATE

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

■ Date of delivery specified for domestic use.
■ USPS TRACKING™ included to many major international destinations.
■ Limited international insurance.
■ Pick up available.
■ Order supplies online.
■ When used internationally, affix customs declaration.

P S 0 0 0 1 1 0 0 0 0 0 1

O-FRB2, Sept 2018
ID: 11.875 x 3.375 x 13.625
OD: 12 x 3.5 x 14.125
ODCUFT: 0.343

EXPECTED DELIVERY DAY:  04/20/19

USPS TRACKING NUMBER

9505 5143 4228 9108 2743 00

FROM:

Dixon Correctional Institute
Keefer Lamar Raglin 406762
P.O. Box 788 Dorm #7
Jackson, LA 70748

TO:

United States District Court
Eastern District Of Louisiana
500 Poydras Street
New Orleans, LA 70130

U.S. POSTAGE PAID
PRIORITY
$14.35

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE