UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KEEFER LAMAR EAGLIN                                    CIVIL ACTION

VERSUS                                                          NO. 19-9659

STATE OF LOUISIANA                                    SECTION: "I"(3)

## REPORT AND RECOMMENDATION

Petitioner, Keefer Lamar Eaglin, is a Louisiana state prisoner incarcerated at the Dixon Correctional Institute in Jackson, Louisiana.  He filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On November 21, 2013, petitioner was convicted of forcible rape under Louisiana law.[1] On March 28, 2014, he was found to be a second offender and was sentenced as such to a term of eighty years imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On April 24, 2015, the Louisiana First Circuit Court of Appeal affirmed his conviction, habitual offender adjudication, and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on April 15, 2016.[4]

---

[1] State Rec., Vol. 4 of 10, transcript of November 21, 2013, p. 802; State Rec., Vol. 1 of 10, minute entry dated November 21, 2013; State Rec., Vol. 1 of 10, jury verdict form.
[2] State Rec., Vol. 4 of 10, transcript of March 28, 2014; State Rec., Vol. 1 of 10, minute entry dated March 28, 2014; State Rec., Vol. 1 of 10, Reasons for Judgment dated April 1, 2014.
[3] State v. Eaglin, No. 2014 KA 1729, 2015 WL 1893276 (La. App. 1st Cir. Apr. 24, 2015); State Rec., Vol. 5 of 10.
[4] State ex rel. Eaglin v. State, 191 So. 3d 591 (La. 2016); State Rec., Vol. 6 of 10.

On March 17, 2017, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on April 27, 2017.[6] His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on September 15, 2017,[7] and February 20, 2018,[8] and by the Louisiana Supreme Court on March 6, 2019.[9]

On April 18, 2019, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[10] The state opposes the application.[11]

## I. Timeliness

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[12] With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration

---

[5] State Rec., Vol. 9 of 10. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court *pro se* prisoner filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to this application, this Court will simply use the signature date of the application as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed.

[6] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017.

[7] State v. Eaglin, No. 2017 KW 0982, 2017 WL 4082897 (La. App. 1st Cir. Sept. 15, 2017); State Rec., Vol. 8 of 10.

[8] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.

[9] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

[10] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). That date cannot be gleaned from the face of the application; however, it was obviously no earlier than the date the application was signed, April 18, 2019. Rec. Doc. 1-1, p. 2.

[11] Rec. Doc. 11.

[12] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, those alternative provisions are not applicable in the instant case.

of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).  However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."  Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.  See Foreman, 383 F.3d at 338-39.  As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.  See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.  Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

In its response in this proceeding, the state halfheartedly argues that petitioner's federal application *may* be untimely because his direct-review writ application *may* have been untimely filed with the Louisiana Supreme Court.  However, the state speculates that the Court may reject that argument because the state bears the burden of proof on this affirmative defense, see Ray v. Clements, 700 F.3d 993, 1006-12 (7th Cir. 2012), and it has no proof that the writ application was in fact untimely.[13]

The defense should indeed be rejected.  Because the Louisiana Supreme Court's decision did not expressly hold that petitioner's direct-review writ application was untimely, and because the state has submitted no evidence showing that the application was in fact untimely, there is not an adequate basis for this Court to conclude that the Louisiana Supreme Court denied the application as untimely.

---

[13] Rec. Doc. 11, p. 7.

Accordingly, pursuant to Butler, the Court finds that petitioner's state criminal judgment became final for AEDPA purposes on July 14, 2016, i.e. ninety days after the Louisiana Supreme Court denied the direct-review writ application on the merits. As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

Regarding the statute of limitations provided in § 2244, the AEDPA states: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

After two hundred forty-five (245) days elapsed, petitioner tolled the federal limitations period by filing a post-conviction application with the state district court on March 17, 2017. That application then remained pending – and the federal limitations period therefore remained tolled – for the duration of the post-conviction proceedings, so long as petitioner continued to seek review at the higher levels of the state court system in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, the state does not argue that petitioner's related collateral-review writ applications were untimely. Accordingly, the Court finds that the limitations period remained tolled until the Louisiana Supreme Court denied post-conviction relief on March 6, 2019.

When the limitations period then resumed running at that point, petitioner had one hundred twenty (120) days remaining. Because he filed his federal application a mere forty-three (43) days

later, it was timely.  In light of that fact, and because the state does not allege that petitioner's claims are unexhausted or procedurally barred,[14] the Court will review the claims on the merits.

## II.  Standards of Review

The AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or

---

[14] Rec. Doc. 11, p. 7.

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell,

535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has

explained:

> A state court decision is contrary to clearly established precedent if the state court
> applies a rule that contradicts the governing law set forth in the [United States]
> Supreme Court's cases. A state-court decision will also be contrary to clearly
> established precedent if the state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme Court and
> nevertheless arrives at a result different from [United States] Supreme Court
> precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses,

and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has

held: "[A] state-court decision is an unreasonable application of our clearly established precedent

if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal

habeas court must be mindful that "an unreasonable application is different from an incorrect one."

Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d)

reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal

justice systems, not a substitute for ordinary error correction through appeal." (quotation marks

omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough

to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted).  "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief."  Id. at 170.

> Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.   AEDPA's  carefully  constructed  framework  would  be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is

nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

### III.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On January 16, 2012, C.B.[FN 2] (the thirteen-year-old victim) left her New Orleans home by taxicab without the knowledge or permission of her mother, who was at home when she left, but did not see her leave.  When the victim's mother realized she was not at home, she contacted the New Orleans Police Department (NOPD).  Defendant, whom the victim started communicating with after she created a profile on a social network, made arrangements with the victim for them to meet in person for the first time at his residence in Slidell that day.[FN 3] According to the victim, shortly after her arrival at defendant's residence, he forced her to engage in sexual intercourse without her consent.  After sexual acts took place, including vaginal and oral intercourse, the victim left defendant's residence, initially on foot.  Defendant followed her in his vehicle and told her to get into the vehicle and that he would give her a ride.  When defendant stopped at a gas station in New Orleans East, the victim got out of the car and ran to a nearby hotel.  The victim called her family and reported the incident.  Her family then informed the police of the victim's whereabouts.  The victim was interviewed by the police and taken to Children's Hospital in New Orleans where an examination revealed vaginal trauma.  The victim was subsequently interviewed at Children's Hospital and at the Children's Advocacy Center (CAC).  During her interviews, the victim indicated that defendant repeatedly pushed her onto his bed, would not allow her to get up or leave the room, forced her legs open, and repeatedly forced her to engage in sexual acts.  Defendant was interviewed after his arrest and denied having sex with the victim.  Thereafter, in a subsequent interview, defendant admitted to sexual intercourse, but contended that it was consensual.  Defendant maintained that he was unaware of the victim's actual age.

> [FN 2]  In reference to the victim and her family members, only initials or "the victim" will be used herein.  See LSA-R.S. 46:1844W.

> [FN 3]  Based on the date of birth provided in the bill of information (October 12, 1979), defendant was thirty-two years old at the time of the offense.[15]

---

[15] State v. Eaglin, No. 2014 KA 1729, 2015 WL 1893276, at *1 (La. App. 1st Cir. Apr. 24, 2015); State Rec., Vol. 5 of 10.

## IV.  Petitioner's Claims[16]

## A.  Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his conviction.  On direct

appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> In the first assignment of error, defendant argues that the evidence is
> insufficient to support the conviction.  Defendant notes that after weeks of
> communication by texts and emails, the victim arranged to meet with him in person,
> packed a bag to bring with her, and arrived by taxicab.  He further notes that he had
> sex with the victim when she arrived, but contends that it was consensual.
> Defendant further contends that the victim never seemed concerned for her safety,
> did not use the cell phone that she had with her, and never stated that he threatened
> her with any physical violence.  Contending that the State used the victim's vaginal
> injuries as evidence of force, defendant notes that Nurse Lupin agreed that the
> vaginal tears could have been the result of inadequate lubrication.  In arguing that
> there was no showing of violence, defendant notes that he did not kidnap, beat, or
> threaten the victim, and that the bedroom door was not locked.  Defendant further
> argues while the victim stated that he pushed her down onto the bed, that fact did
> not rise to the force necessary to justify the verdict.[FN 4]
>
> > [FN 4]  In the summary of his arguments, defendant indicated that the victim gave
> > inconsistent statements that should have caused the jury to be suspicious as to her
> > trial testimony with regard to the lack of consent.
>
> A conviction based on insufficient evidence cannot stand as it violates due
> process.  See U.S. Const. amend. XIV, § 1; LSA-Const. art. I, § 2.  The
> constitutional standard for testing the sufficiency of the evidence, as adopted by the
> legislature in enacting LSA-C.Cr.P. art. 821, requires that a conviction be based on
> proof sufficient for any rational trier of fact, viewing the evidence in the light most
> favorable to the prosecution, to find the essential elements of the crime beyond a
> reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61
> L.Ed.2d 560 (1979).  The Jackson standard of review is an objective standard for
> testing the overall evidence, both direct and circumstantial, for reasonable doubt.
> When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the trier
> of fact must be satisfied that the overall evidence excludes every reasonable
> hypothesis of innocence.  State v. Graham, 02-1492 (La.App. 1 Cir. 2/14/03), 845
> So.2d 416, 420.
> > In accordance with LSA-R.S. 14:41, the elements of rape include: 1) the act
> of anal, oral, or vaginal sexual intercourse; 2) with a male or female person; 3)

---

[16] For ease of analysis, petitioner's claims are discussed herein in a different order than they were presented in the federal application.

without lawful consent of the victim; 4) emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the rape. In accordance with LSA-R.S. 14:42.1, in pertinent part, forcible rape is rape committed when the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes such resistance would not prevent the rape. LSA-R.S. 14:42.1A(1).

The victim's mother, E.B., formally adopted the victim when she was a toddler and has had custody of her since infancy. E.B. testified that she bought the victim a laptop computer for Christmas in 2011, less than a month before the instant offense. She recalled that she was participating in a Martin Luther King Day parade on the day of the offense. She noted that the victim left their home in New Orleans that morning despite the fact that she instructed her daughter to stay inside until it was time to leave for the parade. E.B. testified that she initially drove around the block to look for the victim and considered giving her time to return home before she called the NOPD, noting that the victim was only thirteen years old and had never left the home on her own without permission before this incident. She filed a missing person's report and provided the police with a photograph of the victim. As the police were filling out the report, one of E.B.'s other daughters informed her that the victim called screaming and hollering before the phone abruptly disconnected. Once the victim called another sister who lived in Virginia, E.B. learned that the victim was at a hotel in New Orleans East. E.B. notified the police and a unit was sent to the victim's location. E.B. noted that when she met the victim at the police station, the victim was sad, had been crying, and was afraid that she had disappointed her mother by being disobedient. Before the information was revealed at the police station, E.B. was unaware of the fact that the victim had created a profile for a social website. On cross-examination, E.B. confirmed that the victim took cash and a debit card from her purse before the victim left the home on the morning of the incident. After the victim gave a statement to the police, E.B. was instructed to take her to Children's Hospital, and E.B. complied.[FN 5]

[FN 5]  E.B. noted that the victim was initially outgoing, but that her behavior changed after the offense, specifically stating that she no longer cared about her appearance, had gained a lot of weight, was often depressed, and would often get upset and cry while at school and request to be checked out early. She noted that the victim had been briefly hospitalized for depression after the incident.

Lisa Lupin, a registered nurse at Children's Hospital (an expert witness in the field of pediatric nursing and execution of child sexual assault kits) conducted a sexual assault examination of the victim when she was brought to the hospital on the day of the offense. She noted that the victim was very quiet when she arrived. Along with Nurse Lupin, the examination was conducted by Dr. Lucinda McClaslin, a pediatrician at the hospital. Nurse Lupin testified as follows regarding the findings documented in the physician notes: "Hymenal ring is torn. Lacerations extend from the post – which would be posterior – fourchette into the vagina approximately 6.5 centimeters into the vaginal orifice at six o'clock." The victim's

clothing was collected and the victim's blood was drawn. Noting that she was not a forensic physician, during cross-examination, Nurse Lupin confirmed that she could not testify as to the cause of the victim's vaginal trauma. After being questioned regarding the possibility of trauma being caused by a child victim having intercourse for the first time or engaging in multiple sex acts, she stated that any sex act could have caused the trauma. On re-direct examination, Nurse Lupin noted that the victim's vaginal trauma may have looked different the next day after the incident, confirming that bruising can become more observable during the days after the trauma is endured.

Detective Alvin Hotard of the St. Tammany Parish Sheriff's Office major crimes unit was notified of the reported rape late that afternoon. The victim was still at Children's Hospital in New Orleans when he and another detective arrived, and he interviewed the victim. He noted that the victim was sitting very quietly. During the interview, the victim stated that defendant had sex with her against her will after she arrived at his residence. She stated that she wanted to watch a movie and that defendant started to remove her clothing against her will and raped her. She indicated that he forcefully inserted his penis into her vagina, that it was painful, and that she wanted him to stop. She stated that defendant stopped and went outside when a car horn was blown outside. At that point, she put her clothes on and tried to leave, but he came back inside and raped her again. She stated that when she got dressed again and exited the residence on foot, defendant followed her in his vehicle and told her he would drive her home. Arrangements were made for the victim to be interviewed at the CAC. During cross-examination, Detective Hotard confirmed that the police report showed that the victim initially stated that she was kidnapped by three people from the porch of her home.

Detective Hotard used information retrieved from the victim's cell phone and computer to obtain a photograph of defendant and verified his identity with the victim. After defendant's full name and address were ascertained, an arrest warrant was obtained, and defendant was arrested on January 17, 2012, the day after the offense. After being advised of and waiving his Miranda[FN6] rights, defendant gave a statement. He indicated that he believed the victim was younger than nineteen years old. He confirmed that the victim ran away when he stopped at the gas station. Defendant denied having any sexual contact with the victim. On January 19, 2012, Sergeant Bryan Ocull of the St. Tammany Parish Sheriff's Office obtained a search warrant to secure DNA samples from defendant. He retrieved a saliva sample after meeting defendant at the St. Tammany Parish Jail where he was being housed.[FN 7]

[FN 6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[FN 7] Tara Brown, a forensic DNA analyst and expert in forensic DNA science, performed the DNA analysis in this case on the sex crime kits from the victim and defendant. Defendant was found to be a minor DNA donor in the pubic hair combings taken from the victim during her sexual assault examination (the victim

was the major DNA donor of the profile). The results confirmed that defendant's DNA came into contact with the victim's pubic hair.

After the DNA sample was taken from defendant, Sergeant Ocull was notified that defendant wished to give another statement. After being re-Mirandized, defendant gave a recorded statement. Defendant noted that after the victim arrived in a taxicab, he paid the driver, and they went into his bedroom. He further stated that they watched television for a while. Defendant noted that when they were arranging the meeting, he told the victim to bring pajamas and an outfit to wear on a date. As they watched television, he asked her if she wanted to wear her pajamas so she could be comfortable. He noted that the victim started undressing and that they had sex. He stated that the victim never said no and did not complain about pain while they were having sex. Defendant stated that afterwards he left the room to smoke a cigarette, and when he came back, the victim stated that her stomach was hurting. He offered her food and something to drink, but she declined. He left the room again to go outside to smoke, and when he returned, the victim was dressed and wanted to use the bathroom. He noted that she then went outside and started walking down the street. He asked her where she was going and told her he would take her to get something to eat. Defendant stated that after the victim got into his vehicle, he kept asking her what was wrong because she was "fidgety" and moving around, and she told him that she felt bad about lying to her mother. Defendant further stated that he was puzzled by her explanation because he thought the victim was nineteen years old. He further noted that the victim told him she was in college. He stated that he asked her if she wanted him to take her home, but she told him she did not want to go home. He stated that the victim told him to let her out on the highway. When the vehicle's low-gas light came on, defendant stopped at a gas station, and the victim left on foot. He stated that he later learned that the victim was only thirteen years old. He noted that when the victim was at his house, his wife was at work, and his teenage son was in the opposite end of the house and had not yet gotten up for the day. He denied ever hitting or forcing the victim to have sex.

On January 26, 2012, Joshua Long, a CAC forensic interviewer, conducted the interview of the victim at Audrey Hepburn Care Center. During the interview, the victim noted that her mother did not allow her to go places, and while trying to find someone she could relate to, she began communicating with defendant on a social network website called "Tagged" a couple of weeks before the offense in early January. She stated that shortly after they began communicating, defendant told her that it would be nice if they met in person. The morning of the offense, she called a taxicab to take her to Slidell to meet defendant, and he paid the driver when she arrived at his residence. Upon arrival, she noticed that defendant was older than she thought he would be. She stated that she wanted to watch a movie, and defendant initially agreed. After a while, however, defendant began trying to remove the victim's shirt, and she told him to stop, but he continued to try to remove her clothes. As she repeatedly told him no, he told her to just listen to him and

pushed her onto his bed and removed her clothing. She stated that when defendant "started raping" her, she told him it hurt, but he kept "doing it." Defendant began kissing her and repeatedly told her to calm down, as she continued to tell him to stop. He would not allow her to get off the bed as she repeatedly attempted to get up. She stated that defendant did not want to stop, despite the fact that she was in pain. She ultimately stopped resisting after repeated failed attempts to stop defendant.

When asked what she meant by rape, the victim specified that defendant "kept trying to have sex" with her and ultimately did so. She noted that every time she told him no, he would not stop, but instead kept trying to open her legs and kept trying to get her to be still. She noted that at one point when she tried to get up, he turned her over and continued to try to have sex with her. She clarified that when she used the term sex, she meant that defendant put his penis in her vagina. She stated that as she repeatedly told defendant no and that she wasn't ready, he kept trying and pulling her legs open. She stated that after a while, he was able to open her legs enough to put his penis in her vagina. She stated that it hurt and that although she told him to stop, he kept going. Defendant told her to calm down or it was just going to hurt worse.

The victim also stated that defendant tried to make her "suck on his penis" and ultimately put his penis in her mouth. She noted that defendant stopped when someone pulled up outside of his home. When defendant walked outside to bring something to the visitor, she put her clothes on and tried to leave. Before she could exit the house, defendant came back inside and began trying to remove her clothes again. She stated that he was ultimately able to pull her clothes "half-way down" and again tried to penetrate her. She stated that he ultimately put his penis in her vagina again. The victim further stated that defendant "tried his best to keep me still as possible" and told her that if she wanted it to hurt less, she had to do what he told her to do. She noted that every time she tried to get up, he would push her back down. She noted that he rolled her over more than once and started pulling her hair as she tried to move. She further stated that defendant was "hit[ting] me on my back" and repeatedly told her that she would have to listen to him. She stated that she was in continuous pain as defendant put his penis in her vagina "over and over." As she started crying, defendant eventually allowed her to leave the room. She noted that when she got dressed and left the home on foot, defendant approached her in his vehicle, stated that he would give her a ride and told her to get into his vehicle. When he stopped at a gas station, she ran to a nearby hotel and made contact with her sister. She admitted that she initially indicated that she was kidnapped by three men and did not want her family to know about the incident.

On January 31, 2012, Ann Troy, a CAC nurse practitioner at the Audrey Hepburn Care Center, interviewed the victim when she was brought to Children's Hospital for a follow-up visit. The victim was experiencing her menstrual cycle that day and was not physically examined. During the interview, the victim described the incident consistent with her CAC interview. She again described forced, painful, unwanted sexual and oral intercourse. She again stated that she

told defendant no and that he kept trying until he was able to remove her clothing and rape her. She also consistently described how defendant stopped when someone came to his house and walked outside, but reentered and raped her again. She stated that she initially tried to walk home, but defendant followed her and told her to get into his vehicle, and that she ran to a hotel when he stopped at a gas station. She noted that she experienced bleeding along with the pain from the intercourse.

Although Nurse Troy was not present during the physical examination of the victim on the day of the offense, she reviewed the evaluations with her peers and testified as an expert in the field of child sexual abuse. Nurse Troy testified that the victim's injury was highly suggestive of penetrating blunt trauma. She noted that despite the finding of trauma in this case, it was normal for there to be no bleeding or trauma when female virgins have sexual intercourse for the first time, specifically noting that ninety-five percent of the children she examined in child sexual abuse cases did not have any trauma. She noted that the laceration in this case was located beyond the hymen in the floor of the vaginal wall, between the victim's anus and vagina, consistent with vaginal penetration.

The victim was fifteen years old by the time of the trial. She testified that without the knowledge of her mother, who she described as strict, she started using a website called "Tagged" at the end of 2011 in an attempt to meet new friends. She provided an older age when setting up her profile in order to bypass the parental authorization that was required based on her actual age. She noted that shortly after she created the profile, defendant "tagged" her, and they began communicating back and forth electronically. They ultimately made plans to see each other in person, and she arranged for a taxicab to bring her to defendant's residence on the day in question. She noted that she grabbed the bag that she packed and took her mother's credit card from the counter without her permission before leaving home. Defendant sent her a text message with his address in Slidell, and she gave the information to the taxicab driver.

When she arrived at defendant's residence, she used her cell phone to call him, and he came outside and paid the taxicab fee. The victim testified that after entering the home she was raped by defendant, which she defined as being "forced to have sex." She stated that she did not go there with the intention to have sex and that she told defendant that she did not want to have sex. She stated that defendant pulled her clothes off without her permission and forced her to do something that she was not ready to do. She specifically stated that defendant put his penis inside her vagina. She stated that defendant repeatedly pushed her down as she tried to get off of his bed. Consistent with her pretrial interviews, the victim confirmed that defendant penetrated her more than once, that he stopped and walked outside when a car pulled up, that she got dressed and tried to leave, and that defendant reentered the home before she could leave, removed her clothing, and raped her again. Her trial testimony also consistently indicated that defendant ultimately drove her to New Orleans and that she ran to a hotel when he stopped at a gas station. When specifically questioned as to what happened while defendant was driving on the

interstate, the victim testified that she tried to open the car door. Regarding defendant's actions in response to her attempt to open the car door, she stated he "[p]ulled me back."

The victim admitted that she lied when she initially told the police that she was kidnapped and explained that she did so because she did not want her family to know what happened and thought that they would no longer be proud of her. During cross-examination, she confirmed that defendant did not verbally threaten her and stated that she did not know if there were any bruises on her body.

As indicated, defendant ultimately admitted to having sexual intercourse with the victim. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Gordon, 582 So.2d 285, 292-93 (La.App. 1 Cir. 1991). The testimony of the victim alone is sufficient to prove the elements of the offense. State v. Hampton, 97-2096 (La.App. 1 Cir. 6/29/98), 716 So.2d 417, 418; State v. Orgeron, 512 So.2d 467, 469 (La.App. 1 Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). In finding defendant guilty of forcible rape, it is obvious that the jury believed the testimony and pretrial statements of the victim and rejected the defense's claim of consensual sexual intercourse. While, as defendant notes, the victim initially gave inconsistent statements about being kidnapped, as opposed to taking a taxicab to defendant's residence, she consistently indicated that defendant physically forced her to engage in sexual intercourse.

Defendant cites on appeal the case of State v. Powell, 438 So.2d 1306, 1308 (La.App. 3 Cir.), writ denied, 443 So.2d 585 (La. 1983), wherein our brethren of the third circuit reversed a defendant's forcible rape conviction after finding that the evidence therein was insufficient to convince a reasonable fact finder beyond a reasonable doubt that the victim was prevented from resisting the act by threats of force or physical violence under the circumstances. Therein, the victim testified that she entered the defendant's car after he agreed to bring her to her cousin's residence located nearby. The defendant then allegedly brought the victim to a secluded area and threatened to kill her when she refused to have sexual intercourse with him. The victim stated that the defendant slapped her in the face three or four times while threatening to kill her. He allegedly threatened to use a weapon which, he had indicated, was under the seat of the car. The victim admitted that she never saw the weapon (or an object of any type) which the defendant threatened to kill her with. The victim testified that following these incidents, they each removed their own pants, and the defendant had intercourse with her on the front seat of the car. Thereafter, the defendant brought the victim to where she initially approached him that evening, and the victim sought help from nearby friends, who in turn contacted the police. In reversing the conviction, the majority reasoned, "There was no showing, however, of resistance on the part of the victim and very little evidence that she was prevented from resisting by force or threats of physical violence under the circumstances." Powell, 438 So.2d at 1307-08.

We note that this court is not persuaded by the reasoning in Powell, and previously rejected that case in State v. Savario, 97-2614 (La.App. 1 Cir. 11/6/98), 721 So.2d 1084, 1088, writ denied, 98-3032 (La. 4/1/99), 741 So.2d 1280. This Court has held that a victim need not suffer physical harm to constitute the degree of physical force or threat of physical violence necessary to support a conviction of forcible rape. State v. Montana, 533 So.2d 983, 988 (La.App. 1 Cir.1988), writ denied, 541 So.2d 852 (La. 1989). The showing of resistance and force was strong in this case. The victim herein indicated that defendant ignored her repeated verbal rejections, pulled off her clothes against her will, pushed her every time she attempted to get away, forcefully pried her legs open, and was ultimately able to overcome her resistance and have unwanted sexual intercourse with her. The credibility of the witnesses' testimony is a matter of the weight of the evidence. A determination of the weight to be given evidence is a question of fact for the trier of fact not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1 Cir.), writ denied, 511 So.2d 1152 (La. 1987).

In this case, defendant has contended that the sexual acts were consensual and that the evidence of the use of force was insufficient. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La.App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987). Under the circumstances herein, the jury could have reasonably concluded that the victim did believe, and believed reasonably, that further resistance would be futile and would not prevent the rape. In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence presented in this case in the light most favorable to the State, we are convinced that any rational trier of fact could find that the evidence proved beyond a reasonable doubt, and to the exclusion of the hypotheses of innocence raised by defendant as to the instant offense, all of the elements of forcible rape. Based on the foregoing, we find that the first assignment of error lacks merit.[17]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[18]

---

[17] State v. Eaglin, No. 2014 KA 1729, 2015 WL 1893276, at *1-8 (La. App. 1st Cir. Apr. 24, 2015); State Rec., Vol. 5 of 10.

[18] State ex rel. Eaglin v. State, 191 So. 3d 591 (La. 2016); State Rec., Vol. 6 of 10.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). He has not done so.

As the Louisiana First Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact

"twice-deferential."  Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson,

566 U.S. 650, 651 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring

that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus

proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law

would impose a more demanding standard of proof.   Foy v. Donnelly, 959 F.2d 1307, 1314 n.9

(5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D.

La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009

WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain,

Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil

Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted

by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman,

566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements

of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires

to prove the offense is purely a matter of federal law." (citation and internal quotation marks

omitted)).

In the instant case, petitioner does not dispute that he engaged in sexual intercourse with

the victim; rather, he merely disputes that the act was nonconsensual and that he used force to

overcome a lack of consent.  However, the victim testified at trial that she told petitioner that she

did not want to have sex and that he responded by pulling off her clothes without her permission

and forcing her to have intercourse against her will despite her active resistance.  In light of that

testimony, nothing more was needed – *a victim's testimony alone is generally sufficient evidence*

*to support a conviction.* <u>Peters v. Whitley</u>, 942 F.2d 937, 941-42 (5th Cir. 1991); <u>see also</u> <u>Fetterley</u> <u>v. Whitley</u>, No. 94-30310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); <u>Holderfield v.</u> <u>Jones</u>, 903 F. Supp. 1011, 1017 (E.D. La. 1995).

Petitioner argues that general rule should not apply in this case because, in his opinion, the victim was not credible. However, the jury obviously found otherwise, and a federal habeas court generally will not grant relief grant relief on a sufficiency claim premised on nothing more than a challenge to witness credibility. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) ("[U]nder <u>Jackson</u>, the assessment of the credibility of witnesses is generally beyond the scope of review."); <u>Ramirez</u> <u>v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); <u>McCowin v. Scott</u>, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); <u>Phillips v. Cain</u>, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), <u>adopted</u>, 2012 WL 2565025 (E.D. La. July 2, 2012); <u>Picou v. Cain</u>, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

### B. Involuntary Statement

Petitioner asserts two related claims in which he argues that his statement to the police was involuntary.  In the post-conviction proceedings, the state district court denied the claims, holding:

> [Defendant's] first and second claims allege that the recorded statement he gave to police was obtained in violation of his constitutional rights.  He argues that he had previously invoked his right to counsel but was later coerced by threats to himself and his family.  He offers no evidence of any form of coercion.  It is true that Eaglin invoked his right to counsel during the initial interrogation.  When that occurred, all further questioning ceased.
>
> However, several days later, Eaglin asked to speak to the police about what occurred that morning.  Prior to asking any further questions, Sergeant Ocull read Eaglin his <u>Miranda</u> rights, asked if he understood those rights and if he wished to waive them, which he did.  These facts are evident from Eaglin's two signatures on the Waiver of Rights form and in the video taped interview.
>
> > Once an individual in custody expresses a desire to deal with police only through counsel, all questioning must cease immediately and he is not subject to further interrogation until an attorney is present, unless the suspect initiates further communication, exchanges, or conversation with the police and validly waives his earlier request for counsel.  <u>State v. Koon</u>, 96-1208, pp. 6-9 (La.5/20/97), 704 So.2d 756, 762-763, cert. denied, <u>Koon v. Louisiana</u>, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997) (citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); <u>Miranda v. Arizona</u>, 384 U.S. 436, 440-445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); <u>State v. Abadie</u>, 612 So.2d 1, 4-5 (La.1993), cert. denied, <u>Louisiana v. Abadie</u>, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); <u>State v. Lee</u>, 524 So.2d 1176, 1183 (La.1987)).  When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether the police have "scrupulously honored" his right to cut off questioning.  <u>State v. Koon, supra</u> (citing <u>Michigan v. Moseley</u>, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)).  However, police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, so long as those statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response."  <u>Id.</u> (Citing <u>State v. Ross</u>, 95-1798 (La.3/8/96), 669 So.2d 384, 386 (per curiam)).  Nor does a previous assertion of the right to counsel bar admission of such statements.  <u>Id.</u>  When an accused invokes his <u>Miranda</u> right to counsel, the admissibility of a subsequent confession is determined by a two-step

> inquiry:   (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. *Id.*; *State v. Abadie, supra* at pp. 5-6.   State v. Tilley, 1999-0569 (La. 7/6/00), 767 So. 2d 6, 11.
>
> Eaglin's appointed counsel filed a Motion to Suppress the Confession.  That Motion was heard prior to trial and denied, based on Sergeant Ocull's testimony and the evidence offered.   The court found that Eaglin initiated the later conversation and that the statement was taken only after Defendant waived his rights voluntarily, knowingly and intelligently.    These claims therefore, are denied.[19]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[20]  The Louisiana Supreme Court thereafter likewise denied the claims, holding that "the applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[21]

Where, as here, such claims were denied on the merits in state court, a federal habeas court must apply the AEDPA's deferential standards of review as follows:

> Whether a confession is voluntary is ultimately a legal question, which sometimes involves subsidiary mixed issues of law and fact, and accordingly, we review it under Section 2254(d)(1).  See Barnes v. Johnson, 160 F.3d 218, 222 (5th Cir. 1998).  Any purely factual sub-questions are presumed correct, unless shown to be unreasonable determinations of fact by clear and convincing evidence.  See id.; 28 U.S.C. § 2254(d)(2), (e)(1).  To determine voluntariness, we consider the "totality of the circumstances."  Rogers v. Quarterman, 555 F.3d 483, 491 (5th Cir. 2009). "A statement is involuntary if there existed official, coercive conduct that made it unlikely the statement was a product of the individual's free choice."  Id.

Davila v. Davis, 650 F. App'x 860, 871 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017).

---

[19] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, pp. 4-5.

[20] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.

[21] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

As previously noted, § 2254(d)(1) requires a federal court to defer to the state court decision unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The clearly established federal law with respect to claims such as this challenging the voluntariness of a statement is Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny.

In Miranda, the United States Supreme Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

Miranda, 384 U.S. 444-45 (emphasis added; footnote omitted). The Supreme Court subsequently further developed the contours of this right, holding "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104 (1975).

The United States Fifth Circuit Court of Appeals has provided the following guidance to courts facing the issue of whether the right was "scrupulously honored":

> Rather than issuing a bright-line rule for determining when police were scrupulous in honoring suspects' rights, the [Supreme] Court examined a number of operative facts, all present in Mosley.  See [Mosley, 423 U.S.] at 104-06, 96 S.Ct. 321.  The Court indicated that it found four factors particularly probative:  (1) whether police immediately ceased initial interrogation upon the suspect's request; (2) whether questioning was resumed after a "significant period of time," e.g., "an interval of more than two hours"; (3) whether a "fresh set of warnings" was provided; and (4) whether the topic of the second interrogation was a different crime.  See id. at 105-06, 96 S.Ct. 321.  We have read Mosley to include a fifth factor, implicit in the third, that "the suspect was advised prior to initial interrogation that he was under no obligation to answer question[s]."[FN2] United States v. Alvarado-Saldivar, 62 F.3d 697, 699 (5th Cir. 1995).

> > [FN2]  As Mosley does not do so explicitly, different courts have enunciated different factors when reading the Court's opinion.  See, e.g., Anderson v. Calderon, 232 F.3d 1053, 1066 (9th Cir. 2000) (finding five factors, including "[a] different officer resumed the questioning"); Evans v. Rogerson, 77 F.Supp.2d 1014, 1031 (S.D. Iowa 1999) (identifying nine factors cited by the Mosley Court); People v. Fleming, 103 Ill. App. 3d 194, 58 Ill. Dec. 956, 431 N.E.2d 16, 18 (1981) (noting only three factors as central to the Mosley analysis).

> It does not appear that any single factor is dispositive, though. See, e.g., Kelly v. Lynaugh, 862 F.2d 1126, 1131 (5th Cir. 1988) (stating that "it is not decisive that the interrogations covered the same crime").  Rather, a case-by-case analysis of police conduct is required, Wilcher v. Hargett, 978 F.2d 872, 877 (5th Cir. 1992), although this can sometimes "produce opposite results in cases that are similar in some respects."  Charles v. Smith, 894 F.2d 718, 726 (5th Cir. 1990).

Hebert v. Cain, 121 F. App'x 43, 46 (5th Cir. 2005).

In its response in this federal proceeding, the state concedes that, during his arrest on January 17, 2012, petitioner, after making preliminary statements to Detective Hotard, did in fact invoke his right to consult with an attorney before answering any additional questions.  Further, petitioner does not dispute that Hotard's questioning ceased immediately after that invocation of rights.  Rather, the dispute in this case concerns what occurred during petitioner's statement to Sergeant Bryan Ocull *two days later*.

At trial, Ocull described that interaction as follows:

Q. [by the prosecutor]  Okay.  Now, as you are executing, as you and Mr. Rodrigue with the Coroner's Office, are executing the sex crimes kit on the defendant, does something occur that you perhaps didn't anticipate?

A. [by Ocull]   Yes.

Q.     Okay.  What?

A.     As we started the process and I explained to the defendant that we were there with a search warrant to collect and compare evidence from him to use from what was collected from the victim, Mr. Rodrigue started the collection process and explained to him what he was going to be collecting, swab samples, pulled head hair, pulled public hair, nail samples, the defendant said that he wanted to talk to Detective Hotard and needed to make a statement to him.

     Initially, my reaction was that I was there for the search warrant and that I would send Detective Hotard back.  But, then, with Detective Hotard being in school, I asked him what he needed to inform Detective Hotard of.  He said he wanted to let Detective Hotard know that he had sex with the victim and that he thought she was a virgin because she was in pain afterwards.  Since we were in the process of collecting the kit, I told him to stop right there because we needed to finish the kit first and we continued on with collecting the kit at that point.

Q.     Okay.  After the kit procedure was completed, did you then turn your attention to the issue of the defendant wanting to surrender a statement?

A.     Yes, as soon as Mr. Rodrigue got finished collecting the kit, I had the defendant back in the custody of the jail personnel, because I had to go to my vehicle to get a tape recorder and a Miranda rights form; since I was not prepared to take a statement, I did not bring it inside with me.

     Once I got those items, we went into a separate little office room in the medical unit.  I presented him with the Miranda Rights form and we began to read over that, step by step, first, to make sure he still understood that he had all his rights.

….

Q.     Describe to us the procedure that you used when you went over this rights form with the defendant back on January 19th of last year.

A.     I presented the defendant with the form.  As he held it and looked at it, I read it over verbally with him to make sure that he understood.  It's in two parts, the first part is the Miranda rights and the second part is the waiver.

What we do is we initially go over the Miranda rights for [sic], which states he has the right to remain silent. You have the right to an attorney. He doesn't have to answer questions without an attorney being present. We get them to initial that first, or sign that first, saying that they understand they have those rights and that they're in place.

So the defendant acknowledged that he understood them, he signed it and then we went over the waiver of rights, which is, basically, by signing the waiver means that you're aware that you have all these rights in place but that you decide at that point to waive them to answer or make a statement relative to whatever investigation is going on.

As soon as we went over the waiver of rights part, he said he understood it. He signed his name and said that he wished to make a statement.[22]

In summary, the record in this case indicates that petitioner was advised of his rights during his arrest on January 17, 2012, and that all questioning immediately ceased once he invoked his right to counsel. The state's evidence further reflects that two days later, petitioner, *with no prompting from law enforcement officers,* advised Ocull that he wished to make a statement at that time. Lastly, the state's evidence shows that petitioner was then fully advised of his rights once again, orally stated that he wished to waive those rights, and memorialized that decision by signing a waiver form.

Because petitioner has provided no clear and convincing evidence to rebut the foregoing evidence and the state court's factual findings, there is simply no basis for this Court to conclude that the state court acted unreasonably in finding that that petitioner's rights were "scrupulously honored" and that he validly waived his rights when making the statement to Ocull. Accordingly, there likewise is no basis for this Court to conclude that the state court decision denying petitioner's claim was contrary to or an unreasonable application of clearly established federal law.

---

[22] State Rec., Vol. 4 of 10, transcript of November 21, 2013, pp. 725-27.

Lastly, as for petitioner's contention that he was "coerced" into making a statement, he has not alleged any specific facts regarding the purported coercion, much less produced any evidence that it occurred. Such conclusory allegations are insufficient to meet a petitioner's burden of proof. See, e.g., Uresti v. Lynaugh, 821 F.2d 1099,1103 (5th Cir. 1987) ("[Petitioner] contends that the police officers beat a confession out of him. However, he has not advanced any evidence to support this allegation. A habeas petitioner has the burden of proving facts which would lead the court to conclude that the confession was not voluntary. This unsupported conclusional allegation, therefore, does not warrant habeas relief." (citation omitted)); Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value. We are thus bound to re-emphasize that mere conclusory allegations do not raise a constitutional issue in a habeas proceeding." (citation and footnote omitted)). Considering the lack of facts and evidence concerning the claim of coercion, this Court again has no basis for concluding that the state court's rejection of that claim was contrary to or an unreasonable application of clearly established federal law.

For these reasons, the AEDPA mandates that this Court defer to the state court decision and deny these claims challenging the voluntariness of petitioner's statement.

## C.  Excessive Bail

Petitioner next claims that an excessive bail was set in this case, and that his initial bail was significantly increased without notice or cause. He claims that the excessiveness of the bail

hindered his ability "to adequately prepare his defense and obtain suitable representation of choice."[23]

In the post-conviction proceedings, the state district court denied that claim, stating:

Petitioner alleges that his pre-trial bond was excessive, thereby preventing him from preparing his defense or securing counsel of his choice. A defendant does not have a right to be released on bond in order to better investigate his case.

A similar issue was addressed in State v. Nance, 315 So. 2d 695, 698 (La. 1975). Nance, a North Dakota resident, was charged with armed robbery which carried the potential of a ninety-nine year sentence. He was apprehended shortly after the offense, wearing clothing matching that worn by the robber, with money taken in the robbery.

Nance's bail had been reduced significantly but counsel urged that it was still too high. Citing C.Cr.P. Art. 317 the reviewing court found abuse of discretion on the part of the trial judge in denying the further reduction based on the seriousness of the offense and the weight of the evidence.

Eaglin's initial bond was set by the Commissioner at $100,000 and increased to $500,000 in August, 2013. The subject record is not clear why the increase was requested. However, the record of the predicate listed on the Habitual Offender Bill of Information arising out of this Parish (docket # 443438) evidences that Defendant's probation on that case was revoked and on February 16, 2012, Defendant was ordered to serve the sentence originally imposed [FN3]. Therefore, regardless of the amount of the bond on the subject offense, Eaglin could not have bonded out until he finished serving that sentence. His inability to prepare his defense during that time frame, if that was in fact the case, had nothing to do with the amount of the bond in the subject case.

[FN 3] Defendant had been charged with Theft of Identity, R.S. 14:67.16 (count One) and Theft of between $300 and $500, R.S. 14:67 (Count Two) occurring during October, 2007. He was sentenced to five years suspended on Count One, and two years suspended on Count Two, with probation of five years on both Counts. The probation fees were ordered to be served concurrently but the fines to run consecutively.

Petitioner mentions that he was not transported for a hearing on an Application for Reduction of Bond filed on his behalf. The subject record demonstrates that during his incarceration on his revoked probation, Eaglin was housed in a Department of Corrections facility outside of the Parish. Transportation at that time would have been costly and futile.

Petitioner states that he "completed his term of imprisonment on August 24, 2013" and was transferred back to St. Tammany Parish jail. Once he had served

---

[23] Rec. Doc. 1-1, p. 45.

his sentence on that prior offense, he might have been able to post bond and be released. However, prior to his return to Parish jail, the court ordered Eaglin's bond increased [FN4]. If convicted, defendant faced a possible adjudication as a habitual offender with a sentence over and above the maximum of forty years provided for the charged offense.

> [FN 4] The motion does not contain a Motion to increase the bond. All that exists in the record demonstrative of that action is a "Jail Slip" noting the new bond amount.

Forcible Rape [FN 5] was a crime of violence under R.S. 14:2(B) as well as a sex offense under R.S. 15:535 et seq. C.Cr.P. Art. 334 sets forth the factors to be considered in determining the amount of bail which include the seriousness of the offense, the weight of the evidence against the defendant, and the nature and seriousness of the danger to any other person in the community that would be posed by the defendant's release.[FN 6] Given these factors and the ease with which Defendant perpetrated the charged offense, a substantial bond was justified.

> [FN 5] R.S. 14:42.1 Forcible Rape has since been replaced by R.S. 14:42.1 Second Degree Rape.

> [FN 6] C.Cr.P. Art. 330 prohibits the setting of bond prior to trial for persons charged with crimes of violence.

Petitioner also alleges that the "excessive bond" prevented him from obtaining "suitable representation of choice." Once again, this argument fails. He could have retained counsel regardless of whether or not he could bond out. Many incarcerated individuals have counsel of their own choosing. That could have been accomplished with a phone call.

Eaglin did not post bond. If his argument is based on the financial burden of posting bond alone, the fact that he did not use that money for bond premium would leave those funds for payment of counsel.

Lastly, Petitioner makes a statement that the average bail amount for the past 10 years for "this particular charge" was $40,000 [FN7]. He offers no authority for that statement and the seriousness of forcible rape of a thirteen year old would suggest that the statement is not true. This claim is denied.

> [FN 7] The court is unaware of any source or process by which Defendant could have obtained this information, if in fact he attempted to do so. Given Defendant's meticulous efforts to provide evidence by way of Exhibits to this Application, the lack of any reference here suggests that no such investigation was done.[24]

---

[24] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, pp. 5-8.

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[25]  The Louisiana Supreme Court thereafter likewise denied the claim, holding that "the applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[26]

Because this claim was denied on the merits in state court, petitioner can be granted federal habeas corpus relief only by showing that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  He cannot make that showing with respect to this claim for two reasons.

First, the United States Supreme Court has never held that bail in the amount of $100,000 or $500,000 would be excessive under a set of facts that are materially indistinguishable from those in the instant case.  See Tarver v. Banks, No. 4:10CV159, 2011 WL 3921618, at *13 (N.D. Miss. Sept. 7, 2011) ("The United States Supreme Court has never clearly established what constitutes 'excessive bail' so as to render an [sic] certain amount unconstitutional."), aff'd, 541 F. App'x 434 (5th Cir. 2013).

Second, even more importantly, the Supreme Court has never held that a conviction is rendered invalid merely because a petitioner's ability to prepare his defense and obtain representation of his choice was hindered by the imposition of an excessive pretrial bail.  Cf. State of Texas v. Whittington, 391 F.2d 905, 907 (5th Cir. 1968) ("It has consistently been held that

---

[25] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.
[26] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

even in situations where a proper motion for reduction of bail was presented to the trial court a refusal to lower bail or to release on personal recognizance is not a denial of due process.").

Because there is no clearly established federal law on those issues, this claim necessarily fails. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (quotation marks and brackets omitted)).

### D.  Ineffective Assistance of Counsel

Petitioner next claims that he received ineffective assistance of counsel.  In the post-conviction proceedings, the state district court denied the multifaceted claim, holding:

> Petitioner's fourth claim is one of ineffectiveness of counsel.  The Supreme Court in Strickland v. Washington 466 U.S. 668, 104 S Ct. 2052, 80 L Ed. 2d 674 (1984) set forth the standard for analysis of an ineffectiveness of counsel claim as follows:
>
> > A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable…
> >
> > Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of

counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-
134, 102 S.Ct. 1558, 1574-1575, 71 L.Ed.2d 783 (1982). A fair
assessment of attorney performance requires that every effort be
made to eliminate the distorting effects of hindsight, to reconstruct
the circumstances of counsel's challenged conduct, and to evaluate
the conduct from counsel's perspective at the time. Because of the
difficulties inherent in making the evaluation, a court must indulge
a strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance; that is, the defendant
must overcome the presumption that, under the circumstances, the
challenged action "might be considered sound trial strategy." See
Michel v. Louisiana, supra, 350 U.S., at 101, 76 S.Ct., at 164. There
are countless ways to provide effective assistance in any given case.
Even the best criminal defense attorneys would not defend a
particular client in the same way. See Goodpaster, The Trial for
Life: Effective Assistance of Counsel in Death Penalty Cases, 58
N.Y.U.L.Rev. 299, 343 (1983)…

An error by counsel, even if professionally unreasonable, does not
warrant setting aside the judgment of a criminal proceeding if the
error had no effect on the judgment. Cf. United States v. Morrison,
449 U.S. 361, 364-365, 101 S.Ct. 665, 667-668, 66 L.Ed.2d 564
(1981). The purpose of the Sixth Amendment guarantee of counsel
is to ensure that a defendant has the assistance necessary to justify
reliance on the outcome of the proceeding. Accordingly, any
deficiencies in counsel's performance must be prejudicial to the
defense in order to constitute ineffective assistance under the
Constitution.

In so far as Petitioner's claim that his attorney should have investigated the
details of New Orleans Police Officer Greg Powell's initial report, all of those
details were brought out at trial either through other officers or other witnesses.
Defendant places great significance on the circumstances surrounding the
Preliminary Examination. The purpose of a Preliminary Examination is only to
determine whether probable cause exists to believe that the defendant has
committed a crime. State v. Maxwell, 97-1927 (La. App. 4 Cir. 9/15/97), 699 So.
2d 512, 514, Louisiana Constitution Art. 1 § 14:35. It is, by definition, only a
preliminary matter and not a substitute for a trial. The standard of proof is less than
at trial and even if no probable cause is found, the result would not be dismissal of
the charges, but rather only release of the bond obligation.
Petitioner faults counsel for not having "any preparation in place to
adequately and sufficiently represent Petitioner during the Preliminary
Examination." He claims "no witnesses were summoned on Petitioner's behalf."
In the case at bar, days after his arrest, Eaglin admitted to having sex with the

thirteen year old victim.  Even assuming the sex was consensual, criminal culpability attached to those facts.  That is, Eaglin admitted to there being probable cause for his arrest, if only for a different charge.  Since C.Cr.P. Art. 294 et seq provides that the testimony taken at a Preliminary Examination is admissible at trial, counsel certainly would have advised him not to testify.

Eaglin told the police that his thirteen year old son, Trevon was in his room at the time of the events giving rise to the charges and heard nothing.  The police spoke with Trevon and noted that interview on one of their reports.  That report was provided to Eaglin's attorney by the State.  Trevon did not testify at trial.

Once again, Petitioner admitted all of the following to police:  he had made previous arrangements for a girl to come to his home; at the time of the arranged meeting, his wife was at work; the girl represented herself to be nineteen, or thirteen years his junior; in establishing the communication, he had represented that he was only five years older than the victim had claimed; when the girl arrived, she was clearly much younger than what she had represented; and, despite all of those morally questionable factors, and the victim's apparent age, he had adulterous sexual intercourse with the victim in his bed.

Petitioner suggests that counsel should have called his son who would have testified that he was home the entire time and heard nothing.  "Courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential.  Rose v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000).  For many reasons, counsel's decision not to call Trevon at trial was not unreasonable.

At this stage of the proceedings, Petitioner cannot simply rely on unsupported statements.  It is his burden to establish his claims and that burden is great.  To his credit, Petitioner has prepared a very lengthy, comprehensive and meticulously referenced brief in support of his Application.  Most notably, however, despite all of the other exhibits attached in the form of investigation reports, minute entries, medical records, dictionary definitions, news articles and lists, his claimed "proof" in the form of an affidavit from his son is not attached to the Application, nor is it referenced by Exhibit, as were all of Eaglin's other items of "evidence."

In terms of the prejudice prong, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  466 U.S. at 694, 104 S. Ct. 2068.  "The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong."  Ransom V. Johnson 126 F.3d 716, 721 (5th Cir 1997) cert. denied 522 U.S. 944, 118 S. Ct. 361, 139 L. Ed. 281 (1997).

Petitioner argues that traffic cameras would have verified that he was "not anywhere near the convenience store, nor the intersection of which it is located." He has not offered any evidence of that assertion.  Again, Eaglin admitted that he drove the victim to a convenience store in New Orleans East.  In his Application he

32

has not identified a specific location.  Even if he did, and cameras do not show him to be at there, that negative result would not establish that he was not there, or at another convenience store in the area and perhaps one that did not have surveillance cameras.  "A defendant who asserts a claim of ineffective counsel based on a failure to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome a trial.  General statements and conclusory charges will not suffice."  State v. Casteneda, 94-1118 (La. App. 1st Cir. 6/23/95), 658 So 2d 297, 306.  Proving a negative is close to impossible and here, Eaglin has not succeeded.

Eaglin also asserts without support that the various attorneys assigned to represent him from the Public Defender's Office failed to "communicate with their successor."  If this is in fact true, it fails to recognize that all of the discovery pertaining to the case including the Police reports, video tape of Eaglin's interview with Detective Ocull, Childrens Advocacy Center tape, DNA evidence, as well as counsels' notes would have remained in the file for new counsel to review.

This claim lacks merit and is denied.[27]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[28]  The Louisiana Supreme Court thereafter likewise denied the claim, holding:  "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[29]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States

---

[27] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, pp. 8-12.

[28] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.

[29] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an

ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the
> Strickland standard was unreasonable.  This is different from asking whether
> defense counsel's performance fell below Strickland's standard.  Were that the
> inquiry, the analysis would be no different than if, for example, this Court were
> adjudicating a Strickland claim on direct review of a criminal conviction in a United
> States district court.  Under AEDPA, though, it is a necessary premise that the two
> questions are different.  For purposes of § 2254(d)(1), an unreasonable application
> of federal law is different from an incorrect application of federal law.  A state court
> must be granted a deference and latitude that are not in operation when the case
> involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal
> habeas relief so long as fairminded jurists could disagree on the correctness of the
> state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140,
> 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a
> rule application was unreasonable requires considering the rule's specificity.  The
> more general the rule, the more leeway courts have in reaching outcomes in case-
> by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly
> established Federal law for a state court to decline to apply a specific legal rule that
> has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S.
> ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation
> marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-
> assistance claim can function as a way to escape rules of waiver and forfeiture and
> raise issues not presented at trial, and so the Strickland standard must be applied
> with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the
> very adversary process the right to counsel is meant to serve.  Even under *de novo*
> review, the standard for judging counsel's representation is a most deferential one.
> Unlike a later reviewing court, the attorney observed the relevant proceedings,
> knew of materials outside the record, and interacted with the client, with opposing
> counsel, and with the judge.  It is all too tempting to second-guess counsel's
> assistance after conviction or adverse sentence.  The question is whether an
> attorney's representation amounted to incompetence under prevailing professional
> norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable
> under § 2254(d) is all the more difficult.  *The standards created by Strickland and*

34

> § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. at 105 (emphasis added; citations omitted). Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claim.

As the state courts correctly held, the clearly established federal law with respect to ineffective assistance of counsel claims was set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). For relief to be granted on such a claim, Strickland requires that a petitioner show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Id. at 697. The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.

See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must

demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

Applying both the Strickland analysis and the AEDPA's deferential standards of review, the Court will address each of petitioner's various contentions.

### 1.  Multiple Public Defenders/Ineffective Assistance at Preliminary Examination

In his federal application, petitioner first alleges that he was assigned five different public defenders over a period of twenty-two months.  He contends that the frequent change of attorneys resulted in him receiving effective assistance of counsel.[30]

It is hardly a secret that "there is a high turnover rate in most public defender offices." Heather Baxter, Gideon's Ghost:  Providing the Sixth Amendment Right to Counsel in Times of Budgetary Crisis, 2010 Mich. St. L. Rev. 341, 351 (2010).  Therefore, although consistency in representation is optimal, it is not always possible – and, most importantly, it is not constitutionally required, a fact which petitioner candidly acknowledges.[31]  Rather, as is appropriate, this aspect of petitioner's claim is based on the attorneys' performance, not merely their number.  Specifically, petitioner argues that their performance fell short of the mark because each successive attorney failed to communicate adequately with his or her predecessor when assuming responsibility for the case.[32]  However, that argument fails in three respects.

---

[30] Rec. Doc. 1-1, p. 54.
[31] See id. ("[T]he fact that Petitioner was assigned said total of Public Defenders is not a violation of any State or United State [sic] Constitutional Rights ….").
[32] Id.

First, it is apparently based entirely on petitioner's own suppositions, in that he has failed to provide any evidence establishing that there was in fact an inadequate level of communication among the various attorneys.

Second, as the state district court correctly noted, petitioner's argument fails to consider that there are the other ways in which each attorney could learn about the case, including review of the case file and court records.

Third, petitioner's argument focuses of the lack of counsel's preparation for the *preliminary examination*.[33]  However, even if counsel's performance was deficient in that respect, it cannot reasonably be argued that <u>Strickland</u> "prejudice" resulted.  As previously noted, "prejudice" in the <u>Strickland</u> context has a specific meaning and requires that a petitioner "show that there is a reasonable probability that, but for counsel's unprofessional errors, *the result of the proceeding would have been different*."  <u>Strickland</u>, 466 U.S. at 694 (emphasis added).  However, as the state district court correctly noted in denying petitioner's claim, a preliminary examination is just that – *preliminary* – and its focus is merely on the existence of probable cause, not on the defendant's ultimate guilt or innocence.  <u>See</u> <u>State v. Holmes</u>, 388 So.2d 722, 724 (La. 1980) ("[T]he primary function of the preliminary exam is to ensure that probable cause exists to hold the accused in custody.").  Moreover, a finding of no probable cause results only in a defendant's release from custody or bail; it "is not a judicial dismissal of the case and the State may still proceed against the defendant."  <u>State v. Lewis</u>, 28 So. 3d 548, 552 (La. App. 4th Cir. 2009).  Therefore, any suggestion that, but for counsel's purported deficient performance at the preliminary examination, petitioner *would not have been convicted at trial* is simply too speculative to succeed.

---

[33] <u>Id.</u> at pp. 54-55.

## 2. Inadequate Pretrial Investigation

Petitioner next alleges that his trial counsel was ineffective for failing to perform an adequate pretrial investigation.  Specifically, he contends that counsel failed to (1) obtain photographic or video evidence from traffic, convenience store, and hotel cameras to prove that petitioner did not drive the victim to New Orleans East as she testified and (2) interview the victim's sister.[34]

As a preliminary matter, the Court notes that petitioner's contentions are again apparently based on nothing more than mere suppositions, because he has presented no actual evidence as to what investigative steps counsel took or failed to take.  Without such evidence, he cannot show that counsel performed deficiently.  Netter v. Cain, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016).

Moreover, in any event, even if petitioner had made that showing, he would then additionally have to prove that prejudice resulted from the inadequate investigation.  To make that showing, he must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense.  See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).  Here, petitioner has not submitted any evidence whatsoever to establish that photographic or video evidence from traffic, convenience store, and hotel cameras would show that his car was not at the places the victim alleged.  He likewise has not provided any evidence

---

[34] Id. at pp. 56-57.

that the victim's sister, if interviewed by defense counsel, would have provided any information that exculpated petitioner or could have been used to impeach the victim. In the absence of such evidence, petitioner's contentions are wholly speculative and therefore insufficient to meet his burden of proof.

### 3.  Failure to Call Witnesses

Petitioner next contends that his trial counsel was ineffective for failing to call petitioner's son, the victim's sister, Detective Greg Powell, and the cabdriver who took the victim to petitioner's house to testify at trial.[35]  That contention fails because he has not provided the evidence required to support it. As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added; citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

---

[35] Id. at pp. 55-57; Rec. Doc. 1-2, p. 38.

As to the victim's sister, Detective Greg Powell, and the cabdriver, petitioner presented no evidence whatsoever, such as affidavits from the uncalled witnesses, demonstrating that they were available to testify at the trial and would in fact have testified in a manner beneficial to the defense. Therefore, he obviously failed to meet his burden of proof with respect to this claim as to those proposed witnesses.  See, e.g., Cox v. Stephens, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Petitioner likewise did not submit an affidavit from his son with the original post-conviction application, a fact which was expressly noted by the state district court in denying relief.[36]  However, in an attempt to remedy that defect, petitioner then later procured such an affidavit from his son.  In that affidavit, the son states:

---

[36] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, p. 11.

I, Trevon Eaglin, was present within the residence located at 1326 Hickory Street, in Slidell, Louisiana 70460, on the date and during the time of the alleged [sic] incident, which was said to have happened on the 16th day of January 2012.

I was asleep in my room, which is located approximately four (4) or five (5) yards from my father's room.  During the time of the alleged [sic] incident, I did not hear any noises being made that would have indicated that anyone was in any type of danger or harm.[37]

Nevertheless, even if that affidavit is considered, petitioner's claim still fails for the following reasons.

As an initial matter, it must be noted that Trevon's affidavit in deficient because he does not expressly state therein that he was available to testify at trial and would have done so if called. Such statements are required.  See Vasquez v. Thaler, 505 F. App'x 319, 327 (5th Cir. 2013); Gray v. Epps, 616 F.3d 436, 443-44 (5th Cir. 2010); Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (observing that the requirement that an uncalled witness state that he was available to testify at trial and would have done so "is not a matter of mere formalism"); Day v. Quarterman, 566 F.3d 527, 538-39 (5th Cir. 2009).

Further, in any event, counsel would not be ineffective for failing to call Trevon to testify in conformity with the affidavit for two reasons.

First, as a close relative of petitioner, it is highly likely that the jury would have considered him an inherently suspect witness and would have possibly discounted his testimony on that basis alone.  See, e.g., Ball v. United States, 271 F. App'x 880, 884 (11th Cir. 2008) (Petitioner's wife, brothers, and cousin "were all close family members with a strong motive to fabricate an alibi defense for him.  As such, their testimony would not have been particularly compelling and would have been subjected to vigorous impeachment.  If trial counsel had called these alibi witnesses and

---

[37] Rec. Doc. 1-2, p. 40, affidavit of Trevon Eaglin dated June 30, 2017.

the jury had disbelieved them, the jury also could have inferred that [petitioner] was in fact the [perpetrator].”); Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009) (noting that petitioner's “grandmother's testimony would have been of limited value because her close familial relationship to the petitioner would have made her testimony inherently suspect”), aff'd, 444 F. App'x 835 (5th Cir. 2011); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *15 (E.D. La. June 6, 2008) (noting that petitioner's girlfriend would be an inherently suspect alibi witness), aff'd, 370 F. App'x 531 (5th Cir. 2008); Talley v. Cain, Civ. Action No. 08-3542, 2009 WL 916331, at * 11 (E.D. La. Apr. 6, 2009) (noting that alibi testimony from the petitioner's mother would have been inherently suspect); United States *ex rel.* Emerson v. Gramley, 902 F. Supp. 143, 147 (N.D. Ill. 1995) (noting that petitioner's mother was an “interested witness” and, therefore, “would not have provided persuasive evidence of an alibi”), aff'd, 91 F.3d 898 (7th Cir. 1996).

Second, even if the jurors were willing to overlook the familial relationship, Trevon's testimony would have proved little or nothing.  Although he states that he did not hear anything, he expressly noted that he was *asleep*.  It can hardly be said that there is a reasonable probability that the result of this proceeding would have been different if only Trevon had testified that he was unaware of a crime that allegedly occurred while he was asleep.

### 4.  Failure to Introduce Medical Records

Petitioner next contends that his trial counsel was ineffective for failing to introduce petitioner's medical records at trial.  He opines that those records, which would have shown that he suffers from “retinal detachment and glaucoma caused by diabetic retinopathy” and lacks sensation in his feet, “may have created doubt to the jury regarding the alleged victims [sic] trial

testimony stating that Petitioner had driven a vehicle over forty (40) miles upon a highway in that physical condition."[38]  With respect to this contention, the Court finds that it was not unreasonable for the state court to deny this aspect of petitioner's claim.

As a preliminary matter, it is doubtful that counsel's choice not to introduce the medical records constituted deficient performance because whether petitioner was physically able to drive was largely immaterial.  The critical question before the jury was not whether he drove victim anywhere, it was whether he forced her to have sexual relations with him.  Therefore, a decision not to proceed down this particular rabbit hole was not strategically unreasonable, *especially in that petitioner confessed that he drove the victim back after their encounter at his home*.[39]

Nevertheless, even if counsel did perform deficiently in this respect, petitioner has not proven that prejudice resulted.  Apparently, the only value of this evidence would be to contradict the victim's testimony that petitioner drove her to New Orleans East.  Petitioner seems to suggest that if only counsel had proven that the victim was untruthful on that tangential issue, then there is a reasonable probability the jurors would have found her testimony regarding the critical facts similarly lacking in credibility and therefore refuse to find him guilty.  That seems quite a stretch, especially given that much of the victim's testimony is essentially undisputed – including the far more relevant testimony that she and petitioner had sexual relations, an act to which petitioner himself even confessed.  Any suggestion that the jurors would have discredited the critical portions of the victim's testimony if only she had been impeached on this largely irrelevant point is pure speculation, and, as such, is insufficient to meet petitioner's burden of proof.

---

[38] Rec. Doc. 1-1, p. 58.
[39] See, e.g., State Rec., Vol. 3 of 10, transcript of November 20, 2013, pp. 33-34.

### 5.  Failure to Challenge Jury Composition

Petitioner next contends that "defense counsel failed to defend Petitioner from being tried from a completely Caucasian jury.  Petitioner argues that, theoretically, this factor favored the prosecution in obtaining a guilty verdict."[40]

In support of this claim, petitioner cites Batson v. Kentucky, 476 U.S. 79 (1986); however, that citation is inapposite.  Batson did hold that a petit jury composed of jurors of a single race are unconstitutional – it merely held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  Id. at 89.  Petitioner does not allege, much less show, that the prosecutor challenged any jurors on account of their race or that any discriminatory practice was employed during the selection process. Because petitioner has not shown that there was a basis for a Batson challenge, and because all-Caucasian juries are not unconstitutional absent a discriminatory selection process, he has not met his burden to show that such a challenge had potential merit.  Therefore, this claim fails, because "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."  Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994).  See also Stogner v. Cain, Civ. Action No. 12-2703, 2013 WL 2444667, at *19 (E.D. La. June 4, 2013) ("[Petitioner] presented no evidence whatsoever, much less a preponderance of such evidence, to show … that there was any basis for a Batson challenge.  Without such evidence, he simply cannot show that his counsel was ineffective for failing … to lodge a Batson challenge.").

---

[40] Rec. Doc. 1-1, p. 53.

## 6.  Errors in Appellate Brief

Lastly, petitioner contends that appellate counsel was "ineffective in her representation by lack of attention and detail regarding the case," alleging that her brief was riddled with typographical errors, factual inaccuracies, and factual assertions not based on the evidence presented at trial.[41]  He opines:  "The incorrect information listed throughout the brief written by Appellate Counsel, as a collective, presents a hint of guilt on Petitioner.  In contrast to the trial transcripts, Petitioner argues that should the actual true facts been presented to the Court of Appeals, the Courts decision may have been more favorable to Petitioner."[42]

Even if the Court assumes for the purposes of this decision that the brief constituted deficient performance, petitioner has not met his burden to prove that any prejudice resulted.  He has not linked any of the errors – which concerned tangential and arguably inconsequential matters – to any resulting defects in the court of appeal's decision or the resolution of his claims.  Absent such linkage, there is simply no basis for this Court to conclude that there is a reasonable probability that the appellate court would have vacated or reversed the trial court judgment if only the errors in the brief had not been committed.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Because he has not made that showing in the instant case with respect to any aspect of

---

[41] Id. at pp. 53 and 59-60.
[42] Id. at p. 53.

46

petitioner's claim, the AEDPA's doubly deferential standards of review require this federal court to deny relief.

### E.  Perjured Testimony

Petitioner also claims that the prosecution used perjured testimony to obtain the conviction. In the post-conviction proceedings, the state district court denied that claim, holding:

> Petitioner claims that the State used perjured testimony of Detectives Ocull and Hotard in order to obtain a conviction.  He argues that both detectives answered "No" when asked whether Petitioner ever asked for an attorney.  This issue as to Detective Ocull was previously addressed in Claims One and Two.  As to Detective Hotard's testimony, Petitioner invoked his right to counsel during the initial investigation and all discussions ceased at that time.  Petitioner did not "ask" for an attorney but declared that he would not talk to the officer without counsel being present.  Therefore, Hotard's testimony and Petitioner's reference to it can be reconciled without there being any basis for this claim.
> This claim has no merit and is denied.[43]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[44]  The Louisiana Supreme Court thereafter likewise denied the claim, holding that "the applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[45]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact.  <u>Harvey v. Cain</u>, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013).  Therefore, to obtain federal relief, petitioner must show that the state court's decision denying his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

---

[43] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, p. 12.
[44] <u>State v. Eaglin</u>, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.
[45] <u>State v. Eaglin</u>, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

U.S.C. § 2254(d)(1).  For the following reasons, it is clear that he has not made that showing in this case.

It is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996).  However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was *actually false*, (2) the prosecutor *knew* it was false, and (3) the testimony was *material*.  Duncan v. Cockrell, 70 F. App'x 741, 744 (5th Cir. 2003).  "Evidence is 'false' if, *inter alia,* it is specific misleading evidence important to the prosecution's case in chief.  False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict."  Id.

In its response in this proceeding, the state, contrary to the state district court's finding, concedes that Detective Hotard's testimony was inaccurate.[46]  However, the state notes that defense counsel, having been provided with "open file" discovery,[47] was obviously aware that Hotard's testimony was contrary to the information contained in his police report.  Because defense counsel then took no action when Hotard testified contrary to that report, the state argues that relief is unwarranted.  That is correct.  "[T]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object."

---

[46] Rec. Doc. 11, p. 29 ("The testimony of Detective Hotard – that the petitioner did not 'at any time' request the services of an attorney or say that he didn't wish to speak to Detective Hotard any more (S.C.R., Vol. 3, pp. 552) – is, as the petitioner alleges based upon Detective Hotard's police report – incorrect.").

[47] State Rec., Vol. 1 of 10, State's Answer to Motions for Discovery and Inspections, p. 1 ("The State is providing 'open file' discovery.  All evidence … and current and future file contents (excluding internal state documents as described in C.Cr.P. Art. 723) are available for inspection by appointment upon request."); State Rec., Vol. 2 of 10, transcript of November 18, 2013, p. 41 (defense counsel states that the defense had been provided "open file" discovery).

Beltran v. Cockrell, 294 F.3d 730, 736 (5th Cir. 2002) (quotation marks omitted); accord Dinh Tan

Ho v. Thaler, 495 F. App'x 488, 494-95 (5th Cir. 2012); United States v. Bujilici, Crim. Action

No. 12-00231-01, 2014 WL 2112858, at *7 (W.D. La. May 19, 2014).

As to Ocull's testimony, the state argues that petitioner's claim fails because that testimony

simply was not false.  That is also correct.  Contrary to petitioner's allegation, Ocull did not testify

at trial that petitioner never asked *anyone* for an attorney.  He was not asked *that* question at trial;

rather, he was asked, "Did he ever inquire of *you* about having access to an attorney or anything

that could be interpreted as such?"[48]  Ocull answered, "No, he didn't."[49]  Because petitioner has

not established that he asked *Ocull* about obtaining access to an attorney, there is no basis for this

Court to find that this this testimony was false.

## F.  District Attorney

Petitioner next claims that "[t]he integrity and morality of the charged crime is challenged

due to the creditability of the Saint Tammany Parish District Attorney."[50]  Noting that the charge

in his case was brought by Walter P. Reed, the disgraced former district attorney subsequently

convicted of unrelated crimes in federal court,[51] petitioner argues that his own conviction should

therefore be set aside.  He opines:

> [T]he idea of allowing an individual whom was under investigation by law
> enforcement agencies for a substantial period of time, which subsequently led to
> multiple felony convictions, to sit in for the Parish of Saint Tammany as the

---

[48] State Rec., Vol. 4 of 10, transcript of November 21, 2013, p. 729 (emphasis added).
[49] Id.
[50] Rec. Doc. 1-2, p. 10.
[51] "Walter Reed served as District Attorney for Louisiana's 22nd Judicial District from 1985 to 2015.  Federal prosecutors charged him and his son, Steven Reed, with conspiracy to commit wire fraud and money laundering and substantive counts of both wire fraud and money laundering.  Walter Reed also drew additional counts of wire fraud, false statements on income tax returns, and mail fraud.  The jury convicted on all but one count …." United States v. Reed, 908 F.3d 102, 107 (5th Cir. 2018), cert. denied, 139 S. Ct. 2655 (2019), and 139 S. Ct. 2658 (2019).

undersigned head of the District Attorney's Office of the Twenty Second Judicial District of Louisiana is severely unethical.[52]

In the post-conviction proceedings, state district court found this claim to be meritless, noting that "Reed did not testify at Petitioner's trial, nor was he charged with any crimes related to Petitioner's case."[53] The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[54] The Louisiana Supreme Court thereafter likewise denied the claim, holding that "the applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[55]

Because this claim was denied on the merits in state court, petitioner can be granted federal habeas corpus relief only if he shows that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). However, petitioner has not cited, and this Court has not found, any decision of the United State Supreme Court holding that an individual's conviction is rendered invalid merely because the prosecution was brought by a prosecutor who was subsequently convicted of unrelated crimes. Therefore, this claim necessarily fails. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (quotation marks and brackets omitted)).

---

[52] Rec. Doc. 1-2, p. 11.
[53] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, p. 15.
[54] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.
[55] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

## G.  Actual Innocence

Petitioner's final claim is that he is actually innocent.  In the post-conviction proceedings, state district court found that this claim had "no merit."[56]  The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[57] The Louisiana Supreme Court thereafter likewise denied the claims, holding that "the applicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.P. art. 930.2."[58]

This claim can be summarily denied because "actual innocence" simply is not a recognized ground for granting federal habeas corpus relief.  As the United States Supreme Court noted nearly a century ago, a federal habeas court is concerned *solely* with the question of whether a petitioner's "constitutional rights have been preserved," *not* his underlying "innocence or guilt."  Moore v. Dempsey, 261 U.S. 86, 87-88 (1923); see also In re Swearingen, 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review.").

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal habeas corpus application filed by Keefer Lamar Eaglin be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

---

[56] State Rec., Vol. 7 of 10, Order and Reasons dated April 27, 2017, p. 15.

[57] State v. Eaglin, No. 2017 KW 1623, 2018 WL 1008440 (La. App. 1st Cir. Feb. 20, 2018); State Rec., Vol. 9 of 10.

[58] State v. Eaglin, 264 So. 3d 1202 (La. 2019); State Rec., Vol. 10 of 10.

the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[59]

New Orleans, Louisiana, this ___7th___ day of January, 2020.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[59] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

52